# EXHIBIT 3

Employment Tribunal

# Claim form

| Official Use Only | | | |
|---|---|---|---|
| Tribunal office | London Central | | |
| Case number | 6011625/2026 | Date received | 02-04-2026 |

**You must complete all questions marked with an '*'**

## 1 Your details

| 1.1 | Title | ☐ Mr  ☐ Mrs  ☐ Miss  ☐ Ms  ☐ Other _____ |
|---|---|---|
| 1.2* | First name (or names) | Michael |
| 1.3* | Surname or family name | Herzog |
| 1.4 | Date of birth | ☐☐ / ☐☐ / ☐☐☐☐ |
| 1.5 | Sex | ☑ Male  ☐ Female  ☐ Prefer not to say |
| 1.6* | Address | 2 Og, Weidstrasse 9b,<br>Zug,<br>Switzerland |
| | Postcode | Zug6300 |
| 1.7 | Phone number<br>Where we can contact you during the day | |
| 1.8 | Mobile number (if different) | |
| 1.9 | How would you prefer us to contact you?<br>(Please tick only one box) | ☐ Email  ☐ Post |
| 1.10 | Email address | |
| 1.11 | Would you be able to take part in hearings by video and phone? | ☑ Yes, I can take part in video hearings<br>☑ Yes, I can take part in phone hearings<br>☐ No, I cannot take part in either video or phone hearings.<br>Explain why you are unable to take part in video or phone hearings |

© Crown copyright 2024

**2** **Respondent's details** (that is the employer, person or organisation against whom you are making a claim)

**2.1*** Give the name of your employer or the person or organisation you are claiming against (If you need to you can add more respondents at 2.5)

Davidson Kempner European Partners, LLP

**2.2*** Address

1 New Burlington Place, 3rd Floor,
London,
United Kingdom

Postcode
W1S 2HR

**2.3*** Do you have an Acas early conciliation certificate number?

☑ Yes ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

R116383/26/35

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**2.4** If you worked at a different address from the one you have given at 2.2 please give the full address

Address

Postcode

**2.5** If there are other respondents please tick this box and put their names and addresses here. ✓

(If there is not enough room here for the names of all the additional respondents then you can add any others at Section 13.)

**Respondent 2**

Name

Davidson Kempner Solutions Cayman LP

Address

9 West 57th Street, 29th Floor,
New York,
United States

Postcode  NY10019

**2.6** Do you have an Acas early conciliation certificate number?

✓ Yes   ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

R116384/26/26

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**Respondent 3**

**2.7** Name

Anthony Yoseloff

Address

9 West 57th Street, 29th Floor,
New York,
United States

Postcode  NY10019

2.8 Do you have an Acas early conciliation certificate number?  ☑ Yes  ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.Acas.org.uk*

If Yes, please give the Acas early conciliation certificate number

R116386/26/08

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

## 3 Multiple cases

3.1 Are you aware that your claim is one of a number of claims against the same employer arising from the same, or similar, circumstances?  ☐ Yes  ☐ No

If Yes, and you know the names of any other claimants, add them here. This will allow us to link your claim to other related claims.

## 4 Cases where the respondent was not your employer

4.1 Did you work for the respondent you're making your claim against?  ☐ Yes. Go to section 5  ☐ No. Go to section 8

## 5 Employment details

If you are or were employed please give the following information, if possible.

5.1 When did your employment start?

Is your employment continuing?  ☐ Yes  ☐ No

If your employment has ended, when did it end?

If your employment has not ended, are you in a period of notice and, if so, when will that end?

5.2 Please say what job you do or did.

## 6 Earnings and benefits

**6.1** How many hours on average do, or did you work each week in the job this claim is about?

[ ] hours each week

**6.2** How much are, or were you paid?

Pay before tax £ [ ]   [ ] Weekly   [ ] Monthly   [ ] Annually

Normal take-home pay
(Incl. overtime, commission, bonuses etc.) £ [ ]   [ ] Weekly   [ ] Monthly   [ ] Annually

**6.3** If your employment has ended, did you work (or were you paid for) a period of notice?   [ ] Yes   [ ] No

If Yes, how many weeks, or months' notice did you work, or were you paid for?   [ ] weeks   [ ] months

**6.4** Were you in your employer's pension scheme?   [ ] Yes   [ ] No

If Yes, give your employers weekly contributions £ [ ]

**6.5** If you received any other benefits, e.g. company car, medical insurance, etc, from your employer, please give details.

