# EXHIBIT 3

35.3. Numerous partners in one-on-one meetings. In those meetings the Claimant said that this was a complete change in terms of how the partnership had worked previously, as now the partners were not involved or properly informed about business decisions.

36. These statements were a protected disclosure or disclosures ("**PD2**").

37. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

37.1. Mr Yoseloff's duties of loyalty and care under Delaware law;

37.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

38. In other words, the proposed changes to the partnership governance documents could not be considered, in good faith, to be in the best interests of any of the entities in the Firm including DKCM and DKEP and/or a reasonable person in a similar position and circumstances would exercise greater care and/or the changes were in Mr Yoseloff's own self-interest as the Executive Managing Member. In particular:

38.1. The proposed change at paragraph 33.1 above, when combined with Mr Yoseloff's power to make Schedule A Decisions and therefore determine which partners, taken in combination, held 75% of the Firm, would have had the potential of enabling Mr Yoseloff to decrease the likelihood that he would be removed;

38.2. The proposed change at paragraph 33.2 above would – for the same reason – enable Mr Yoseloff to increase the likelihood that he would be able to make changes that he wanted provided they were not adverse to the managing members; and

38.3. The proposed change at paragraph 33.3 above would enable Mr Yoseloff to control the likelihood that he, via the General Partner entity (i.e. the entity through which the Executive Managing Member conducted his duties in respect of the limited partnerships), would be able to be removed from DKCM or DK Solutions; and

13

38.4. The amendments increased Mr Yoseloff's power, without proper supervision or scrutiny.

39. The Claimant reasonably believed that PD2 was made in the public interest because:

39.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

39.2. it is in the public interests of the people whose funds are being managed by the Firm for the Respondents to be operating in a way where there are appropriate controls and governance in relation to the management of very substantial investor funds; and

39.3. it is in the public interest for partners to be able to hold accountable senior management of a firm, especially one in which members of the public are investing, and therefore scrutinise and debate proposed changes to governance documents that would have the effect of limiting accountability in future.

40. The Claimant's belief was reasonable in all the circumstances.

PD3 and PD4: The Firm's Strategy

41. In 2022 Mr Yoseloff decided to start an insurance business, following a proposal by Mr Gabriel Schwartz, the Co-Deputy Managing Partner of DKCM and subsequently a partner in DK Solutions after it was established to run the insurance business. As Co-Deputy Managing Partner, Mr Schwartz owed the same fiduciary duties to DKCM as a matter of Delaware law as Mr Yoseloff as set out at paragraph 17 above. Mr Schwartz was also a member of the Management Committee and therefore owed the same fiduciary duties to DKEP as a matter of English law as Mr Yoseloff set out at paragraph 20 above.

42. The Claimant disclosed information by raising his concerns that this was the wrong strategy and that Mr Yoseloff was diverting resources into areas where the Firm lacked the history, reputation, client relationships, and scale to compete with the big players on many occasions with:

14

42.1.   Mr Yoseloff, including at lunch in 2023 at Cecconis, London; and

42.2.   The managing member partners in meetings at partner offsites, including in January 2024 in Miami.

43.   These statements were protected disclosures ("**PD3**").

44.   In addition, the Claimant disclosed information by raising his concerns that the insurance business proposal made no sense for the business, specifically because:

44.1.   It involved running a 'stack them high, sell them low' business using an extremely expensive hedge fund platform;

44.2.   Hedge fund resources were being used for a low margin product. For example, the structured products team were required to select the investments when they could have been spending time working on hedge funds;

44.3.   The Firm were clearly avoiding allocating costs to the insurance business to distort the fact that it was deeply unprofitable; and

44.4.   The Firm risked unsettling the investors who paid fees that should have been allocated to the management of the funds that they invested in, but which were effectively diverted to the insurance business.

45.   These statements were also protected disclosures ("**PD4**").

46.   These concerns were raised with the managing member partners at the 2022, 2023 and 2024 offsites, as well as Mr Yoseloff and Mr Schwartz separately.

47.   The Claimant reasonably believed that the information disclosed in PD3 and PD4 tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

47.1.   Mr Yoseloff's and Mr Schwartz' duties of loyalty and care under Delaware law;

15

47.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

47.3. The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business.

48. In other words, it could not be considered, in good faith, to be in the best interests of any of the Firm's entities including DKEP and DKCM for resources to be diverted to establish an insurance business, particularly when that risked unsettling or even losing investors and provided very little benefit to the Firm or any of its entities. A reasonable person in a similar position and circumstances would exercise greater care.