[ ]

## 7 If your employment with the respondent has ended, what has happened since?

**7.1** Have you got another job?   [ ] Yes   [ ] No

If No, please **go to section 8**

**7.2** Please say when you started (or will start) work.

[ ]

**7.3** Please say how much you are now earning (or will earn).

£ [ ]   [ ] Weekly   [ ] Monthly   [ ] Annually

**8** **Type and details of claim**

8.1*    Please indicate the type of claim you are making by ticking one or more of the boxes below.

☐  I was unfairly dismissed (including constructive dismissal)

☐  I was discriminated against on the grounds of:

☐  age                               ☐  race (including colour, nationality, and ethnic or national origins)

☐  gender reassignment               ☐  disability

☐  pregnancy or maternity            ☐  marriage or civil partnership

☐  sexual orientation                ☐  sex (including equal pay)

☐  religion or belief

☑  I am making a whistleblowing claim including dismissal or any other unfair treatment after whistleblowing

☐  I am claiming a redundancy payment

☑  I am owed

☐  notice pay

☐  holiday pay

☐  arrears of pay

☑  other payments

☐  I am making another type of claim which the Employment Tribunal can deal with.
    (Please state the nature of the claim. Examples are provided in the Guidance.)

8.2* Please set out the background and details of your claim in the space below.

The details of your claim should include **the date(s) when the event(s) you are complaining about happened.** Please use the blank sheet at the end of the form if needed.

**Please see attached Grounds of Complaint.**

## 9 What do you want if your claim is successful?

9.1 Please tick the relevant box(es) to say what you want if your claim is successful:

☐ If claiming unfair dismissal, to get your old job back and compensation (reinstatement)

☐ If claiming unfair dismissal, to get another job with the same employer or associated employer and compensation (re-engagement)

☐ Compensation only

☐ If claiming discrimination, a recommendation (see Guidance).

9.2 What compensation or remedy are you seeking?

If you are claiming financial compensation please give as much detail as you can about how much you are claiming and how you have calculated this sum. (Please note any figure stated below will be viewed as helpful information but it will not restrict what you can claim and you will be permitted to revise the sum claimed later. See the Guidance for further information about how you can calculate compensation). If you are seeking any other remedy from the Tribunal which you have not already identified please also state this below.

**10**  **Information to regulators in protected disclosure cases**

10.1  If your claim consists of, or includes, a claim that you are making a protected disclosure under the Employment Rights Act 1996 (otherwise known as a 'whistleblowing' claim), please tick the box if you want a copy of this form, or information from it, to be forwarded on your behalf to a relevant regulator (known as a 'prescribed person' under the relevant legislation) by tribunal staff. (See Guidance). ☐

**Name of relevant regulator**

_____

**11**  **Your representative**

If someone has agreed to represent you, please fill in the following. We will in future only contact your representative and not you.

11.1  Name of representative

Employment Portal

11.2  Name of organisation

Mishcon de Reya LLP

11.3  Address

Africa House,
70 Kingsway,
London

Postcode  | W | C | 2 | B | 6 | A | H |

11.4  DX number (If known)

11.5  Phone number

11.6  Mobile number (If different)

11.7  Their reference for correspondence

11.8  Email address

employment.portal@mishcon.com

11.9  How would you prefer us to communicate with them? (Please tick only one box)   ☑ Email   ☐ Post

## 12 Disability

12.1 Do you have a physical, mental or learning disability or health condition that means you need support during your case?

☐ Yes    ☐ No

If Yes, it would help us if you could say what this disability is and tell us what assistance, if any, you will need as your claim progresses through the system, including for any hearings that maybe held at tribunal premises.

We call these reasonable adjustments. Reasonable adjustments can include:
-documents in alternative formats, colours and fonts
-help with communicating, sight, hearing, speaking and interpretation
-access and mobility support if a hearing takes place in person

## 13 Details of additional respondents

Section 2 allows you to list up to three respondents. If there are any more respondents please provide their details here

**Respondent 4**

Name

Address

Postcode

Do you have an Acas early conciliation certificate number?

☐ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**Respondent 5**

Name

Address

Postcode

Do you have an Acas early conciliation certificate number?

☐ Yes   ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

## 14 Additional information

You can provide additional information about your claim in this section.