49. The Claimant reasonably believed that PD3 and PD4 were made in the public interest because:

49.1. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondent to be operating in a way which is *prima facie* likely to lead to the greatest returns for investors rather than divert hedge fund resources to low margin products, in respect of which the Firm has no real experience, client relationships or capability to succeed, when they could be put to better use; and

49.2. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties.

50. The Claimant's belief was reasonable in all the circumstances.

PD5: Risk Management

51. The hedge fund's existing risk management strategy was prejudiced and jeopardised because there was no holistic strategy to risk across the Firm. The Claimant persistently raised his concerns as to the need to improve risk management of the hedge fund,

16

specifically to stop constructing hedges on the credit books which correlated too much with the high yield indices at investment committee meetings which took place every fortnight. To the best of the Claimant's recollection, pending disclosure, the people in attendance at those meetings included:

51.1.   Mr Yoseloff;

51.2.   Mr Conor Bastable, the Deputy Chief Investment Officer of the Firm who also oversaw the risk management team and who was also a partner in DK Solutions; and

51.3.   Mr Jeff Hurwitz, the Chief Risk Officer.

52.   As managing member partners, Mr Bastable and Mr Hurwitz owed the same fiduciary duties under Delaware law as Mr Yoseloff, set out at paragraph 17 above.

53.   The Claimant also disclosed information by raising his concerns with partners at off-site meetings.

54.   These statements were protected disclosures ("**PD5**").

55.   The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

55.1.   Mr Yoseloff's, Mr Bastable's and Mr Hurwitz's duties of loyalty and care under Delaware law;

55.2.   The duties of the management committee members, including Mr Yoseloff, owed to DKEP under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

55.3.   The regulatory duties of the hedge funds, by failing to have adequate risk management systems, including the duty of DKEP as an FCA-regulated entity to comply with Principles 2 and 3 of the FCA's Principles for Business, and the duty of DKCM under the Investment Advisors Act for Regulated Investment Advisers

17

to implement record keeping functions and maintain adequate management by designated persons.

56. In other words, prejudicing and jeopardising the hedge fund's existing risk management strategy could not be considered, in good faith, to be in the best interests of DKCM or DKEP, and a reasonable person in a similar position and circumstances would exercise greater care.

57. The Claimant reasonably believed that PD5 was made in the public interest because:

57.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties; and

57.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) to have an effective risk management policy, to reduce the likelihood of losses.

58. The Claimant's belief was reasonable in all the circumstances.

PD6: Distressed Opportunities Fund

59. The Firm managed approximately USD 4-5bn in the distressed opportunities fund ("**DOF**"). While Mr Bastable and Mr Morgan Blackwell were nominally responsible for DOF, in reality no one properly constructed the DOF portfolio nor was anyone accountable for its performance. Instead an 'odds and ends' approach was adopted whereby all the credit portfolio managers decided what to add to the portfolio. Normally credit portfolio managers chose to add the balance of positions which they had taken in their own funds but which were limited, for example, by how big that position could be or because of liquidity issues. As a result, what was added to the DOF was what the credit portfolio managers thought was best for their own funds, rather than for the DOF.

60. The Claimant disclosed information by raising his concerns about this approach, and the lack of appropriate investment oversight and management, at the 2024 partner off-site.

18

61. This statement was a protected disclosure ("**PD6**").

62. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

   62.1. Mr Yoseloff's duty of care under Delaware law;

   62.2. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

   62.3. The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in investors' best interests.

63. In other words, how the DOF was managed could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKCM and DKEP and a reasonable person in a similar position and circumstances would exercise greater care. Nor was the credit portfolio managers' use of the DOF in the best interests of the investors.

64. The Claimant reasonably believed that PD6 was made in the public interest because:

   64.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

   64.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondents to be operated with reasonable care and skill rather than for a fund to be used as a bin for leftovers to be thrown into, which will likely lead to the fund performing poorly and the Firm having to decide whether to leave itself or the investors being left with illiquid positions, as in fact happened.