If you're part of a group claim, give the Acas early conciliation certificate numbers for other people in your group. If they don't have numbers, tell us why.

**General Data Protection Regulations**

The Ministry of Justice and HM Courts and Tribunals Service processes personal information about you in the context of tribunal proceedings.

For details of the standards we follow when processing your data, please visit the following address https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter.

To receive a paper copy of this privacy notice, please call our Customer Contact Centre:

England and Wales: 0300 323 0196

Welsh speakers: 0300 303 5176

Scotland: 0300 790 6234

**Please note:** a copy of the claim form or response and other tribunal related correspondence may be copied to the other party and Acas for the purpose of tribunal proceedings or to reach settlement of the claim.

**Employment Tribunals check list**

Please check the following:

1. Read the form to make sure the information given is correct and truthful, and that you have not left out any information which you feel may be relevant to you or your client.
2. Do not attach a covering letter to your form. If you have any further relevant information please enter it in the 'Additional Information' space provided in the form.
3. Send the completed form to the relevant office address.
4. Keep a copy of your form posted to us.

If your claim has been submitted on-line or posted you should receive confirmation of receipt from the office dealing with your claim within five working days. If you have not heard from them within five days, please contact that office directly. If the deadline for submitting the claim is closer than five days you should check that it has been received before the time limit expires.

You have opted to print and post your form. We would like to remind you that forms submitted online are processed much faster than ones posted to us. If you want to submit your claim online please go to www.gov.uk/employment-tribunals/make-a-claim

A list of our office's contact details can be found at the hearing centre page of our website at – www.gov.uk/guidance/employment-tribunal-offices-and-venues; if you are still unsure about which office to contact please call our Employment Tribunal Customer Contact Centre (Mon – Fri, 9am – 5pm) they can also provide general procedural information about the Employment Tribunals.

**Customer Contact Centre:**

England and Wales: 0300 323 0196

Welsh speakers: 0300 303 5176

Scotland: 0300 790 6234

<u>IN THE EMPLOYMENT TRIBUNAL</u>

BETWEEN:

**MICHAEL HERZOG**

<u>Claimant</u>

- and -

**(1) DAVIDSON KEMPNER EUROPEAN PARTNERS, LLP**
**(Incorporated as a limited liability partnership in England & Wales)**
**(2) DAVIDSON KEMPNER SOLUTIONS CAYMAN LP**
**(Incorporated as an exempted liability partnership in Cayman Islands)**
**(3) MR ANTHONY YOSELOFF**

<u>Respondents</u>

---

**GROUNDS OF COMPLAINT**

---

**INTRODUCTION**

1.  The Claimant made a series of repeated protected disclosures between 2020 and 2024, the consistent theme of which was the inadequate corporate governance of the global investment management firm, Davidson Kempner (the "**Firm**"), headed by the Third Respondent, Mr Yoseloff. Over the course of several years, Mr Yoseloff was able to parlay his minority interest in the Firm to take effective control of it, ensuring that it operated like his personal fiefdom. The result of Mr Yoseloff's virtually uncontrolled power over the Firm was that it operated with a lack of transparency, an inadequate risk management strategy, and as though the Firm was an adjunct of Mr Yoseloff's family office rather than one of the largest hedge funds in the world, managing investments including those of pension funds, university endowments, and insurance companies. Many of these protected disclosures not only raised potential breaches of fiduciary duties by the Respondents, and various other partners, but also potential breaches of regulatory duties in the UK and USA.

1

2. The Claimant was subjected to unlawful detriments contrary to s. 47B(1) ERA 1996 on the ground that he made the protected disclosures. He also claims (and in the alternative) for unlawful deduction from wages by the First and Second Respondents contrary to s. 13 ERA 1996.

## THE PARTIES

3. The Claimant joined the Firm in 2001. The Firm comprises several entities including the First and Second Respondents. The Firm is headquartered in New York City, with additional offices in London, Hong Kong, Dublin, Philadelphia, Shenzhen and Mumbai. As of January 2026, the Firm has more than USD 37 billion in assets under management, over 500 employees across seven offices, and over 1600 investors globally.

4. The Firm's investors include the partners in the various limited liability partnerships that comprise the Firm themselves as well as large institutional investors such as pension funds, university endowments, insurance companies, and sovereign wealth funds. The Firm manages both evergreen and closed-end drawdown fund structures to accommodate different investor requirements and liquidity needs. The Firm employs a multi-strategy approach, investing globally across a variety of credit and equity strategies as well as real assets.