65. The Claimant's belief was reasonable in all the circumstances.

PD7: Misallocation of Costs

19

66. A further issue with how the Firm operated was that there were no proper internal management accounts for allocating costs to the relevant fund. The Claimant disclosed information by raising this concern on numerous occasions on the basis that it is impossible to run a business properly if one cannot clearly establish profitability and returns on capital of various businesses, and that consequently it was also impossible to make accurate Schedule A Decisions, including at:

66.1.    Annual compensation meetings;

66.2.    Annual partner offsites, including the January 2024 offsite in Miami; and

66.3.    Monthly partner meetings.

67. This statement was a protected disclosure ("**PD7**").

68. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

68.1.    Mr Yoseloff's duty of care under Delaware law;

68.2.    The duties of the management committee members, including Mr Yoseloff, owed to DKEP under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

68.3.    The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business, and the regulatory duty on DKCM as an RIA to maintain records necessary to form the basis for or demonstrate the calculation of performance for managed accounts.

69. In other words, the failure to keep proper internal management accounts for allocating costs could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and a reasonable person in a similar position and circumstances would exercise greater care in respect of the management of the Firm.

70. The Claimant reasonably believed that PD7 was made in the public interest because:

70.1.  it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

70.2.  it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Firm to allocate the right costs to the investments and to keep accurate accounting records so that the Firm can assess which businesses are profitable, what the return on capital is, and which businesses incur the most costs, and use that information to make decisions about where to divert resources in a way that creates the greatest returns for investors.

71. The Claimant's belief was reasonable in all the circumstances.

PD8: Compliance

72. Furthermore, there were issues with how the compliance team of the Firm worked and its lack of separation from the legal team.

73. The Claimant disclosed information by raising the following concerns, to the best of his recollection (pending disclosure herein), with (i) general counsel in 2023 and 2024, (ii) the head of compliance, Mr James Ganges, (iii) Mr Yoseloff, (iv) Mr Chris Krishanthan, a partner in DK Solutions, and (v) the investment committee:

73.1.  That the compliance team effectively left compliance issues to line managers to resolve between themselves.

73.2.  That decisions in respect of managing conflicts were being made not in accordance with Firm policy or in the Firm's best interests; and

73.3.  That the reason internal conflicts processes were not effective was that it was clear to portfolio managers that Mr Yoseloff did not care about those processes.

74. These statements were protected disclosures ("PD8").

21

75. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

75.1. Mr Yoseloff's duty of care as an officer under Delaware law;

75.2. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence;

75.3. The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in their investors' best interests;

75.4. The regulatory duties of the hedge funds, by failing to have robust conflicts procedures, including the duty of DKEP as an FCA-regulated entity to comply with Principles 2 and 8 of the FCA's Principles for Business, and the duties of DKCM as an RIA (and all other U.S. affiliates) to adopt and implement compliance procedures and policies under the Compliance Rule (Rule 206(4)-(7)).

76. In other words, how the compliance team functioned and the lack of robust conflicts procedures could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to compliance and conflicts issues in the Firm. Furthermore, the hedge fund managers' approach to making decisions about conflicts could not be considered in good faith to be in the best interest of investors, and/or a reasonable person in their position would exercise greater care when making such decisions.

77. The Claimant reasonably believed that PD8 was made in the public interest because:

77.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

22

77.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for a hedge fund to have effective and robust conflicts and compliance procedures.

78. The Claimant's belief was reasonable in all the circumstances.

<u>PD9: Not Managing Business in Best Interests of Investors</u>

79. As a result of these issues with the Firm, the Claimant became concerned that the Firm was losing direction and therefore potentially not managing investments in the best interests of its investors. On a personal level, the Claimant had concerns about his capital being at risk. The Claimant disclosed information by raising these concerns with Mr Yoseloff over lunch in 2023 at Cecconis in London, and more specifically that:

79.1. The Firm was not focusing on the performance of the hedge funds even though the fees from those funds supported the entire Firm;

79.2. The Firm was one major redemption away from not being able to continue to operate, at least without significant cost-cutting;

79.3. The US credit team had no one taking responsibility or in charge;

79.4. A managing member partner at DKCM, Ms Suzanne Gibbons, had lost over USD 500m and there was no accountability for this from the partners in charge, including Mr Schwartz, and yet Mr Schwartz was nevertheless rewarded by Mr Yoseloff by being promoted; and

79.5. The firm was not acting like a meritocracy.

80. These statements were protected disclosures ("**PD9**").

81. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

81.1. Mr Yoseloff's duty of care under Delaware law;

23

81.2. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence;

81.3. The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in their investors' best interests; and

81.4. The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business, and the duty on DKCM as an RIA under the Investment Advisers Act for Registered Investment Advisers to maintain adequate management by designated persons.