5. In the 24 years that he was at the Firm, the Claimant played a key role in building the Firm's global Merger Arbitrage business. He was also instrumental in building the Firm's London office and establishing the Firm in European markets.

6. Recognised as a leading market participant in the European M&A market, the Claimant was appointed to the Code Committee of the UK Panel on Takeovers and Mergers in 2016, and served for the maximum three terms until 2024.

7. Within the Firm, the Claimant was:

7.1. A limited partner of the First Respondent ("**DKEP**") from its incorporation, for which the Claimant was responsible, in 2004;

2

7.2. A limited partner of the Second Respondent ("**DK Solutions**") since its incorporation in 2022;

7.3. The Firm's Global Head of Merger Arbitrage and Global Head of Long/Short Equity, positions which he had held for almost ten years;

7.4. One of the largest capital holders in the partnership; and

7.5. A 'managing member partner' of the Firm, being a partner who had a net share in the general profit of the Firm.

8.   As a partner of DKEP and DK Solutions, the Claimant was a worker for each of those entities.

9.   The Claimant ceased being a partner and holding the above roles on 31 January 2025 (see further below at paragraph 104).

10.  The First Respondent, DKEP, is a London-based limited liability partnership, and part of the global investment management Firm. DKEP is an FCA-regulated entity (no. 401821). DKEP is governed by a partnership agreement, effective 1 July 2023 (see paragraphs 21-22 below).

11.  The Second Respondent, DK Solutions, is a Cayman-based exempted limited partnership that participates and invests in the insurance business.

12.  The Firm operates through multiple fund entities and operating companies globally. The Firm's main operating entity is Davidson Kempner Capital Management LP ("**DKCM**"). DKCM is a Registered Investment Advisor ("**RIA**") with the U.S. Securities and Exchange Commission and all Firm affiliates based in the USA operate on the basis of being registered. DKCM was the ultimate controlling party of DKEP.

13.  In addition to DKEP and DK Solutions, the principal fund entities include Davidson Kempner Partners ("**DKP**"), a New York limited partnership; Davidson Kempner Institutional Partners, L.P. ("**DKIP**"), a Delaware limited partnership; and Davidson Kempner International, Ltd. ("**DKIL**"), a British Virgin Islands business company.

3

DKCM acts as investment manager to these entities, as well as DKEP and DK Solutions, and is responsible for the voting and investment decisions.

14. The Third Respondent, Mr Yoseloff, is a managing member partner, the Managing Partner and Chief Investment Officer of the Firm. Mr Yoseloff was appointed in 2020 when the former Managing Partner and Chief Investment Officer of the Firm, Mr Tom Kempner, retired. Mr Yoseloff is referred to in partnership agreements as the "**Executive Managing Member**". As Executive Managing Member, Mr Yoseloff ultimately controls both DKEP and DK Solutions.

15. Mr Yoseloff is also identified on Companies House as a person with significant control over DKEP because he has the right to appoint or remove members, owns 75% or more of the voting rights, and has a 75% or more right to surplus assets.

16. Mr Yoseloff is also a partner of DK Solutions.

17. All of the managing member partners in DKCM, including Mr Yoseloff, at all material times owed and continue to owe fiduciary duties to DKCM and to the other general and limited partners under Delaware law, namely:

   17.1. A duty of loyalty, namely a duty to act in good faith and with a reasonable belief that what is done is in DKCM's best interests and while refraining from self-dealing.

   17.2. A duty of care, namely a duty that he act in good faith with the care that a reasonable person in a similar position and circumstances would exercise and in the best interests of DKCM and its stakeholders.

18. All of the managing member partners in DK Solutions, including Mr Yoseloff, at all material times owed and continue to owe the same duties to DK Solutions and to the other general and limited partners in DK Solutions under Delaware law.