82. In other words, how the Firm was being managed (as set out at paragraph 79) could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the Firm.

83. The Claimant reasonably believed that PD9 was made in the public interest because:

83.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

83.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for a hedge fund to be operated in a way that maximised returns for investors and that ensured the hedge fund's long-term stability.

84. The Claimant's belief was reasonable in all the circumstances.

PD10: The Firm as an Autocracy

24

85. The Claimant disclosed information by voicing his broader concern that Mr Yoseloff wanted to have an autocracy where he controlled everything without any accountability, and only a 'democracy' in the sense of shared risk and liability and shared costs (but without the participants having any vote) on various occasions, including:

85.1. To Mr Yoseloff in the 23 August 2023 Email. Among other things, the Claimant stated that: "*the MC* [Management Committee] *operates largely to support and executive the decisions of the managing partner*" and that few decisions even required a vote of the managing member partners; that there was a "*concentration of control with the managing partner*"; that "*[t]he partnership no longer operates as a true partnership and certainly not how it used to operate*";

85.2. At a meeting with an external consultant, the managing member partners, and Mr Yoseloff;

85.3. With Mr Patrick Dennis, a Co-Deputy Managing Partner and a partner in DK Solutions, over drinks at Oswald's in London in 2024 before the London office drinks party.

86. These statements were protected disclosures ("**PD10**").

87. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

87.1. Mr Yoseloff's duties of loyalty and care under Delaware law; and

87.2. The duties of the management committee members, including Mr Yoseloff and Mr Dennis, under English law to act in good faith in the best interests of DKEP and DKCM and to exercise reasonable care, skill and diligence.

88. In other words, Mr Yoseloff's attempt to make the Firm into an autocracy could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the Firm.

25

89. The Claimant reasonably believed that PD10 was made in the public interest because:

89.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

89.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for those in charge of hedge funds to be held accountable by the partners and for decisions affecting hedge funds (and therefore the investors' investments) to be made by a group rather than one individual.

90. The Claimant's belief was reasonable in all the circumstances.

<u>PD11: Mr Yoseloff Devoting Resource to his Family Office and Creating a Conflicts Risk</u>

91. An example of Mr Yoseloff running the firm however he liked was that he devoted one day per week to his family office, instead of the Firm's funds. The Claimant disclosed information by voicing his concern that Mr Yoseloff should not have done so given the size of the Firm's funds and the value of his time spent on that, as well as the conflicts risk, and his view that Mr Yoseloff did not want to take full responsibility for the Firm, many times since 2020 to many partners, including Mr Tom Kempner, Mr Chris Krishanthan several times in the Claimant's office, and Mr Dennis over drinks at Oswald's in London in 2024 before the London office drinks party.

92. The Claimant reasonably believed that the information disclosed tended to show that a Mr Yoseloff was not devoting sufficient time and attention to the management of the Firm and the funds, and that a breach of the following obligations had occurred, was occurring, or was likely to occur:

92.1. Mr Yoseloff's duties of loyalty and care under Delaware law;

92.2. Mr Yoseloff's obligations set out in the clauses listed at paragraph 19 above to devote all of his business time and attention and his best efforts exclusively to the business and interests of the Firm; and

92.3. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

93. In other words, Mr Yoseloff spending a day a week working in his family office could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the management of the Firm.

94. These statements were protected disclosures ("**PD11**").

95. The Claimant reasonably believed that PD11 was made in the public interest because:

95.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

95.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for those in charge of hedge funds to be held accountable by the partners and for decisions affecting hedge funds (and therefore the investors' investments) to be made by a group rather than one individual.

96. The Claimant's belief was reasonable in all the circumstances.

PD12: Hiring of a COO

97. After the COO of the Firm left in mid-2024, there was a search for a new COO. That search was led by Mr Schwartz.

98. The Claimant had concerns about the process of recruiting a new COO and raised those concerns. In particular, the Claimant disclosed information in 2024 by:

98.1. Writing to the entire partnership in an email dated 27 September 2024, addressed to Mr Schwartz, saying that as this was *"a very important and consequential decision for the partners and the firm"* there should be a partners meeting to discuss

27

and review the decision and a vote on the proposed COO in line with the approach taken to discussing internal candidates for the same role;

98.2.  Expressing the view many times to the managing member partners and to Mr Yoseloff that Mr Schwartz should not have been appointed the acting COO in the period until a new COO was appointed, as Mr Schwartz had no COO experience and only dedicated a third of his time to the role;

98.3.  Having many discussions with Mr Yoseloff about how Mr Schwartz should not be leading the search as he lacked relevant experience and by leading the search, an inadequate COO could be appointed; and

98.4.  Discussing with Mr Yoseloff how the new COO once appointed should report to Mr Yoseloff not Mr Schwartz, as was consistent with how other hedge funds operated, especially in circumstances where Mr Schwartz had no experience of COO functions.