19. In addition, each of the limited partners, of which Mr Yoseloff was one, agreed to devote all of his or her business time and attention and his or her best efforts exclusively to the business and interests of the Firm (including DKCM), under Clause 4.2 of the Eleventh

4

Amended and Restated Limited Partnership Agreement of DKCM, dated 1 July 2023, (the **"Eleventh DKCM Partnership Agreement"**) and, pending disclosure, it is assumed in the earlier version(s) of the agreement in force since 2020. Similar provisions were contained in the following provisions (and, pending disclosure, it is assumed in earlier versions of the provisions in force since 2020):

19.1.    Clause 4.1 of the Fifth Amended and Restated Limited Liability Company Operating Agreement of Davidson Kempner Long-Term Distressed Opportunities GP LLC, of which Mr Yoseloff was a limited partner;

19.2.    Clause 4.1 of the Second Amended and Restated Limited Liability Company Agreement of Davidson Kempner Holdings LLC, of which Mr Yoseloff was a managing partner;

19.3.    Clause 4.2 of the Third Amended and Restated Limited Partnership Agreement of M.H. Davidson & Co. 520 LP, of which Mr Yoseloff was a limited partner;

19.4.    Clause 4.2 of the Second Amended and Restated Exempted Limited Partnership Agreement of DK Solutions (the **"DK Solutions Partnership Agreement"**), of which Mr Yoseloff was a limited partner; and

19.5.    Clause 4.1 of the Second Amended and Restated Limited Liability Company Operating Agreement of Davidson Kempner Drawdown GP Topco LLC, of which Mr Yoseloff was a managing partner.

20. Furthermore, as Executive Managing Member, Mr Yoseloff was on the management committee (the **"Management Committee"**) of the Firm, together with the Claimant at all material times. As a result, Mr Yoseloff – together with the other members of the Management Committee – was responsible for acting for or on behalf of other DK entities that comprised the Firm in circumstances which gave rise to a relationship of trust and confidence and/or in circumstances which involved the assumption of responsibility by Mr Yoseloff in respect of the conduct and/or the affairs of DKEP. As a result, Mr Yoseloff at all material times owed and continues to owe fiduciary duties under English law to DKEP:

5

20.1.    A duty to act in good faith in the best interests of DKEP;

20.2.    A duty to exercise reasonable care, skill and diligence;

20.3.    A duty to avoid a conflict with DKEP and not to compete with DKEP.

**THE PARTNERSHIP AGREEMENTS**

21.    DKEP was governed by a 'partnership agreement' which was amended and restated on a number of occasions while the Claimant was an LLP partner. The most recent version is the Tenth Amended and Restated Limited Liability Partnership Agreement dated 22 February 2023 (the "**Tenth DKEP Partnership Agreement**"), which is supplemented by the Tenth Amended and Restated Agreement Supplementing the Tenth Amended and Restated Limited Liability Partnership Agreement of Davidson Kempner European Partners, LLP (the "**Tenth DKEP Supplemental Partnership Agreement**") effective as of 1 July 2023. The LLP Partners are listed in Schedule A of that agreement as the Claimant, Mr Jogeesvaran Krishanthan and Mr Zachary Gozali.

22.    The terms of the Tenth DKEP Supplemental Partnership Agreement provide, in material part, as follows:

22.1.    For so long as an LLP partner is a partner in DKEP, the LLP Partner shall be entitled to a profit distribution (the calculation of which is set out in the agreement) (Clause 4A). The LLP partner shall be required to contribute (i) all or a portion of his or her profit distribution and (ii) all or a portion of his or her allocable share of the profits of DK Solutions, as determined by DKCM, through its Executive Managing Member (i.e. Mr Yoseloff), to Davidson Kempner International (BVI), Ltd ("**DKIL**").

22.2.    An LLP partner may elect to become a retired partner, provided the partner has been a party to the Tenth DKEP Partnership Agreement or any prior version for five years or more (a "**Retired Partner**"), by providing a written notice of the partner's intent to retire and to elect to receive certain benefits, referred to as "**Retirement Benefits**" (a "**Notice of Intent to Retire**") (Clause 8A(ii)).

6

22.3.    The retirement term shall continue for four years from the effective date of the LLP partner's retirement (the "**Retirement Term**"). During that period the Retired Partner shall continue to receive a profit distribution calculated in accordance with Clause 11F(i).

22.4.    During the Retirement Term, the Retired Partner will be provided, at no expense to him, with office space, and secretarial, health and other ancillary benefits (Clause 11J).