99.  The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

99.1.  Mr Yoseloff's and Mr Schwartz' duties of care under Delaware law;

99.2.  Mr Yoseloff's and Mr Schwartz' duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

99.3.  The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business.

100. In other words, the approach to finding a new COO and appointing a COO in the interim could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the management of the Firm.

28

101. These statements were protected disclosures ("**PD12**").

102. The Claimant reasonably believed that PD12 was made in the public interest because:

    102.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

    102.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents), including the partners, that an adequately qualified chief operating officer be appointed to manage the Firm's operations and ensure efficiency and growth of the Firm.

103. The Claimant's belief was reasonable in all the circumstances.

## NOTICE OF RETIREMENT

104. On 30 October 2024, the Claimant sent a notice to Mr Yoseloff stating that he was exercising his right under Clause 8A(ii) of the Tenth DKEP Supplemental Partnership Agreement to become a 'Retired Partner'. The Notice of Intent to Retire stated the following:

    104.1. The Claimant would retire on 31 January 2025.

    104.2. Consistent with the overarching theme of his repeated protected disclosures set out above, the reason for the Claimant's retirement was the fact that despite repeated attempts to express to Mr Yoseloff the concerns he had regarding the management and operation of the firm over the past five years, they had largely fallen on deaf ears or had been rejected out of hand and remained unresolved; that "*this neglect has already resulted in a series of events that have hurt the partnership and the firm's prospects*"; and that he saw "*little evidence that there is any real desire to make the tough decisions to change the situation*".

## DETRIMENTS

29

105. The Claimant has suffered the following detriments as a result of his protected disclosures above.

106. To the extent there is any issue as to whether these acts are out of time, the Claimant will assert that they are part of a series of similar acts or failures within the meaning of s. 48(3)-(4) ERA 1996.

### 1. Failure to treat the Claimant as a Retired Partner

107. As set out at paragraphs 22 and 23 above, under the Tenth DKEP Supplemental Partnership Agreement and the DK Solutions Partnership Agreement, as a Retired Partner, the Claimant would be entitled to (i) Retirement Benefits, and (ii) an office, and secretarial, health other ancillary benefits, at no expense to him. However, the Claimant was never provided with these.

108. In addition, the Firm began charging the Claimant significant fees on his DKIL shares in 2025. There was no basis under the Tenth DKEP Supplemental Partnership Agreement for the Firm to charge such fees in respect of a Retired Partner's DKIL shares.

109. Prior to the Claimant's disclosures, there was no indication that if and when the Claimant issued a Notice of Intent to Retire, he would not be treated as a Retired Partner, including (i) receiving Retirement Benefits in accordance with Clause 11.F; (ii) receiving an office, secretarial and other ancillary benefits at no cost to him in accordance with Clause 11.J; and (iii) not being charged fees on his capital.

110. Faced with the prospect of paying significant management fees, on 29 April 2025 the Claimant was forced to submit a notice to redeem all of his shares, in consequence of which the Claimant had to give up any claim to be entitled to participate in the Firm's retirement programme. In addition, DKEP and/or the Firm retained 10% (approximately USD 80m) of the Claimant's redemption proceeds, pending completion of the audit.

111. As set out at paragraph 22.6, a Retired Partner who redeems all of his shares is treated as having given a notice of Early Termination and therefore exiting the retirement program.

30

112. Pending disclosure herein, it is reasonably to be inferred that the decisions of the Firm to force the Claimant to redeem his shares were ultimately made by Mr Yoseloff as Mr Yoseloff felt threatened by the Claimant's challenges to his decision-making and position in the Firm. That inference is based on Mr Yoseloff's strategy to seek and consolidate ever greater unilateral control over the Firm's business and affairs and from the following threats made by Mr Yoseloff to the Claimant:

112.1.   In October 2023 over lunch, when Mr Yoseloff threatened to remove the Claimant from the Firm or force the Claimant to withdraw;

112.2.   In December 2023, when Mr Yoseloff said that he could have removed the Claimant from the Firm; and

112.3.   In January 2024, when Mr Yoseloff and the Claimant met the day before the 2024 partners offsite meeting and Mr Yoseloff said that he had considered over Christmas whether to tell the Claimant that he had to leave the Firm, and that Mr Yoseloff had decided not to do so, but that the Claimant would have to step into line going forwards.

113. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the act of the Respondents, was done on the ground of the Claimant's protected disclosures set out above. The Claimant has, as a result, suffered the following detriments:

113.1.   First, he was not treated as a Retired Partner by the Firm despite giving a Notice of Intent to Retire;

113.2.   Second, the Claimant has been forced to redeem his capital earlier than he otherwise would have;

113.3.   Third, DKEP and/or the Firm retained 10% of the redemption proceeds and thereby deprived the Claimant of the ability to reinvest that 10%, which they would not have done had the Claimant not redeemed in full and instead redeemed less than 90% of the net asset value of his shares; and

31

113.4. Fourth, by redeeming his capital, the Claimant has given up any claim he had to Retirement Benefits. These would have included an earnout of approximately USD 170m.

## 2. Wrongful deductions from carry distributions

114. Furthermore, on 3 April 2025, Mr Anthony Gonzalez, a managing director at DKCM, provided by email a summary of the carry distribution for Q1, with a deduction for "compensation points" of USD 14,805.

115. In that same email, Mr Gonzalez also stated in respect of the Claimant's 2024 profit allocation that:

> "*Additionally in 2024, given the investment in the DK Solutions platform, there are additional capital needs here relating to:*
>
> *i. 2024 capital calls upfront paid by the Firm on behalf of your proportionate ownership ($2.9m), and*
>
> *ii. your proportionate reallocation of the retiring Partners' investment in DK Solutions ($3.2m)*
>
> *Given there has been no formal withdrawal of your interest in DK Solutions, the above reallocation is reflected*
>
> *As the total amounts due (aggregate of the above = $6.1m) are greater than your 2024 residual profit allocation ($5.8m), there remains a ~$300k amount due, to be netted against future earnings cash flow*"

116. In other words, two further wrongful deductions were made, despite the Claimant no longer being a limited partner of DKEP nor having agreed that his profits should be reinvested rather than returned to him. In particular:

116.1. A deduction for an additional subscription to Davidson Kempner Solutions Co-Invest Fund K LP which Mr Yoseloff rounded up to USD 2.9m (which was in fact USD 2,890,619); and

116.2. A deduction for an additional subscription in relation to redemptions by two other retired partners, Mr Tom Kempner (the former Managing Member who retired in 2020, as set out at paragraph 14 above) and Mr Avi Friedman, which Mr Yoseloff rounded up to $3.2m (which was in fact USD 3,249,989).

117. Mr Gonzalez added that the total carry distribution for Q1 would be credited against the residual $300k amount remaining due.

118. The Q2 carry distribution summary that the Firm considered was due to the Claimant was provided on 19 July 2025 by Mr Gonzalez by email, being the sum of £477,670. There is no reason why payment should not have been made on the same date – i.e. 19 July 2025.

119. That summary included various deductions, in particular:

119.1. As in the Q1 summary, a deduction for an additional subscription to DK Solutions totalling USD 2,890,619;

119.2. As in the Q1 summary, a deduction for an additional subscription in relation to redemptions by Mr Kempner and Mr Friedman, totalling USD 3,249,989;

119.3. A deduction of USD 438,698 from the residual 2024 profit allocation set out in the schedule dated 29 January 2025 which was sent to the Claimant by email on 7 February and 3 April 2025; and

119.4. A deduction for "compensation points", which reduced the distribution by USD 703,965 in the Q2 carry distribution sheet. The deduction seems to amount to 45% of the distribution from a fund known as LDO GP IV significantly higher than the standard 15% awarded as employee compensation and contrary to the compensation policy.

120. The Claimant queried these deductions with Mr Gonzalez by email dated 20 July 2025. Mr Gonzalez, in response in an email dated 30 July 2025:

120.1. Purported to explain the deduction of USD 438,698 in respect of the Claimant's residual 2024 profit allocation as due in large part to expenses related to the internally developed IT software and applications; and

120.2. Confirmed that compensation points deductions *"will have occurred in any periods in which there has been realized carry in any of the closed-end funds (LDO II –*

33

*DKOF – VI, and DKIF 1) and will continue into the future, as more realized carry is received"*.