22.5.    During his Retirement Term, an LLP partner shall have the right to redeem: an amount of the aggregate of the partner's (i) DKIL shares, (ii) capital account in DKEP, and (iii) capital account in DK Solutions, as well as the DKIL shares of any related person to whom the partner has transferred a portion of his or her DKIL shares ("**Aggregate DK Interests**") that, when aggregated with any other amount of the Aggregate DK Interest redeemed by such LLP partner does not exceed 50% of such partner's aggregate net asset value of the Aggregate DK Interests determined as of the close of business of the day prior to the effective date of the Retirement Term ("**DKEP Partner's Retirement Capital**") (Clause 8A(v)).

22.6.    In the event that a partner elects to redeem (i) an amount of Aggregate DK Interests, or (ii) DKIL Shares, that exceeds 50% of the DKEP Partner's Retirement Capital at any time during the Retirement Term, the partner shall be deemed to have provided a notice of Early Termination (Clause 8A(v) and (vii)). The partner will retain a limited interest in the DKEP and will be entitled to receive his or her share of the net profits for the remaining term of any Close End Fund listed in Schedule D (Clause 11.L).

22.7.    The Tenth DKEP Supplemental Partnership Agreement is governed and construed in accordance with New York law, without regard to its conflict of law rules (Clause 21.C).

23.    The terms of the DK Solutions Partnership Agreement dated 28 June 2023, and effective as of 1 July 2023, provide, in material part, as follows:

7

23.1. During his Retirement Term, a partner shall have the right to withdraw an amount that when aggregated with any other amounts withdrawn does not exceed 50% of the aggregate amount of capital attributable to the partner's Capital Account, determined as of the close of business on the day prior to the effective date of the Retirement Term (the "**DK Solutions Partner's Retirement Capital**"). In the event the partner elects to withdraw an amount that when aggregated with other amounts withdrawn exceeds 50% of the DK Solutions Partner's Retirement Capital, such partner shall be deemed to have provided a notice of early termination (Clause 11.1(iv)).

23.2. A partner may elect to become a Retired Partner, provided that such partner has been a partner of the Firm for five or more years (Clause 12.1), by providing a written notice of the partner's intent to retire and to elect to receive Retirement Benefits (Clause 12.2). The DK Solutions Retirement Benefits set out in Clauses 12.6 and 12.12 are materially identical to the Retirement Benefits offered by DKEP: i.e. a profit distribution and office space, and secretarial, health and other ancillary benefits at no expense to the Retired Partner.

23.3. The DK Solutions Partnership Agreement is governed and construed in accordance with Cayman Islands law (Clause 15.11).

## THE CLAIMANT'S DISCLOSURES

24. Between 2020 and 2024, as particularised below, the Claimant made a number of protected disclosures to:

24.1. Partners in DKEP and DK Solutions (with whom he had a worker relationship);

24.2. Mr Yoseloff; and

24.3. Partners in DKCM which as stated at paragraph 10 above was the ultimate controlling entity and/or related or affiliated entity of DKEP or DK Solutions.

25. As detailed below, those disclosures related to how the Firm and/or entities within the Firm, including DKEP and DKCM, were being run. The disclosures ought to have been

8

handled in accordance with SYSC 18. Insofar as it is established at the hearing of this claim that the Firm, including DKEP, have failed to comply with SYSC 18 and/or that the disclosures herein were not handled in accordance with SYSC 18, the Claimant is entitled to and will invite the Tribunal to draw an adverse inference about the reason for the detriments to which he was subjected (set forth below).

PD1: 2020 Amendments to Partnership Governance Documents

26. In 2020 Mr Yoseloff proposed changes to the partnership governance documents. The proposed changes concerned the checks and balances that already existed to offset the Executive Managing Member's (i.e. Mr Yoseloff's) power to determine on a biannual basis each managing member partner's percentage share in the Firm's profit by reference to the Executive Managing Member's assessment of each partner's contribution to the Firm (known as a "**Schedule A Decision**"). The changes included extending the non-compete terms and increasing the length of time that shareholders were restricted from selling their shares after they gave notice to withdraw from the partnership. Previously, the ability of a partner to leave without being significantly restricted from being employed shortly afterwards served as a counter-balance to the power of the Executive Managing Member to make Schedule A Decisions, in the event that a Schedule A Decision seemed unfair to them.

27. The Claimant disclosed information by raising his concerns about these changes with Mr Yoseloff orally and in writing by an email on 23 August 2023 marked "High" importance (the "**23 August 2023 Email**"), specifically that these changes represented a substantial shift in the checks and balances that were put in place to offset the Executive Managing Member's power in respect of Schedule A Decisions.