121. No clear or coherent explanation was provided, however, as to why the deduction for compensation points were significantly greater than normally. Nor has any supporting documentation been provided to support the calculations.

122. The Claimant raised further queries as to the deductions in emails dated 3 August 2025 and 13 November 2025. Among other things, the Claimant flagged that an additional large expense for internal IT software costs after the end of the financial year is *"highly unusual and hard to reconcile, given how the budgeting process works"*. To date, no detailed clarification has been received as to how this was possible and what the circumstances were. That is despite regulation 6 of the Limited Liability Partnerships (Accounts and Audits) (Application of Companies Act 2006) Regulations 2008 which grants the Claimant the right to inspect DKEP's accounting records.

123. In addition, DKEP withheld the distribution, without explanation. It was only after the Claimant made enquiries, that the wire transfer was made on 15 November 2025, almost four months after it ought to have been and without any explanation for the delay.

124. DKEP then failed to inform the Claimant of his carry distribution for Q3 or make payment of the same which was due in October 2025, until he made enquiries.

125. On 25 November 2025, payment was eventually made. Given that deductions were made for other carry distributions, the Respondents are put to proof as to the basis for any deductions made to the Q3 distribution. Despite repeated requests, no explanation was provided by DKEP as to why the carry distribution was held back until the Claimant chased for an update.

126. On 9 January 2026, payment of the Q4 distribution was received by the Claimant. The summary of the carry distribution, sent by email by the Firm's legal representatives on 7 January 2026, stated that it included a deduction for "compensation points", totalling USD 4,921. However, no explanation was provided as to what the compensation point percentage was or how it had been determined.

34

127. Prior to the Claimant's disclosures, there was no indication that:

127.1. The Claimant would not be paid his Q2 and Q3 carry distribution on time;

127.2. The Claimant would not be provided with any notification or information regarding his Q3 carry payment until he made enquiries himself;

127.3. Any deductions would be made to the carry payments payable to the Claimant, including the deductions set out at paragraphs 114, 116, 119, 125 and 126 above;

127.4. The Firm would refuse to address adequately the Claimant's concerns and queries regarding the adjustments and deductions from his carry distributions in his email dated 3 August 2025 and/or provide the Claimant with sufficient information to enable him to reconcile what he was told he would receive with what he actually received in Q2; and

127.5. The Firm would refuse altogether to address (or even acknowledge) certain concerns and queries regarding the adjustments and deductions from his carry distributions in the Claimant's email of 13 November 2025.

128. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the relevant Respondents to act as pleaded above, given his position in the Firm and for the reasons set out at paragraph 112 above.

129. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the acts of the Respondents, were done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered detriments.

130. Further or alternatively, for the reasons set out at paragraphs 114-125 above, DKEP and/or DK Solutions have made an unlawful deduction from the Claimant's wages contrary to s. 13 ERA 1996, in that it has failed to pay the full carry distributions for Q1, Q2 and Q3 2025 to which the Claimant is entitled.

3. Wrongful revocation by the Firm of the agency relationship with the Claimant

35

131. DKCM set up DKEP on 20 May 2004. At the outset, DKCM insisted that all employees in DKEP would be partners – i.e. a disguised employment scheme – so that the Firm would not have to pay national insurance contributions ("**NIC**"). The original partners in DKEP had no choice but to accept the requirement. In addition, in 2010, the Firm introduced a further scheme whereby partners in DKEP were required to defer their profit allocations initially for 2 years and then for 3 years, so that the profits could be reinvested, net of corporation tax, as a capital contribution to DKEP with the benefit that profits were taxed at a significantly lower rate of 28% (the rate of UK corporation tax) instead of 51% (the top rate of personal tax at the time).

132. The DKEP partners had to rely entirely on the Firm when it came to dealing with tax matters and filing tax returns to HMRC.

133. HMRC ultimately disputed the schemes and continues to investigate the partners' tax income for the 2015/16 tax year (the "**HMRC Investigation**"). All DKEP partners were required to sign a release stating that the Firm would manage all communications and the resolution of the dispute. As a result, the Firm was designated to act as the Claimant's agent vis-à-vis HMRC. That meant that the Firm would settle the dispute for everyone affected. It was therefore agreed that the Claimant and the Firm would respond to HMRC together.