28. These statements were a protected disclosure ("**PD1**").

29. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

29.1. Mr Yoseloff's duties of loyalty and care under Delaware law;

9

29.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

30. In other words, the changes to the checks and balances on the Executive Managing Member's power could not be considered, in good faith, to be in the best interests of any of the entities that made up the Firm and/or were in Mr Yoseloff's own self-interest as the Executive Managing Member. Furthermore, a reasonable person in a similar position and circumstances would exercise greater care when amending partnership governance documents.

31. The Claimant reasonably believed that PD1 was made in the public interest because:

31.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

31.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondents to be operating in a way where there are appropriate controls and governance in relation to the management of very substantial investor funds.

32. The Claimant's belief was reasonable in all the circumstances.

PD2: 2023 Amendments to Partnership Governance Documents

33. In 2023, Mr Yoseloff proposed further changes to the partnership governance documents. The proposed changes included (but were not limited to) the following:

33.1. For a managing member (including the Executive Managing Member), who has been a managing member for over 5 years, to be removed, the consent of 75% of the Schedule A percentage interest of all managing members and the consent of the Management Committee (on which the Executive Managing Member sat) would be required. The current position in 2023 was that only the consent of 75% (per capita) of all managing members was required.

10

33.2. The Executive Managing Member would be able to make changes that are not adverse to the managing members with the consent of 75% in Schedule A interest of all managing members, instead of the consent of 100% of the managing members.

33.3. The General Partner entity, through whom the Executive Managing Member conducted his duties in respect of DKCM and DK Solutions, would only be able to be appointed with a 75% Schedule A interest voting threshold rather than a 75% per capita voting threshold.

33.4. The Executive Managing Member would be given express rights to (i) enter into an agreement for a negotiated separation with a partner (with the approval of the Management Committee), (ii) prosecute/ settle claims against the Firm (with the approval of the Management Committee), (iii) reorganise/ restructure the entity in a way that does not materially adversely affect the partners (with the approval of the Management Committee), (iv) purchase insurance for the Firm, (v) establish and maintain reserves or escrow accounts as the Executive Managing Member considers appropriate), and (vi) establish Firm committees.

34. As stated above, Mr Yoseloff as the Executive Managing Member controlled the Schedule A interests held by the managing member partners. It would therefore have been possible for Mr Yoseloff to reward loyalty and penalise those who challenged him.

35. The Claimant disclosed information by raising his concerns with:

35.1. Mr Yoseloff, in writing, in the 23 August 2023 Email. That email set out the Claimant's *"key concerns as a UK partner and a set [of] proposals to address them"*. The Claimant stated that:

35.1.1. The overall corporate governance of the firm – how major decisions impacting the general partnership were taken in practice and what the checks and balances were – directly impacted the assessment of the risks under the partnership agreements;

11

35.1.2. The changes to the voting bases from a per capita voting threshold to an ownership percentage threshold, combined with the fact the managing partners were accruing the capital of the largest capital owners as they retired, meant that the informal control that already existed in the Firm was soon to become formalised;

35.1.3. The fact that the partners were having to agree to another set of revised terms after the 2020 revisions and the manner in which the revisions were presented to the partners made clear how the partnership now worked;

35.1.4. The partnership governance documents generally included many provisions which were broadly defined, lacked clarity or specificity, and so were left open to the interpretation of the Executive Managing Member or Management Committee, and therefore granted powers that were open to abuse, particularly where there was no requirement for transparency to establish and disclose the facts to support the invocation of any condition and without any requirement for the remedies to be reasonable and proportionate; and

35.1.5. The updated partnership governance documents would not provide adequate safeguards to departing partners *"due to a combination of the degree of management discretion, the absence of any clear standards to be met before the exercise of that discretion can be justified, a lack of required transparency and disclosure and the risk that information can be deemed sensitive and so restricted from the partner. Without tightening up these conditions this creates too much room for discretion and interpretation."*

35.2. Mr Yoseloff, by telephone, in 2023. The Claimant raised his concerns that the changes suggested that Mr Yoseloff's intention was to turn the Firm from an institution into his own family office, and to insulate and protect his personal position and control about the changes, and said that if Mr Yoseloff made those changes, he ought to account for himself to the partners rather than remove the topic from the partners' agenda as he had done.

12