134. On 30 January 2026, the Firm revoked the agency relationship it had with the Claimant concerning the HMRC Investigation.

135. On 6 February 2026, the Firm passed on information that it had received from HMRC regarding the HMRC Investigation, including that the Claimant's residual tax liability is £9,152,866 (plus interest which continues to accrue). The Firm also informed the Claimant that it had informed HMRC that it is no longer acting for him in this matter. This petty act is simply intended to make life as difficult as possible for the Claimant.

136. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the relevant Respondents to act as pleaded above, given his position in the Firm and for the reasons set out at paragraph 112 above.

137. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the acts of the Respondents, was done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered a detriment as he will have to incur the costs of his own legal representatives in respect of the HMRC Investigation. The Claimant reserves the right to plead further detriment as the HMRC Investigation progresses.

<u>4. Wrongful accusation that the Claimant has breached his confidentiality and non-solicitation obligations</u>

138. On 30 January 2026, the Firm via their legal representatives made serious and unsubstantiated allegations against the Claimant of breach of Clause 2(A) (regarding confidentiality) and Clause 2(D) (regarding non-solicitation) of the Tenth Amended LPA.

139. The allegations were untrue. The Claimant provided a detailed denial via his legal representatives in a letter dated 6 February 2026. The Firm has not pursued these allegations further.

140. In the letter dated 30 January 2026, the Firm threatened to require the Claimant to forfeit certain financial entitlements without identifying what those entitlements would be, and in circumstances where there is no provision in the Tenth Amended LPA for any financial entitlement to be withheld from the Claimant.

141. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the Firm's legal representatives to act in this way, on behalf of the Firm including the relevant Respondents, given his position in the Firm and for the reasons set out at paragraph 112 above.

142. Mr Yoseloff's direction, alternatively the act of the Respondents, was done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered detriments.

143. The Claimant reserves the right to plead further detriment should these baseless allegations be pursued.

**REMEDY**

144. The Claimant claims against each of the Respondents:

144.1. A declaration that the Claimant has been subjected to unlawful protected disclosure detriment contrary to s. 47B(1) ERA 1996;

144.2. Compensation for losses consequent to the detriments suffered, in addition to compensation for injury to feelings;

144.3. Such amount as the Tribunal considers appropriate in all the circumstances to compensate the Claimant for the financial loss sustained by him as a result of the failure to pay the Claimant sums which he was owed, including (without limitation) interest to reflect his loss of investment returns as a result of the delay in the receipt of the sums owed to him;

144.4. Aggravated damages;

144.5. Costs.

145. The Claimant claims against each of the First and Second Respondents:

145.1. A declaration that the Claimant is and/or was entitled to office space and secretarial, health and other ancillary benefits at no expense to him during the Retirement Term; and

145.2. A declaration that the Claimant is entitled to office space and secretarial and other ancillary benefits at no expense, and health benefits for which he may be charged a reasonable amount, after the Retirement Term has expired; and

145.3. A penalty under section 12A of the Employment Tribunals Act 1996.

146. Further or alternatively, by reason for the First Respondent's and/or Second Respondent's unlawful deductions from his wages, the Claimant is entitled to and seeks:

146.1. A declaration that the First and Second Respondents have made an unlawful deduction from the Claimant's wages contrary to s. 13 ERA 1996;

38

146.2. A order for payment of the amount of the deduction, namely for a sum to be particularised in due course following relevant disclosure from the First and/or Second Respondent;

146.3. Such amount as the Tribunal considers appropriate in all the circumstances to compensate the Claimant for the financial loss sustained by him as a result of the unlawful deduction, including (without limitation) interest and/or a sum to reflect his loss of investment returns as a result of the First and Second Respondents' unlawful deductions and the delay in the receipt of the sums owed to him; and

146.4. Costs.

147. In relation to the public interest disclosure claim, the Claimant also seeks a referral by the Employment Tribunal of DKEP to the FCA pursuant to the guidance at SYSC 18.3.9 ("*the FCA would regard as a serious matter any evidence that a firm had acted to the detriment of a whistleblower. Such evidence could call into question the fitness and propriety of the firm or relevant members of its staff, and could therefore, if relevant, affect the firm's continuing satisfaction of threshold condition 5 (Suitability) or, for an approved person or a certification employee, their status as such*").

CHARLES CIUMEI KC

KATHERINE RATCLIFFE

ESSEX COURT CHAMBERS

30 March 2026

39