# EXHIBIT 4

EXECUTION COPY
*Highly Confidential*

**TENTH AMENDED AND RESTATED AGREEMENT
SUPPLEMENTING THE TENTH AMENDED AND RESTATED LIMITED LIABILITY
PARTNERSHIP AGREEMENT OF
DAVIDSON KEMPNER EUROPEAN PARTNERS, LLP**

TENTH Amended and Restated Agreement (this "Agreement"), effective as of July 1, 2023 by and among those Persons who have executed this Agreement and whose names are set forth on Schedules A, B and C hereto, Davidson Kempner European Partners, LLP, a limited liability partnership incorporated in England and Wales (the "Partnership"), and DK European Ltd., an exempted company incorporated with limited liability under the provisions of the Companies Law (as amended) of the Cayman Islands (the "Managing Member").

The parties hereto previously entered into an agreement dated as of January 1, 2008, which was amended and restated as of December 9, 2010, January 1, 2012, April 5, 2014, January 1, 2015, January 1, 2018, January 1, 2020, January 1, 2021, January 1, 2022 and January 1, 2023 (resulting in the "Ninth Amended and Restated Agreement"). The required percentage of DK Members and retired DK Members as at the date of this Agreement have determined in accordance with Section 13 of the Ninth Amended and Restated Agreement to make certain amendments to the Ninth Amended and Restated Agreement, and accordingly, the parties hereto are now entering into this Agreement in substitution for the Ninth Amended and Restated Agreement (which shall with effect from the date of this Agreement be entirely superseded by this Agreement and shall be of no further force and effect) to restate the provisions of the Ninth Amended and Restated Agreement (to the extent restated herein) and to make such amendments to the Ninth Amended and Restated Agreement as have been so agreed by the DK Members and retired DK Members.

This Agreement supplements the provisions of the Tenth Amended and Restated Limited Liability Partnership Agreement of the Partnership, dated as of January 1, 2023 (such limited liability partnership agreement, as amended or substituted from time to time, the "Partnership Agreement"). If any of the provisions herein are not consistent with the provisions of the Partnership Agreement, the provisions of this Agreement shall control. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Partnership Agreement.

1.      Definitions.

A.      "*2.5% Proviso*" shall have the meaning set forth in Section 7.

B.      "*10.A(i) Election*" shall have the meaning set forth in Section 10.A(i).

C.      "*Affiliate*," when used with respect to any Person shall mean:

(i)      any other Person at the time directly or indirectly controlling, controlled by or under direct or indirect common control with such Person,

(ii)     any other Person of which such Person at the time owns, or has the right to acquire, directly or indirectly, 10% or more on a consolidated basis of the equity or beneficial interest of such Person,

*Highly Confidential*

(iii)    any other Person which at the time owns, or has the right to acquire, directly or indirectly, 10% or more of any class of the capital stock or beneficial interest of such Person,

(iv)    any executive officer or director of such Person, and

(v)    when used with respect to an individual, shall include a spouse or Spousal Equivalent, any ancestor or descendant, or any other relative (by blood, adoption or marriage), within the second degree of such individual.

D.    "*Aggregate DK Interest*" shall mean, in the aggregate, (i) an LLP Partner's DKIL Shares, (ii) the DKIL Shares of a related Schedule B Person, (iii) an LLP Partner's capital account in the Partnership and (iv) an LLP Partner's capital account in DK Solutions.

E.    "*Agreement*" shall have the meaning set forth in the preamble.

F.    "*Arbitration Rules*" shall have the meaning set forth in Section 17.B(ii).

G.    "*Authorized Representative*" shall mean, with respect to (i) any LLP Partner or Retired Partner, (a) financial, tax or legal agents or advisers of such LLP Partner or Retired Partner, as applicable, in each case, that are subject to a duty of confidentiality or that enter into a confidentiality agreement with the applicable LLP Partner or Retired Partner, at least as stringent as the confidentiality provisions of this Agreement or as otherwise agreed to by the Managing Member, (b) any immediate family members (including Spousal Equivalents) of such LLP Partner or Retired Partner or (c) any other Person approved in writing by the Managing Member, and (ii) any Schedule B Person or Schedule C Person, (a) directors, trustees, employees or financial, tax or legal agents or advisers of such Schedule B Person or Schedule C Person, as applicable, in each case, that are subject to a duty of confidentiality or that enter into a confidentiality agreement with the applicable Schedule B Person or Schedule C Person, as applicable, at least as stringent as the confidentiality provisions of this Agreement or as otherwise agreed to by the Managing Member, (b) the related LLP Partner (or his/her immediate family members (including Spousal Equivalents)) or Retired Partner (or his/her immediate family members (including Spousal Equivalents)) or (c) any other Person approved in writing by the Managing Member.

H.    "*Bankruptcy*" shall mean, with respect to a Person, if a court of competent jurisdiction shall enter an order, judgment or decree appointing or authorizing a receiver, trustee, liquidator, custodian or conservator for such Person or for the whole or substantially all of his, her or its property, or enter an order for relief against him, her or it in any case commenced under the U.K. Insolvency Act 1986, as amended, or grant relief under any other similar law or statute of the United Kingdom or any other country; or if, under the provisions of any law for the relief or aid of debtors, a court of competent jurisdiction or a receiver, trustee, liquidator, custodian or conservator shall assume custody or control or take possession of the whole or substantially all of his, her or its property; or if there is commenced against him, her or it any proceeding for any of the foregoing relief or if a petition is filed against him, her or it under the U.K. Insolvency Act 1986, as

2

*Highly Confidential*

amended, or under any other similar law or statute of the United Kingdom or any other country and such proceeding or petition remains undismissed for a period of 30 days; or if he or she by any act indicates his, her or its consent to, approval of or acquiescence in any such proceeding or petition.

I.        "*Biennial Period*" has the meaning set forth in Section 14.A(ii).

J.        "*Capital Earnings*" shall mean that portion of an LLP Partner's Profit Distribution which is attributable to his or her Capital Rate (which, for the avoidance of doubt does not include Closed End Fund GP Profits).

K.        "*Capital Rate*" shall mean with respect to each LLP Partner the proportion of the Schedule A Percentage granted to an LLP Partner designated as the Capital Rate by the Executive Managing Member for each Biennial Period calculated using the methodology notified in writing by the Executive Managing Member (or his or her designee) to the LLP Partner in accordance with Section 14; provided, however, that an LLP Partner's Capital Rate may be amended at any time to the extent permitted by Section 14.

L.        "*Cause*" shall mean (i) an LLP Partner's or the Retired Partner's breach of this Agreement or the Partnership Agreement, or any other material policy or procedure of the DK Group that, in the reasonable judgment of the Management Committee, has or could reasonably be expected to have a material adverse effect on the business or reputation of the DK Group, (ii) the continued failure of the LLP Partner or the Retired Partner to perform his or her material duties, or the violation by the LLP Partner or the Retired Partner of any policies maintained by the DK Group that, in the reasonable judgment of the Management Committee, has or could reasonably be expected to have a material adverse effect on the business or reputation of the DK Group, it being agreed that in no event shall the performance of the investments made or recommended by the LLP Partner or the Retired Partner be grounds for Cause under this clause (ii); provided that to the extent such failure or violation is curable, such failure or violation has not been cured by the LLP Partner or the Retired Partner within 10 days of receiving written notice from the Executive Managing Member, (iii) the conviction of, or plea of guilty or nolo contendere in respect of, any felony or other crime that would materially interfere with the duties, responsibilities, business or operations of the DK Group, (iv) any gross negligence or willful misconduct of the LLP Partner or the Retired Partner that in the reasonable judgment of the Management Committee has, or is likely to have, a material adverse effect on the business, affairs, reputation or prospects of the DK Group, (v) fraud, embezzlement or theft against the DK Group or (vi) an LLP Partner's or the Retired Partner's commission of any material violation of any material rule or regulation of the Financial Conduct Authority of the United Kingdom, the Securities and Exchange Commission, Financial Industry Regulatory Authority, Inc. or similar regulatory authorities having jurisdiction over any DK Entity.  A member of the Management Committee shall not be included in the vote to determine whether Cause has occurred with respect to himself or herself.

M.        "*Clawback Obligation*" shall have the meaning set forth in Section 4.A.

N.      "*Closed End Fund*" shall mean any Weighted Average Fund or Fixed Schedule A Percentage Fund.

O.      "*Closed End Fund GP Profits*" shall mean the net profits received by the general partner of a Closed End Fund from such Closed End Fund.

P.      "*Closed End Fund LP Profits*" shall mean any net profits attributable to an investment by M.H. Davidson & Co. 520 LP in a Closed End Fund.

Q.      "*Confidential Information*" shall have the meaning set forth in Section 2.A.

R.      "*Controversies*" shall have the meaning set forth in Section 17.B(i).

S.      "*Date of D, B, D or I*" shall have the meaning set forth in Section 10.A(i).

T.      "*Deputy Executive Managing Member*" shall mean the person or persons the Executive Managing Member has designated to serve as the "Deputy Executive Managing Member" of the general partner of DKCM in accordance with the terms of its limited partnership agreement.

U.      "*Disability*" shall mean an LLP Partner or Retired Partner has not been able, in the judgment of the Management Committee, for a period of 12 consecutive weeks or for a total of 24 weeks (whether or not consecutive) in any 12-month period, to perform his or her regular duties for the Partnership as a result of any physical or mental incapacity, with or without reasonable accommodation.

V.      "*DK Entities*" shall mean each of the companies, partnerships, corporations and other entities comprising the DK Group, any entities of which any such company, partnership, corporation or other entity is a managing member, investment manager, general partner or otherwise acts in a similar capacity and any Affiliate of any such company, partnership, corporation or other entity.

W.      "*DKIF II*" shall mean Davidson Kempner Income Fund II LP, a Delaware limited partnership, Davidson Kempner Income International II LP, a Cayman Islands exempted limited partnership, Davidson Kempner Income International Master Fund II LP, a Cayman Islands exempted limited partnership and any related alternative investment vehicles or special purpose vehicles.

X.      "*DK Group*" shall mean, individually or collectively, as the context may require, the entities listed on Appendix I hereto and any other entity formed in the future that is an Affiliate of, and formed for purposes similar to, the entities listed on Appendix I.

Y.      "*DK Group Insurance*" shall mean all director and officer liability insurance policies, general partnership liability insurance policies or other liability insurance policies that may be maintained by or on behalf of the DK Group.

*Highly Confidential*

Z.       "*DK Members*" shall mean the Limited Partners and Managing Members of the DK Group (as each such term is defined in the relevant DK Group entity's operating agreement), excluding partners of the Partnership, in their capacities as such.

AA.       "*DK Solutions*" shall mean Davidson Kempner Solutions Cayman LP.

BB.       "*DK Solutions Agreement*" shall mean the Amended and Restated Limited Liability Company Agreement of DK Solutions, as the same may be amended and/or restated from time to time.

CC.       "*DK Solutions Profits*"  shall mean any net profits of DK Solutions.

DD.       "*DKCM*" shall mean Davidson Kempner Capital Management LP.

EE.       "*DKIL*" shall mean Davidson Kempner International (BVI), Ltd.

FF.       "*DKIL Shares*" shall mean the shares in DKIL held by any UK Partner.

GG.       "*Earliest Initiation Date*" shall have the meaning set forth in Section 17.A(v)

HH.       "*Early Termination*" shall have the meaning set forth in Section 11.K.

II.       "*Excess Over Fair Value*" shall have the meaning set forth in Section 4.D(i).

JJ.       "*Excess Over the DKCM Percentage*" shall have the meaning set forth in Section 4.D(ii).

KK.       "*Executive Managing Member*" shall mean the Executive Managing Member of the general partner of DKCM.

LL.       "*Fair Value*" shall have the meaning set forth in Section 4.D(i).

MM.       "*Family Investor*" shall have the meaning set forth in Section 11.M.

NN.       "*Family Office*" shall mean a company (including its directors, partners, members, managers, trustees and employees acting within the scope of their position or employment) that (i) has no clients other than family clients; (ii) is wholly owned by family clients and is exclusively controlled (directly or indirectly) by one or more family members (including Spousal Equivalents) and/or family entities; and (iii) does not hold itself out to the public as an investment adviser.  For purposes of this definition, a "family client" is (a) any family member (including a Spousal Equivalent), former family member (including a Spousal Equivalent), key employee or former key employee; (b) the estates of any of the foregoing; (c) any irrevocable trust in which one or more other family clients are the only current beneficiaries; (d) any irrevocable trust funded exclusively by one or more other family clients in which other family clients and nonprofit organizations and charitable organizations are the only current beneficiaries; (e) any revocable trust of which one or more other family clients are the sole grantor; (f) any trust of which each trustee or other person authorized to make decisions with respect to the trust is a key employee, and each

5

*Highly Confidential*

settlor or other person who has contributed assets to the trust is a key employee or the key employee's current and/or former spouse or Spousal Equivalent who, at the time of the contribution, holds a joint, community property, or other similar shared ownership interest with the key employee; or (g) any company wholly owned (directly or indirectly) exclusively by, and operated for the sole benefit of, one or more other family clients.

OO.    "*Federal Funds Rate*" shall mean, for any period, the interest rate at which a depository institution lends immediately available funds (balances at the U.S. Federal Reserve) to another depository institution overnight in effect in New York, New York.

PP.    "*First Meeting*" shall have the meaning set forth in Section 17.A(iii).

QQ.    "*Fixed Schedule A Percentage*" shall mean, with respect to a particular LLP Partner with respect to a particular Fixed Schedule A Percentage Fund, the Schedule A Percentage in effect as of the initial closing date of such Fixed Schedule A Percentage Fund as provided under the relevant Fund Agreement (or as of such other date as determined by the Executive Managing Member).

RR.    "*Fixed Schedule A Percentage Fund*" shall mean any fund designated as such on Schedule D hereto.

SS.    "*Fund Agreement*" shall mean the limited partnership agreement, limited liability company agreement or other governing documents of a Fund, as amended from time to time.

TT.    "*Fund Insurance*" shall mean all director and officer liability insurance policies or other liability insurance policies that may be maintained by or on behalf of any Fund or an Affiliate thereof.

UU.    "*Funds*" shall mean accounts or funds sponsored by the DK Group and formed to invest and trade in securities, financial instruments and any other assets or types of investments.

VV.    "*Gate*" shall have the meaning set forth in Section 11.C.

WW.   "*Indemnified Person*" shall have the meaning set forth in Section 5.A.

XX.    "*Indemnitee*" shall have the meaning set forth in Section 5.B.

YY.    "*Inventions*" means  all inventions, improvements, original works of authorship, formulas, processes, computer programs, computer software (including source code, executable code and documentation), techniques, know-how, data, whether or not patentable or copyrightable or protectable as trade secrets and all other intellectual property, made or conceived or first reduced to practice or learned by an LLP Partner, either alone or in conjunction with others, at a time when such LLP Partner was an LLP Partner, in each such case, provided that the Management Committee reasonably determines that such intellectual property is associated with the DK Group or otherwise

6

*Highly Confidential*

developed in the course of performing services for the DK Group or using DK Group resources.

ZZ.    "*Investment Period*" shall mean the investment period of each Weighted Average Fund as set forth on <u>Schedule D</u> to this Agreement, which for purposes of determining an LLP Partner's or Schedule C Person's Weighted Average Schedule A Percentage (if applicable), may be different from that designated in a Closed End Fund's Fund Agreement.

AAA.    "*LLP Partner*" shall mean the Persons set forth on <u>Schedule A</u> hereto.

BBB.    "*Management Committee*" shall have the meaning set forth in Section 12.

CCC.    "*Managing Member*" shall have the meaning set forth in the preamble.

DDD.    "*Non-Disparagement Period*" shall have the meaning set forth in Section 2.C hereof.

EEE.    "*Notice of Intent to Retire*" shall have the meaning set forth in Section 11.B.

FFF.    "*Partnership*" shall have the meaning set forth in the preamble.

GGG.    "*Partnership Agreement*" shall have the meaning set forth in the preamble.

HHH.    "*Partnership Legal Matter*" shall have the meaning set forth in Section 21.I(i).

III.    "*Performance Earnings*" shall mean that portion of an LLP Partner's Profit Distribution which is attributable to his or her Performance Rate (which, for the avoidance of doubt, includes Closed End Fund LP Profits but excludes Closed End Fund GP Profits).

JJJ.    "*Performance Rate*" shall mean, with respect to each LLP Partner, the proportion of the Schedule A Percentage granted to such LLP Partner designated as the Performance Rate by the Executive Managing Member for each Biennial Period as notified in writing by the Executive Managing Member (or his or her designee) to the LLP Partner in accordance with Section 14; <u>provided</u>, <u>however</u>, that the Performance Rate may be amended at any time to the extent permitted by Section 14.

KKK.    "*Person*" shall mean a natural person, corporation, partnership, limited liability company, limited liability partnership, trust or other entity, including, when the context so requires, a governmental entity.

LLL.    "*Post-LP Non-Compete Period*" shall have the meaning set forth in Section 2.E(i)(a).

MMM. "*Post-Retirement Member*" shall have the meaning set forth in Section 11.M.

*Highly Confidential*

NNN. "*Profit Distribution*" shall mean the amount ("*Amount D*") which, except as otherwise provided herein, is payable to an LLP Partner by the Partnership for any fiscal year, calculated by the following steps:

(i)     First, determine "*Amount A*" by multiplying:

(a)     the sum of:

i.      the DK Group net profits including amounts accrued but not yet paid (excluding Closed End Fund GP Profits, Closed End Fund LP Profits and DK Solutions Profits) for such fiscal year, and

ii.     the appreciation or depreciation for such fiscal year in (i) the aggregate net asset value of all DKIL Shares owned by or on behalf of the LLP Partners and their related Schedule B Persons and (ii) the aggregate net asset value of all LLP Partners' capital accounts in the Partnership; by

(b)     an LLP Partner's Schedule A Percentage then in effect for such fiscal year;

(ii)    second, determine "*Amount B*" by subtracting:

(a)     the amount of the appreciation or depreciation for such fiscal year in the net asset value of the DKIL Shares owned by or on behalf of an LLP Partner and his or her related Schedule B Persons and such LLP Partner's capital account in the Partnership (as specified in (i)(a)ii above), from

(b)     Amount A (determined under (i) above);

(iii)   third, determine "*Amount C*" by multiplying Closed End Fund LP Profits by an LLP Partner's Schedule A Percentage then in effect for such fiscal year;

(iv)    fourth, determine "*Amount D*" as the sum of:

(a)     the LLP Partner's share of the Closed End Fund GP Profits for the fiscal year for each Closed End Fund;

(b)     Amount B (determined under (ii) above; and

(c)     Amount C (determined under (iii) above).

For each fiscal year, an LLP Partner's share of the Closed End Fund GP Profits for each Closed End Fund shall be an amount that, when combined with such LLP Partner's share of Closed End Fund GP Profits for prior fiscal years, will reflect as closely as possible the product of the aggregate Closed End Fund GP Profits from such Closed End Fund multiplied by the LLP Partner's Weighted Average Schedule A Percentage or the LLP

8

*Highly Confidential*

Partner's Fixed Schedule A Percentage (as the case may be) then in effect for such Closed End Fund as set forth on Schedule D.

OOO.    "*Retired Partner,*" for purposes of this Agreement, shall have the meaning set forth in Section 11.A.

PPP.    "*Retirement Benefits*" shall mean the benefits of a Retired Partner as set forth in Section 11.F.

QQQ.    "*Retirement Capital*" shall mean, with respect to any LLP Partner, the aggregate net asset value of the Aggregate DK Interests, determined as of the close of business on the day prior to the effective date of the LLP Partner's Retirement Term (after giving effect to any allocations and any distributions pursuant to Section 3 and prior to giving effect to any withdrawals pursuant to Sections 7 and 8.A(iv) that are effective as of such close of business).

RRR.    "*Retirement Term*" shall have the meaning set forth in Section 11.F.

SSS.    "*Sale*" shall have the meaning set forth in Section 4.B .

TTT.    "*Schedule A*" shall mean Schedule A attached to this Agreement, as it may be amended biennially by the Executive Managing Member in his or her discretion and otherwise in accordance with Section 14.A.

UUU.    "*Schedule A Notice*" shall have the meaning set forth in Section 14.A.

VVV.    "*Schedule A Percentage*" shall mean the percentage denoted on Schedule A to this Agreement as the Schedule A Percentage, as it may be amended from time to time in accordance with Section 14.A.

WWW.        "*Schedule B Persons*" shall mean the Persons set forth on Schedule B hereto, including any Retired Partner or Person to whom an LLP Partner has transferred a portion of his or her DKIL Shares pursuant to this Agreement including any foundation, trust, individual retirement account or any other estate planning or similar entity established for the benefit of an LLP Partner or his or her relatives.

XXX.    "*Schedule C Persons*" shall mean the Persons set forth on Schedule C hereto, including an LLP Partner who has otherwise withdrawn or has been removed as an LLP Partner pursuant to Sections 8, 9, 10 and 11, and who, pursuant to Sections 8, 9, 10 and 11, retains an interest in the Partnership in order to receive his or her share of Closed End Fund GP Profits following the date of such withdrawal or removal.  A Schedule C Person shall have none of the other rights afforded LLP Partners under the Partnership Agreement or under this Agreement except those rights that cannot be waived under the Limited Liability Partnerships Act 2000 (as amended) of England and Wales.

YYY.    "*Spousal Equivalent*" shall mean, with respect to any individual, any other individual where the following circumstances are true: (a) irrespective of whether or not

9

*Highly Confidential*

the relevant individuals are the same sex, they are the sole spousal equivalent of the other for the last twelve months; (b) they intend to remain so indefinitely; (c) neither are married to anyone else; (d) both are at least eighteen years of age and mentally competent to consent to contract; (e) they are not related by blood to a degree of closeness that would prohibit legal marriage in the state in which they legally reside; and (f) they have resided together in the same residence for the last twelve months and intend to do so indefinitely.

ZZZ.   "*Tenth Amended and Restated Agreement*" shall have the meaning set forth in the preamble.

AAAA.   "*Two-Month Period*" shall have the meaning set forth in Section 11.D.

BBBB. "*UK Partner*" shall mean the Persons set forth on Schedule A and Schedule B (including Retired Partners) hereto.

CCCC. "*Weighted Average Schedule A Percentage*" shall mean, with respect to a particular LLP Partner with respect to a particular Weighted Average Fund, the weighted average, determined as of any relevant date, of the Schedule A Percentage assigned to such LLP Partner for each year during such Weighted Average Fund's Investment Period, weighting each Schedule A Percentage based on the number of months that such Schedule A Percentage was in effect over the course of the Investment Period, taking into account any adjustments to an LLP Partner's Schedule A Percentage pursuant to Section 8, 9, 10 and 11.K. For example, the Weighted Average Schedule A Percentage for an LLP Partner on December 31, 2025 with respect to a Weighted Average Fund for which the Investment Period begins on January 1, 2023 and ends on December 31, 2025 where such LLP Partner has a Schedule A Percentage of 5% in 2023, and 4% in 2024 and 2025 shall be equal to 4.34%. DKIF II shall have a separate Weighted Average Schedule A Percentage as set forth on Schedule D with respect to each Investment Period of DKIF II.  For the avoidance of doubt, except as otherwise permitted by this Agreement, for purposes of calculating the Weighted Average Schedule A Percentage of an LLP Partner with respect to a Weighted Average Fund, the Schedule A Percentage for any month in which such LLP Partner was not an LLP Partner or a Retired Partner of the Partnership shall be 0%.

DDDD.   "*Weighted Average Fund*" shall mean any fund designated as such on Schedule D hereto.

2.   Covenant of Confidentiality, Non-Disparagement, Non-Solicitation; Non-Competition.

A.   Prior to the termination of an LLP Partner's, Retired Partner's or Schedule C Person's status as a partner in the Partnership for any reason whatsoever, and thereafter without limitation of time, such LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person shall not knowingly divulge, furnish, or make available to any third party other than its Authorized Representatives, without the prior written consent of the Executive Managing Member, after consultation with the Management Committee, any non-public confidential, proprietary or trade secret information concerning the DK Group, any of their Affiliates or any of their respective clients, or any business of the foregoing, including, without limitation, information concerning any of the DK Entities'

10

*Highly Confidential*

operations, systems, services, personnel and their respective family members, family offices and the like, administration, marketing, financial affairs, investment and trading performance rates of return (*e.g.*, historical or projected performance information or investment track records), philosophies, strategies and techniques, structure, products, product development, technology, valuation models and analysis, research and analysis, credit files, risk management tools, portfolio composition, trading parameters and risk limits, clients and investors and client and investor lists (including, without limitation, the identity of clients or investors and prospective clients or investors, names, addresses, contact Persons and the client's or investor's business or investment status, strategies or needs) (collectively, "Confidential Information").  Prior to any disclosure to an Authorized Representative that is an immediate family member (including a Spousal Equivalent) of an LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person, as applicable, such LLP Partner, Retired Partner, related Schedule B Person or Schedule C Person, as applicable, must advise such Authorized Representative of the obligations set forth in this Section 2.A.  Notwithstanding the foregoing, nothing herein shall prevent an LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person from responding to lawful subpoenas, court orders or requests from regulatory or self-regulatory bodies without the Management Committee's prior written consent; provided, that to the extent practicable and unless prohibited from doing so by law, such LLP Partner, Retired Partner, related Schedule B Person or Schedule C Person shall have given the Management Committee prior written notice of any such subpoena, court order or request promptly following receipt thereof.  In addition, nothing in this Agreement shall be construed to (A) prohibit any LLP Partner, Retired Partner, related Schedule B Person or Schedule C Person from lawfully making reports to or communicating with any governmental agency or law enforcement entity regarding possible violations of federal law or regulation in accordance with the provisions and rules promulgated under Section 21F of the U.S. Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder, or Section 806 of the U.S. Sarbanes-Oxley Act of 2002, as amended from time to time, and the rules and regulations promulgated thereunder, or of any other express "whistleblower" protection provisions of state or federal law or regulation, or (B) require notification to, or prior approval by, the Managing Member of any reporting described in the foregoing clause (A).  Each LLP Partner, Retired Partner, related Schedule B Person and Schedule C Person acknowledges and agrees that Confidential Information shall be the sole and exclusive property of the Partnership, and such LLP Partner, Retired Partner, related Schedule B Person or Schedule C Person shall have no right, title or interest in or to the Confidential Information.  Each LLP Partner, Retired Partner and Schedule C Person hereby assigns to the Partnership any rights such LLP Partner, Retired Partner or Schedule C Person may have or acquire in all Confidential Information.

B.      If an LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person commits a breach, or threatens to commit a breach, of any of the provisions of Section 2.A, the Partnership shall have the right and remedy to have the provisions of such Section specifically enforced by injunctive relief or otherwise exclusively through use of the Emergency Relief Procedures set forth in the JAMS Comprehensive Arbitration Rules & Procedures, without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the

*Highly Confidential*

Partnership, the other LLP Partners, Retired Partners and Schedule C Persons, any of their Affiliates, and the investments, accounts and funds managed by such Persons and that money damages alone shall not provide an adequate remedy to such Persons. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity. In addition, if an Authorized Representative takes any action that would, if such Authorized Representative were a party to this Agreement, be a breach or threatened breach of any of the provisions of Section 2.A, the LLP Partner, Retired Partner, related Schedule B Person, Schedule C Person, former LLP Partner, former Retired Partner, former related Schedule B Person or former Schedule C Person, as applicable, that disclosed Confidential Information to such Authorized Representative shall be deemed to have breached or threatened to breach the provisions of Section 2.A and shall be liable for such breach and/or threatened breach to the same extent it would be liable had such LLP Partner, Retired Partner, related Schedule B Person, Schedule C Person, former LLP Partner, former Retired Partner, former related Schedule B Person or former Schedule C Person, as applicable, directly breached or threatened to breach the provisions of Section 2.A.

C.      Prior to the termination of an LLP Partner's, Retired Partner's or Schedule C Person's status as a partner in the Partnership for any reason whatsoever, and thereafter without limitation of time (the "Non-Disparagement Period"), such LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person shall not disparage or defame any of the DK Entities, or their respective current or former officers, directors, shareholders, partners or members, in communications with investors, clients, potential clients, competitors, the media, or other Persons with whom any of the above do business or may do business. For purposes of illustration, the foregoing restriction bars each LLP Partner, Retired Partner, any related Schedule B Person or Schedule C Person from making, publishing or communicating any remarks, comments or statements that impugn or criticize the character, honesty, integrity, morality, business acumen or abilities of the individual or entity to whom such remarks, comments or statements are directed or that portray or tend to portray such individual or entity in a negative light. Likewise, each of the other members, partners and shareholders of DK Group have agreed that during the Non-Disparagement Period, he or she shall not disparage or defame the terminated LLP Partner, Retired Partner or Schedule C Person.

D.      Non-Solicitation and Non-Interference. (i) Clauses (ii)(A)-(ii)(G) of this subparagraph (D), set forth below, shall apply prior to the voluntary withdrawal or removal of an LLP Partner as a partner of the Partnership or the retirement of a Retired Partner, as applicable, and:

> (a)      in the case of an LLP Partner that does not elect to become a Retired Partner, for a period of 24 months thereafter, or

> (b)      in the case of a Retired Partner, during the Retirement Term and for a period of 24 months after expiration thereof or early termination thereof.

*Highly Confidential*

(ii)    An LLP Partner and a Retired Partner shall not, directly or indirectly, on behalf of such LLP Partner or Retired Partner, as applicable, or any other Person, without the written consent of the Management Committee, in any way:

(a)    <u>Non-Solicitation of Investors and Clients</u>.  Solicit, or any manner attempt to solicit, the business of any existing or prospective investor or client of any of the DK Entities or any investor or client who was an investor or client of any of the DK Entities at any time during the 12 month period preceding the effective date of the withdrawal or removal of such LLP Partner or the retirement of such Retired Partner, as applicable; for the avoidance of doubt, the restriction set forth herein prohibits the acceptance of, or discussion of the possibility of accepting in the future, investment capital from any existing or prospective investor or client of the DK Entities or any former investor or client who was an investor or client of any of the DK Entities during the 12 month period preceding the effective date of the withdrawal or removal of such LLP Partner or the retirement of such Retired Partner, as applicable;

(b)    <u>Non-Interference with Investors, Clients and Business Partners</u>.  Interfere, or attempt to interfere, with the relationship between the DK Entities and any client, investor, account, customer, licensee or other business relation of the DK Entities;

(c)    <u>Non-Inducement and Non-Diversion of Investors, Clients and Business Partners</u>.  Encourage or induce, or in any manner attempt to encourage or induce any client, investor, account, customer, licensee or other business relation of the DK Entities to cease doing business with or reduce the amount of business such client, investor, account, customer, licensee or other business relation conducts with the DK Entities, or to divert the relationship of any of the DK Entities with any client, investor, account, customer, licensee or other business relation for the personal benefit of such LLP Partner or Retired Partner, as applicable, or of such company or other person or entity associated with such LLP Partner or Retired Partner, as applicable;

(d)    <u>Non-Solicitation of Personnel</u>.  Solicit, induce or encourage, or attempt to solicit, induce or encourage, the withdrawal or resignation of any partner, employee or other personnel of any of the DK Entities;

(e)    <u>Non-Interference with Personnel</u>.  Interfere, or attempt to interfere, in any way with the relationship between the DK Entities and any of their partners, employees or other personnel;

(f)    <u>Non-Hire of Personnel</u>.  Hire (which shall include retaining the services of), attempt to hire, or engage in any discussions or communications concerning hiring or potentially hiring any partner, employee or other personnel of the DK Entities or any Person who was a

13

*Highly Confidential*

partner, employee or other personnel of the DK Entities at any time during the six month period immediately prior to the effective date of the withdrawal or removal of such LLP Partner (or, in the case of a Retired Partner, during the six month period preceding the expiration or early termination of the Retirement Term); and/or

(g)　No Business Relationship with Personnel.  Enter into a partnership, limited liability company, corporation, new or joint venture or similar business arrangement with, any Person who is a partner, employee or other personnel of the DK Entities or who was such a partner, employee or other personnel of the DK Entities at any time within the six month period preceding the effective date of the withdrawal or removal of such LLP Partner or retirement of such Retired Partner, as applicable.

E.　Non-Competition.

(i)　Clause (ii) of this subparagraph E, set forth below, shall apply prior to the voluntary withdrawal or removal of an LLP Partner as a partner of the Partnership or the retirement of a Retired Partner, as applicable, and:

(a)　in the case of an LLP Partner that does not elect to become a Retired Partner, for a period of 12 months following the effective date of such LLP Partner's withdrawal pursuant to Section 8.A(i) or removal pursuant to Section 9.A of this Agreement (the "Post-LP Non-Compete Period"), or

(b)　in the case of a Retired Partner, during the Retirement Term and for a period of 12 months after the expiration thereof or early termination thereof.

(ii)　An LLP Partner and a Retired Partner shall not directly or indirectly, other than on behalf of the DK Entities, without the written consent of the Management Committee, organize, establish, own, operate, manage, control, engage in, participate in, invest in, permit his or her name to be used by, act as a consultant or advisor to, render services for (alone or in association with any Person, firm, corporation or business organization), or otherwise assist, whether as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor, stockholder, partner, member or in any other individual or representative capacity, any Person or entity that engages in or owns, invests in, operates, manages or controls any venture or enterprise which engages or proposes to engage in, any asset management business or investment business or any other business activities identical or similar to any of those engaged in by any of the DK Entities as of the date of the LLP Partner's withdrawal or the Retired Partner's retirement, as applicable, if, in any of the foregoing roles, such LLP Partner or Retired Partner, as applicable, would engage in activity (x) which is similar or substantially related to any activity in which such LLP Partner or Retired Partner was engaged, in whole or in part, while performing work for the DK Entities; (y) for which such LLP Partner or Retired Partner had direct or indirect personal, managerial or supervisory

14

or other responsibility while associated with the DK Entities; or (z) which calls for the application of the same or similar specialized knowledge or skills or investment and trading strategies as those utilized by such LLP Partner or Retired Partner while performing work for the DK Entities; provided, further, that during the Post-LP Non-Compete Period, the LLP Partner shall provide, as soon as practicable and in all cases at least 10 business days written advance notice to the Partnership of the LLP Partner's intention to accept a position to be employed by, associated with or represent any person, firm, association, partnership, corporation or other entity or to begin providing services to any such entity, and provide the Partnership with such information as the Partnership may require to determine whether such position, role and duties would likely or potentially lead to a violation of such restrictions; provided, further, that in the event the LLP Partner voluntarily withdraws from the Partnership, during the Post-LP Non-Compete Period, (a) the LLP Partner will be paid his or her annualized draw as in effect immediately prior to his or her notice of voluntary withdrawal, paid in accordance with the normal payroll practices of the Partnership, and (b) the Partnership will pay or reimburse the LLP Partner for the cost of continuation health coverage if the LLP Partner elects and is eligible for continuation coverage and is not eligible to participate in another group health plan; provided, however, that nothing contained in this Section 2.E(ii) shall restrict an LLP Partner's or a Retired Partner's right to (A) manage his or her own investments or the investments of any other Person, within the definition of Family Office or (B) with the consent of the Management Committee, manage (including for compensation) the investments of a Person that is a tax-exempt entity under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended, or an equivalent statute under the laws of the United Kingdom.

F.      Each UK Partner undertakes to, and to cause its respective Affiliates to, in either case, take all actions necessary or appropriate for the UK Partner to comply with the provisions of this Section 2. Each of the UK Partners further undertakes not to, either directly or indirectly including through Affiliates of such UK Partner, circumvent or attempt to circumvent the effect of this Agreement, including the taking of any other actions that would reasonably be expected to result in the foregoing.

G.      Each UK Partner, Retired Partner, any related Schedule B Person and Schedule C Person acknowledges that a material breach or attempted or threatened breach by it of any provisions of this Section 2 would cause irreparable injury to the DK Entities if not specifically enforced.  Each DK Entity shall be entitled, in addition to all other applicable remedies available at law and equity, including claims for damages, to seek injunctive relief or otherwise exclusively through use of the Emergency Relief Procedures set forth in the JAMS Comprehensive Arbitration Rules & Procedures, without the need to post any bond or other security.

H.      As one of its remedies for a material breach or attempted or threatened material breach of any provisions of this Section 2 by a Retired Partner, and without in any way limiting the ability of the Partnership to seek additional or other remedies, the Partnership

15

*Highly Confidential*

may terminate all Retirement Benefits provided for under Section 11 hereof, including, without limitation, rights that apply after expiration of the Retirement Term.

I.      The provisions of this Section 2 shall survive the termination of this Agreement. Any of the restrictions on activities set forth in this Section 2 may be waived by the Management Committee in its sole discretion.

J.      For the avoidance of doubt, the duration of the restrictive covenants set forth in subparagraphs (D) and (E) of this Section 2 shall not be extended solely because an LLP Partner retains an interest in the Partnership as a Schedule C Person.

3.      <u>Activities of LLP Partner</u>.  No LLP Partner or Retired Partner shall engage for his or her own account or the account of any other Person in any transaction of the type included in the business of the DK Entities other than as permitted in the DK Entities' Code of Ethics, except with the express written consent of the Executive Managing Member and the DK Entities' Chief Compliance Officer.

4.      <u>Profit Distributions; Sale; Clawback</u>.

A.      Except as provided herein, for so long as an LLP Partner is a partner in the Partnership (and not a Retired Partner), such LLP Partner shall be entitled to a Profit Distribution calculated (in the manner set out in the definition of "Profit Distribution" above) by reference to the Schedule A Percentage, Weighted Average Schedule A Percentage(s) and Fixed Schedule A Percentage(s), as applicable, set forth on <u>Schedule A</u> and <u>Schedule D</u> attached hereto, as such Schedule A and Schedule D may be revised from time to time in accordance with Section 14.  Each LLP Partner shall be required to contribute all or a portion of such Profit Distribution and all or a portion of such LLP Partner's allocable share of the DK Solutions Profits, as determined by DKCM, acting through its Executive Managing Member, to DKIL as of the first subscription date for DKIL falling on or after the date of the distribution of such Profit Distribution and the DKIL Shares issued in respect of such contribution shall be subject to the withdrawal provisions found in this Agreement, or as otherwise directed by DKCM.  In the event a general partner of a Closed End Fund becomes subject to a clawback obligation, each LLP Partner shall be personally obligated to return to the Partnership an amount reasonably interpreted and determined by DKCM to be his or her share of the clawback obligation based on the Closed End Fund GP Profits received by such LLP Partner with respect to such Closed End Fund.  In each case, this obligation shall (i) remain in full force and effect for so long as the general partner of the applicable Closed End Fund has such obligation to such Closed End Fund and (ii) shall continue to apply to any LLP Partner who withdraws, retires or is removed from the Partnership and becomes a Retired Partner or Schedule C Person (the "<u>Clawback Obligation</u>").  In the sole discretion of the Managing Member, an LLP Partner's or Retired Partner's Clawback Obligation may be satisfied by a compulsory redemption of its DKIL Shares and a contribution of the required amount to the Partnership on behalf of such LLP Partner or Retired Partner.

B.      For so long as an LLP Partner is a partner in the Partnership (except as a Schedule C Person), including during any Retirement Term, the assets or interests of the Partnership

16

*Highly Confidential*

shall be included as part of any transaction in which all or part of the assets, interests or shares of the DK Group are sold (a "Sale"). Furthermore, the percentage of the assets or interests of the Partnership that is sold shall be equal to the percentage of assets, interests or shares of each other entity within the DK Group being sold. An LLP Partner shall share in the Sale proceeds to the extent determined by DKCM, acting through the Executive Managing Member.

C.      DKCM undertakes that its determination under Section 4.B shall be made in good faith upon consideration of the appropriate value to be allocated to an LLP Partner's interests in the Partnership and taking into consideration the bases upon which the Sale proceeds are allocated. In making its determination, DKCM shall not consider the percentage of voting rights in the Partnership held by an LLP Partner.

D.

(i)      In the event of a Sale, DKCM shall select, and pay for, a recognized and reputable appraiser and a member of the U.K. tax bar (that is referred to as a QC) to determine the portion of the Sale proceeds attributable to the fair value of the assets or interests of the Partnership (the "Fair Value"). With respect to Sale proceeds received by an LLP Partner that are in excess of the amount determined to be attributable to such LLP Partner's portion of the Fair Value (the "Excess Over Fair Value"), DKCM shall pay to such LLP Partner an amount equal to the difference between the U.K. tax on the Excess Over Fair Value calculated at ordinary income rates versus the U.K. tax on the Excess Over Fair Value calculated at capital gain rates (and any U.K. taxes imposed on the amounts payable under this Section 4.D(i). Such payment shall be made at such time as such tax is due.

(ii)     Furthermore, in the event that the U.K. tax authorities or the QC selected under Section 4.D(i) determine, assess or notify that some or all of the Sale proceeds attributable to an LLP Partner's portion of the Fair Value is subject to tax at ordinary income rates (rather than capital gains rates) and the percentage of such LLP Partner's portion of the Fair Value that is subject to tax at ordinary income rates is greater than the percentage, if any, of the Sale proceeds received by members of DKCM that is subject to tax at ordinary income rates (such difference in the percentages of Sale proceeds subject to ordinary income rates being referred to as the "Excess Over the DKCM Percentage"), then DKCM shall pay to such LLP Partner an amount equal to the difference between the U.K. tax on the Excess Over the DKCM Percentage calculated at ordinary income rates versus the U.K. tax on the Excess Over the DKCM Percentage calculated at capital gains rates (and any U.K. taxes imposed on the amounts payable under this 4.D(ii) and associated interest, penalties and interest on penalties). Such payment shall be made at such time as such tax is due. In addition, associated legal and other professional costs shall be reimbursed as incurred.

E.      For the avoidance of doubt, except with respect to amounts relating to periods prior to their becoming LLP Partners, the LLP Partners shall not participate in the Deferred Profit Allocation Program of the Partnership.

17

*Highly Confidential*

F.       In the event any Person shall be an LLP Partner for less than a full fiscal year pursuant to Sections 8 or 9, such LLP Partner shall cease to share in the Profit Distribution (excluding Closed End Fund GP Profits which shall be payable otherwise in accordance with the provisions hereunder) attributable to any period following the effective date of the withdrawal, and the Profit Distribution (excluding Closed End Fund GP Profits which shall be payable otherwise in accordance with the provisions hereunder) to such LLP Partner for such fiscal year shall be adjusted to equal the lesser of (i) the amount that would have been distributable to such LLP Partner if such withdrawal had occurred at the end of the relevant fiscal year multiplied by a fraction, the numerator of which shall be the number of days during the relevant fiscal year prior to such withdrawal and the denominator of which shall be 365 and (ii) the amount that would otherwise be distributable to such LLP Partner if the date of such withdrawal had been the last day of a fiscal year.

G.       In the event any Person shall be an LLP Partner for less than a full fiscal year as a consequence of his or her admission to the Partnership on a date other than the first day of fiscal year, then the Profit Distribution (excluding Closed End Fund GP Profits which shall be payable otherwise in accordance with the provisions hereunder) with respect to such LLP Partner for such fiscal year shall be adjusted to equal the lesser of (i) the amount that would have been distributed to such LLP Partner if such admission had occurred as of the first day of the fiscal year multiplied by a fraction, the numerator of which shall be the number of days during the relevant fiscal year in which such Person is a UK Partner, and the denominator of which shall be 365 and (ii) the amount that would have been distributable to such UK Partner for such partial year without taking into account any adjustments hereunder.

5.       <u>Exculpation and Indemnification</u>.

A.       None of the LLP Partners or Retired Partners, acting in his or her capacity as such (collectively, "<u>Indemnified Persons</u>"), shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any UK Partner for any action taken or omitted to be taken by it or by any other LLP Partner or other Person with respect to the Partnership, including any acts of any brokers or other agents of the Partnership or the UK Partners, except in the case of such Indemnified Person's own gross negligence, willful misconduct or fraud.

B.       Each Indemnified Person shall be protected and indemnified by the Partnership to the fullest extent legally permissible under and by virtue of the laws of the State of New York against all damages, fines, liabilities and losses suffered by such Indemnified Person by virtue of his or her status as an Indemnified Person, (including amounts paid in respect of judgments or fines or in settlement of litigation and expenses, including attorneys' fees, reasonably incurred by any of them in connection with any pending or threatened litigation or proceeding) with respect to any action or omission taken or suffered by such Indemnified Person, other than damages, fines, liabilities and losses resulting from the gross negligence, willful misconduct or fraud of the Indemnified Person.  The indemnification provided by this Section 5 shall be recoverable only out of the assets of the Partnership.  The Partnership will pay expenses (including reasonable attorneys' fees) incurred by any Indemnified Person seeking indemnification under this Section 5 (the "<u>Indemnitee</u>") in defending any

action described hereunder in advance of the final disposition of that action upon receipt of an undertaking by or on behalf of the Indemnitee to repay those expenses if it is ultimately determined that the Indemnitee is not entitled to be indemnified by the Partnership pursuant to this Section 5.

C.      Notwithstanding the foregoing, (i) Section 5.B will not apply with respect to any action against the DK Group brought by or on behalf of a UK Partner (or his or her related Schedule B Persons or Schedule C Persons), in each case, in which such UK Partner (or his or her related Schedule B Persons or Schedule C Persons) does not prevail against the DK Group, and (ii) a UK Partner shall not be entitled to advancement of expenses pursuant to Section 5.B with respect to any action brought by such UK Partner (or his or her related Schedule B Persons or Schedule C Persons) against the DK Group or another DK Member.

D.      To the maximum extent permitted by law, as among (1) Fund Insurance, (2) the Funds, (3) DK Group Insurance, (4) the DK Group and (5) the Managing Member, this Section 5 shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments, with (a) Fund Insurance (if applicable) having primary liability, (b) the Funds having secondary liability, (c) DK Group Insurance (if applicable) having tertiary liability, (d) the DK Group having quaternary liability and (e) the Managing Member having quinary liability.

6.      <u>Assignment</u>.

A.      No LLP Partner shall sell, assign, pledge or otherwise encumber or dispose of all or any part of his or her interest in the Partnership without the prior written consent of the Executive Managing Member and all the DK Members if such assignment is to a new or existing LLP Partner.  In addition, no LLP Partner shall sell, assign, pledge or otherwise encumber or dispose of all or any part of his or her DKIL Shares without the prior written consent of (i) the Management Committee, if the assignment is to a Person that is not already a Schedule B Person, (ii) the Executive Managing Member, if the assignment is to a Person that is already a Schedule B Person or (iii) the Executive Managing Member and all the DK Members if such assignment is to a new or existing LLP Partner.  Any assignment by an LLP Partner not made in accordance with the terms of this Section 6.A shall be null and void.  No Person to whom an LLP Partner sells, assigns, pledges or otherwise disposes of all or any part of his or her interest in the Partnership shall be admitted as a partner of the Partnership without the consent of all of the other DK Members.

B.      No Schedule B Person shall sell, assign, pledge or otherwise encumber or dispose of all or any part of its DKIL Shares (including any beneficial interest therein) without the prior written consent of the Management Committee.  Any assignment by a Schedule B Person not made in accordance with the terms of this Section 6.B shall be null and void.

C.      As a condition to any Schedule B Person becoming a party to this Agreement, such Schedule B Person shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the Executive Managing Member, as the Executive Managing Member may deem necessary or desirable, including to confirm that the individual legal representative, committee or other entity joining as a party hereto as such Schedule B

19

Person has agreed to be bound by all the applicable covenants, terms and conditions of this Agreement, as the same may have been amended.  Such Schedule B Persons shall become a party to this Agreement on the last to occur of:  (i) their execution of the instruments described in this Section 6.C; and (ii) the approval of the Executive Managing Member and the prior written consent of the Management Committee.  Such Persons shall thereupon be included in the definitions of Schedule B Persons and UK Partners, as applicable, for all purposes of this Agreement.

D.      If any UK Partner is involved in a divorce or other dissolution of marriage proceeding with his or her spouse, such UK Partner shall use his or her best efforts to continue to own his or her interest in the Partnership vis-à-vis his or her spouse. If all or a part of such UK Partner's interest in the Partnership is transferred to his or her spouse as a result of the divorce or other dissolution of marriage proceeding, effective as of the date of such transfer, notwithstanding any provision to the contrary herein, the transferred portion of such interest in the Partnership shall be a non-voting, passive interest in the Partnership and such spouse: (i) shall have no voting or consent rights with respect to his or her interest in the Partnership; (ii) shall have no right to inspect the books and records of the Partnership; and (iii) shall not have any access to any of the Partnership's proprietary or other information, except for certain financial information directly relating to its interest, including tax information, as determined by the Executive Managing Member. In addition, the Managing Member or its designees shall have the right (but not the obligation) to purchase such spouse's interest in the Partnership for a purchase price based on a formula as determined by the Management Committee. The Managing Member or its designees shall exercise their buyout right pursuant to this Section 6.D by the delivery of an exercise notice to the spouse.  As soon as practicable, but no later than the 60th day after the delivery of such exercise notice, the parties to the transaction shall execute and deliver such instruments and documents as shall be reasonably required by the parties to consummate the transaction and the Managing Member or its designees, as applicable, shall pay the purchase price for the purchased interest in the Partnership.  If, within such 60 day period following the delivery of the exercise notice, the spouse is unable to transfer his or her interest in the Partnership or is unavailable to execute the transfer instruments and documents, in each case, in accordance with this Section 6.D, then, upon the delivery of the purchase price therefor (which may be held in a segregated account for the benefit of the spouse), such interest shall automatically, with no further action taken by the Managing Member, the Partnership, or any other Person, be transferred in accordance with the terms of this Agreement.  All interests in the Partnership purchased pursuant to this Section 6.D shall be conveyed free and clear of all liens; <u>provided</u>, however, that if any such interests in the Partnership are conveyed subject to any liens, the purchase price payable to the spouse shall be reduced by the amount necessary to release any such liens.  For purposes of this Section 6.D, a "transfer" shall include any assignment, pledge, charge, creation of a security interest or lien, placement in trust (voting or otherwise), assignment or in any other way encumbrance or disposition, directly, indirectly or synthetically.

7.      <u>Advances</u>.

At any time prior to an LLP Partner's Retirement Term, an LLP Partner may request, and the Partnership shall pay, an advance in an amount equal to up to 2.5% *per annum* of the aggregate

20

net asset value of such LLP Partner's Aggregate DK Interests, calculated as of the first day of the year in which any such advance is taken pursuant to this Section 7 (the "2.5% Proviso"). The Management Committee may waive or modify the 2.5% Proviso at any time and from time to time, in its discretion. The interest on such advance, as calculated at an interest rate determined by the Management Committee in its discretion at the time such advance is taken, shall be due as of the end of the then-current Biennial Period. The Partnership may satisfy such interest in part or in whole by withholding such amount from an LLP Partner's Profit Distributions for the relevant period, if any. The amount equal to any advance and any interest which is not paid through withholding by the Partnership or repayment by an LLP Partner to the Partnership shall be paid through a compulsory withdrawal from an LLP Partner's capital account in the Partnership or capital account of such LLP Partner in any other entity comprising the DK Group and/or a compulsory redemption of an LLP Partner's DKIL Shares as of the end of the then-current Biennial Period, with the redemption proceeds payable directly to the Partnership or such other entity comprising the DK Group.

8.     Voluntary Withdrawal.

A.     Withdrawal.

(i)     Prior to his or her Retirement Term, an LLP Partner shall have the right to withdraw as a partner in the Partnership and, at his or her option, concurrently redeem all, but not less than all, of his or her DKIL Shares and interest in the Partnership effective as of the last day of any month upon three months' prior written notice to the Executive Managing Member and DKIL. A notice by an LLP Partner to redeem all of his or her DKIL Shares hereunder shall be deemed a notice by any related Schedule B Persons to redeem all of its DKIL Shares pursuant to Section 8.A(vi) as of the last day of such month. Upon the withdrawal of an LLP Partner from the Partnership, his or her interest shall cease to carry with it management responsibilities and shall become non-voting.

(ii)     An LLP Partner may elect to become a Retired Partner by providing a Notice of Intent to Retire pursuant to Section 11.B; provided, however, that such LLP Partner is eligible to make such election as set forth in Section 11.A. Upon such election, such LLP Partner shall be entitled to receive Retirement Benefits for the Retirement Term upon the terms set forth in Section 11. Should such LLP Partner desire to withdraw from the Partnership and not provide a Notice of Intent to Retire, he or she, if applicable, shall retain a limited interest in the Partnership as a Schedule C Person and shall have the right to receive in addition to his or her capital account in the Partnership:

(a)     his or her annual Profit Distribution from the Partnership through the month-end falling on or immediately following the effective date of withdrawal; provided, however, that any Closed End Fund GP Profits for the then current fiscal year shall be excluded from the Profit Distribution under this clause (a) and shall be paid under Section 8.A(ii)(b) below; and

21

*Highly Confidential*

(b)      as a Schedule C Person, his or her share of Closed End Fund GP Profits for the remaining term of any Closed End Fund identified on Schedule D; provided, that in the event of an LLP Partner's withdrawal during the Investment Period of a Weighted Average Fund, for purposes of determining such LLP Partner's Weighted Average Schedule A Percentage, such LLP Partner's (and his or her related Schedule B Persons') Schedule A Percentage shall be 0% for such Weighted Average Fund as of the date of such withdrawal.

(iii)      If an LLP Partner voluntarily withdraws from the Partnership but (1) does not provide a Notice of Intent to Retire and (2) at the time of such voluntary withdrawal, does not submit a proper request to redeem all of his or her DKIL Shares (including any DKIL Shares owned by his or her related Schedule B Persons), then such LLP Partner's DKIL Shares (including any DKIL Shares owned by his or her related Schedule B Persons) shall be converted, beginning as of the first day of the first quarter immediately following the effective date of withdrawal, into the class of shares of DKIL that is subject to the highest fees paid by (and incentive allocation made with respect to) any investor in DKIL and shall be subject to the same terms in respect of redemptions (including compulsory redemptions and the gate) as are set forth with respect to such class in the DKIL fund documents in respect of full fee paying investors.

(iv)      Notwithstanding Section 8.A(i) and subject to Section 7, upon providing a Notice of Intent to Retire pursuant to Section 11.B, an LLP Partner shall have the right to redeem, as of the close of business on the last day of the fiscal year preceding the fiscal year in which such LLP Partner's Retirement Term will begin, an amount that, when aggregated with any advance paid to such LLP Partner or his or her related Schedule B Persons pursuant to Section 7 that has not been repaid, does not exceed 50% of his or her Retirement Capital, upon 75 days' prior written notice to the Executive Managing Member.

(v)      During his or her Retirement Term, an LLP Partner shall have the right to redeem as of the end of any fiscal year, an amount of the Aggregate DK Interest that, when aggregated with any other amount of the Aggregate DK Interest redeemed by such LLP Partner pursuant to Section 8.A(iv) or this Section 8.A(v) and the amount of Aggregate DK Interest redeemed by the related Schedule B Persons during the period commencing upon an LLP Partner's provision of a Notice of Intent to Retire, does not exceed 50% of such LLP Partner's Retirement Capital upon 75 days' prior written notice to the Executive Managing Member.  In the event that such LLP Partner and/or any related Schedule B Persons elect to redeem an amount that, when aggregated with any other amounts redeemed by such LLP Partner pursuant to Section 8.A(iv) or this Section 8.A(v) and amounts redeemed by the related Schedule B Persons, if any, during such period, exceeds 50% of such LLP Partner's Retirement Capital at any time during such LLP Partner's Retirement Term, such LLP Partner shall be deemed to have provided a notice of Early Termination under Section 11.K and such LLP Partner and any related Schedule B Persons shall be subject to the terms of Section 11.K.

*Highly Confidential*

(vi)     Each Schedule B Person shall have the right to redeem all or a portion of its DKIL Shares as of the last day of each fiscal year, subject to the approval of the Management Committee and upon 75 days' prior written notice to the Executive Managing Member and DKIL.  Such notice of an intent to redeem shall specify the number of such Schedule B Person's DKIL Shares to be redeemed.

(vii)    In the event a Schedule B Person and/or an LLP Partner makes an election to redeem DKIL Shares as of (i) the close of business on the last day of the fiscal year preceding the fiscal year in which such LLP Partner's Retirement Term will begin, (ii) at any time during such LLP Partner's Retirement Term or (iii) following such LLP Partner's death (provided that such LLP Partner was eligible for Retirement Benefits) in an amount that, when aggregated with any amounts redeemed by the related Schedule B Persons during the periods described in clauses (ii) and (iii) and amounts redeemed by such LLP Partner pursuant to Sections 8.A(iv) and 8.A(v), exceeds 50% of such LLP Partner's Retirement Capital, such LLP Partner shall not be permitted to elect to become a Retired Partner pursuant to Section 11.A or shall be deemed to have provided a notice of Early Termination under Section 11.K, as applicable, and such LLP Partner and his or her related Schedule B Person shall thereafter be subject to the terms of Section 11.K.

(viii)   Any LLP Partner providing notice of voluntary withdrawal from the Partnership shall be deemed to have given notice of voluntary withdrawal from all DK Group entities in which such LLP Partner holds an interest effective as of the date of withdrawal from the Partnership.  Distributions or payments due upon the withdrawal from any other DK Group entity shall be subject to the distribution provisions and other terms set forth in each entity's governing documents.

B.     Distribution of Withdrawal Proceeds Under Section 8.A.

(i)      The redemption proceeds with respect to DKIL Shares redeemed pursuant to the terms of Sections 8.A(i), 8.A(iv), 8.A(v) and 8.A(vi) shall be distributed in accordance with the terms of the governing documents of DKIL to the extent fiscally practicable for DKIL, as determined in the discretion of the Management Committee, but at least 90% shall be distributed no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period) distributed as soon as practicable after the annual audit for such fiscal year.

(ii)     In the sole discretion of DKIL, DKIL may fulfill the redemption request in cash or in kind, or in a combination thereof.

(iii)    Notwithstanding anything to the contrary herein, all distributions pursuant to this Section 8.B shall remain subject to any gate, suspension and, except as otherwise provided herein, other provisions of DKIL relating to redemptions.

*Highly Confidential*

(iv)    Subject to Section 12.8 of the Partnership Agreement, with respect to an interest of the Partnership withdrawn pursuant to the terms of Sections 8.A(i), 8.A(iv), 8.A(v) and 8.A(vi), the Partnership shall distribute 90% of the withdrawal proceeds (computed on the basis of unaudited data as of the end of the fiscal year and including interest at the Federal Funds Rate on the amount distributed for the period from the end of the fiscal year through the date of distribution) no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period from the end of the fiscal year through the date of distribution) distributed as soon as practicable after the annual audit for such fiscal year.  Notwithstanding the foregoing, the Managing Member may in its discretion hold back, postpone or suspend the payment of withdrawal amounts if, among other reasons, (i) the Partnership is unable to make a timely payment due to liquidity or other considerations (including the imposition of a gate at a DK Entity) or (ii) as of the effective date of the withdrawal, the Partnership has pending multiple requests for withdrawals.  Upon any such postponement or suspension, the Managing Member shall use reasonable efforts to make any payment of the withdrawal amount (together with interest, payable simultaneously with the distribution, at the Federal Funds Rate, compounded quarterly) as soon as practicable.

(v)    The Partnership shall distribute withdrawal proceeds in cash, unless the Management Committee determines, based on the liquidity needs of the Partnership, that all or a portion of the withdrawal proceeds shall be paid in kind. Distributions that are made in kind shall represent a pro rata portion of each asset held by the Partnership unless the Management Committee determines a pro rata distribution is not practicable.

(vi)    Distributions of any withdrawal proceeds by the Partnership pursuant to this Section 8.B are subject to the provision by the Partnership for reserves for liabilities for any Clawback Obligation in the Managing Member's discretion.  In addition, in the sole discretion of the Managing Member, any redemption proceeds with respect to DKIL Shares pursuant to this Section 8.B may be required to be contributed to the Partnership on behalf of such LLP Partner for reserves for liabilities for any Clawback Obligation.

(vii)    Upon the effective date of a complete withdrawal by an LLP Partner of his or her capital account in the Partnership, such LLP Partner shall be withdrawn as a partner in the Partnership and a party to this Agreement, except with respect to his or her right to receive Closed End Fund GP Profits as provided hereunder.

C.    <u>Withdrawal for Income Tax Payments</u>.  An LLP Partner shall be entitled, upon written notice to the Managing Member within 25 days following the end of the fiscal year, to withdraw amounts from his or her capital account in the Partnership to the extent necessary to pay personal income taxes attributable to such LLP Partner's share of income, gains and losses recognized by the Partnership for income tax purposes in respect of the fiscal year immediately preceding such withdrawal (but only to the extent there was not a sufficient distribution charged to such LLP Partner's capital account in the Partnership

*Highly Confidential*

prior to such withdrawal) and any penalties or interest imposed by the taxing authorities in connection with any Partnership profits of prior taxable years. Any amounts withdrawn pursuant to this Section 8.C shall be charged against an LLP Partner's capital account in the Partnership, as of the first day of the fiscal year in which paid. If at any time the Partnership is required or wishes to take action under this Section 8.C and all information needed to make the determinations required in connection therewith is available to the Partnership other than the amounts of the items to be taken into account that are referred to in this Section 8.C (*i.e.*, income, gains and losses) the Partnership shall cause a reasonable estimate of such amounts to be made by the firm of independent certified public accountants then retained by the Partnership, and such reasonable estimate shall be used in completing the determinations to be made by the Partnership. In addition to an LLP Partner withdrawing amounts from his or her capital account in the Partnership to the extent necessary to pay his or her tax obligations, an LLP Partner may also redeem such amounts from his or her DKIL Shares.

9.    Removal.

A.    Removal of an LLP Partner. At the direction of the Executive Managing Member, the Managing Member may remove an LLP Partner from the Partnership:

(i)    With respect to any LLP Partner that has been a LLP Partner for at least five years (prior to such LLP Partner's Retirement Term), with the written consent of at least 75% of all DK Members in interest (which interest shall be based upon the aggregate Company Percentage or Partnership Percentage of such DK Member and his or her related members in each of the DK Group entities (as such term is defined in the operating agreement of each DK Group entity) then in effect) with the consent of the Management Committee,

(ii)    With respect to any LLP Partner that has been a LLP Partner for less than five years (prior to such LLP Partner's Retirement Term), by the Executive Managing Member with the consent of the Management Committee, or

(iii)    With respect to any LLP Partner during such LLP Partner's Retirement Term, by the DK Members with the written consent of at least 75% of all DK Members (determined on a per capita basis);

provided, in the case of clauses (i), (ii) and (iii) above, that if there are fewer than four DK Members, including the Executive Managing Member, then at the direction of the Executive Managing Member and one of the DK Members, the Managing Member may remove an LLP Partner; provided, further, that during the Retirement Term, a Retired Partner may only be removed for Cause. Such removal shall be effective as of the date such consent is received. The determination of whether Cause has occurred shall be made in the reasonable discretion of the Management Committee. Upon the removal of an LLP Partner from the Partnership, his or her interest shall cease to carry with it management responsibilities and such interest shall become non-voting.

*Highly Confidential*

B.      Removal of Schedule C Person.  Subject to Section 9.C(i)(d), at the direction of the Executive Managing Member, the Managing Member may require any Schedule C Person to withdraw from the Partnership for Cause effective as of the last day of any month.  In addition, upon the removal of an LLP Partner for Cause, the treatment of any related Schedule C Person's interest shall be consistent with the treatment of the related LLP Partner's interest pursuant to Section 9.C(i)(d).

C.      Proceeds of Removal.

(i)      Upon the removal of an LLP Partner or Schedule C Person from the Partnership for Cause prior to, or during, the Retirement Term:

(a)      the Executive Managing Member shall direct DKIL to compulsorily redeem such LLP Partner's DKIL Shares as of the effective date of removal.

(b)      if the effective date of removal occurs prior to the commencement of the Retirement Term, then such LLP Partner shall receive his or her annual Profit Distribution from the Partnership through the effective date of removal; provided, however, that any Closed End Fund GP Profits for the then current fiscal year shall be excluded from the Profit Distribution under this clause (b) and shall be paid under Section 9.C(i)(d) below.  He or she also shall receive his or her draw from the Partnership, as well as any health and other ancillary benefits, through the effective date of removal.

(c)      if the effective date of removal occurs during the Retirement Term, then such LLP Partner shall receive his or her Retirement Benefits as set forth in Section 11 through the effective date of removal.

(d)      in the discretion of the Management Committee either:

i.      subject to Section 9.D, such LLP Partner or Schedule C Person shall be fully withdrawn as a partner with no continuing interest in the Partnership and receive a distribution equal to his or her share of Closed End Fund GP Profits attributable to any Closed End Funds as of the date of removal, less any such Closed End Fund GP Profits previously distributed to such LLP Partner or Schedule C Person hereunder; or

ii.      such LLP Partner or Schedule C Person shall retain a limited interest in the Partnership as a Schedule C Person and receive his or her share of any Closed End Fund GP Profits for the remaining term of any Closed End Fund identified on Schedule D; provided, in the case of an LLP Partner, in the event the LLP Partner's removal occurred during the Investment Period of a Weighted Average Fund, for purposes of determining such LLP Partner's Weighted Average Schedule A Percentage, such LLP Partner's (and his or her related Schedule B Persons') Schedule A Percentage shall be 0% for such Weighted Average Fund as of the date of such removal.

26

*Highly Confidential*

(ii)    In the event of the removal of an LLP Partner without Cause, such LLP Partner may elect to become a Retired Partner by providing a Notice of Intent to Retire pursuant to Section 11.B; provided, however, that such LLP Partner is eligible to make such election as set forth in Section 11.A.  Upon such election, such LLP Partner shall be entitled to receive Retirement Benefits for the Retirement Term upon the terms set forth in Section 11.  Subject to Section 9.D, should an LLP Partner be removed without Cause and not provide a Notice of Intent to Retire, he or she, if applicable, shall retain a limited interest in the Partnership as a Schedule C Person and shall have the right to receive, in addition to his or her capital account in the Partnership (including interest on the amount distributed at the Federal Funds Rate from the effective date of the withdrawal through the date of distribution):

> (a)    his or her annual Profit Distribution from the Partnership through the month-end falling on or immediately following the effective date of removal; provided, however, that any Closed End Fund GP Profits for the then current fiscal year shall be excluded from the Profit Distribution under this clause (a) and shall be paid under Section 9.C(ii)(c) below;

> (b)    his or her draw from the Partnership, as well as any health and other ancillary benefits at no charge, for 90 days from the effective date of removal; and

> (c)    as a Schedule C Person, his or her share of Closed End Fund GP Profits for the remaining term of any Closed End Fund; provided, that in the event of an LLP Partner's removal during the Investment Period of a Weighted Average Fund, for purposes of determining such LLP Partner's Weighted Average Schedule A Percentage, such LLP Partner's (and his or her related Schedule B Persons') Schedule A Percentage shall be 0% for such Weighted Average Fund as of the date of such removal;

In addition, such LLP Partner's DKIL Shares shall be converted, beginning as of the first day of the first quarter immediately following the effective date of removal, to the class of shares of DKIL that is subject to the highest fees paid by (or incentive allocation made with respect to) any investor in DKIL and shall be subject to the same terms in respect of redemptions (including compulsory redemptions and the gate) as are set forth in the DKIL fund documents in respect of full fee paying investors.

D.    <u>Distribution of Redemption Proceeds under Section 9.A</u>.

(i)    The redemption proceeds with respect to DKIL Shares redeemed pursuant to the terms of Section 9.C(i)(a) shall be distributed in accordance with the terms of the governing documents of DKIL to the extent fiscally practicable for DKIL, as determined in the discretion of the Management Committee, but at least 90% shall be distributed no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period from the end of the fiscal year through the date of distribution) distributed as soon as

27

*Highly Confidential*

practicable after the annual audit for such fiscal year.

(ii)    In the sole discretion of DKIL, DKIL may fulfill the redemption request in cash or in kind, or in a combination thereof.

(iii)    All distributions pursuant to this Section 9.D shall remain subject to any gate, suspension and, except as otherwise provided herein, other provisions of DKIL relating to redemptions.

(iv)    Subject to Section 12.8 of the Partnership Agreement, with respect to an interest in the Partnership withdrawn pursuant to the terms of Sections 9.C(i) and 9.C(ii), the Partnership shall distribute 90% of the withdrawal proceeds (computed on the basis of unaudited data as of the end of the fiscal year and including interest at the Federal Funds Rate on the amount distributed for the period from the end of the fiscal year through the date of distribution) no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period from the end of the fiscal year through the date of distribution) distributed as soon as practicable after the annual audit for such fiscal year. Notwithstanding the foregoing, the Management Committee may in its discretion hold back, postpone or suspend the payment of withdrawal amounts if, among other reasons, (i) the Partnership is unable to make a timely payment due to liquidity or other considerations (including the imposition of a gate at a DK Entity) or (ii) as of the effective date of the withdrawal, the Partnership has pending multiple requests for withdrawals. Upon any such postponement or suspension, the Managing Member shall use reasonable efforts to make any payment of the withdrawal amount (together with interest, payable simultaneously with the distribution, at the Federal Funds Rate, compounded quarterly) as soon as practicable.

(v)    The Partnership shall distribute withdrawal proceeds in cash, unless the Management Committee determines, based on the liquidity needs of the Partnership, that all or a portion of the withdrawal proceeds shall be paid in kind. Distributions that are made in kind shall represent a pro rata portion of each asset held by the Partnership unless the Management Committee determines a pro rata distribution is not practicable.

(vi)    Distributions of any withdrawal proceeds by the Partnership pursuant to this Section 9.D are subject to the provision by the Partnership for reserves for liabilities for any Clawback Obligation in the Managing Member's discretion. In addition, in the sole discretion of the Managing Member, any redemption proceeds with respect to DKIL Shares pursuant to this Section 9.D may be required to be contributed to the Partnership on behalf of such LLP Partner for reserves for liabilities for any Clawback Obligation.

*Highly Confidential*

10.    <u>Death, Bankruptcy, Disability or Adjudication of Incompetency</u>.

A.    Benefits.

(i)    Upon the death, Bankruptcy, Disability, or adjudication of incompetency of an LLP Partner, such LLP Partner (which for these purposes shall include his or her estate or legal representatives) may: (a) redeem all, but not less than all, of his or her DKIL Shares and interest in the Partnership as of the end of the month during which the date of death, Bankruptcy, Disability or adjudication of incompetency occurred (the "<u>Date of D, B, D or I</u>"), pursuant to the same terms as set forth in Section 8.A, by providing notice to the Executive Managing Member (such election, an "<u>10.A(i) Election</u>"); or (b) elect to become a Retired Partner by giving Notice of Intent to Retire pursuant to Section 11.B; <u>provided</u>, <u>however</u>, that such LLP Partner is eligible to make such election as set forth in Section 11.A.  Upon the election in sub-section (i)(b), the LLP Partner shall be entitled to the Retirement Benefits for the Retirement Term upon the terms set forth in Section 11.  In addition, upon the death, Bankruptcy, Disability, or adjudication of incompetency of such LLP Partner, his or her interest in the Partnership shall cease to carry with it management responsibilities and shall become non-voting.

(ii)    Upon the death, Bankruptcy, Disability, or adjudication of incompetency of such LLP Partner, should such LLP Partner not (x) make an 10.A(i) Election or (y) provide a Notice of Intent to Retire pursuant to Section 11.B:

(a)    Such LLP Partner shall if applicable, retain a limited interest as a Schedule C Person and receive:

i.    such LLP Partner's Performance Earnings through the end of the fiscal year in which the Date of D, B, D or I occurred;

ii.    such LLP Partner's Capital Earnings through the last day of the fiscal year in which the Date of D, B, D or I occurred; <u>provided</u>, <u>however</u>, that if the last day of the 12th full calendar month following the Date of D, B, D or I occurs subsequent to such year-end, then, in addition to the allocation through such year-end, an LLP Partner shall be entitled to Capital Earnings prorated for the period from the beginning of the subsequent year through the last day of such 12th full calendar month;

iii.    such LLP Partner's draw from the Partnership, as well as any health and other ancillary benefits at no charge, for 12 full calendar months following the Date of D, B, D or I;

iv.    such LLP Partner's capital account in the Partnership, which shall be compulsorily withdrawn at the end of the 12th full calendar month following the Date of D, B, D or I;

*Highly Confidential*

v.        as a Schedule C Person, receive his or her share of Closed End Fund GP Profits for the remaining term of any Closed End Fund identified on <u>Schedule D</u>; provided that for purposes of determining such LLP Partner's Weighted Average Schedule A Percentage with respect to any Weighted Average Fund, such LLP Partner's (and his or her related Schedule B Persons') Capital Rate shall be 0% for such Weighted Average Fund as of the day after the 12th full calendar month following the Date of D, B, D or I and such LLP Partner's (and his or her related Schedule B Persons') Performance Rate shall be 0% for such Weighted Average Fund as of the day after the fiscal year-end in which the Date of D,B, D or I occurred; and

(b)        Such LLP Partner's DKIL Shares shall remain invested in DKIL for a period of 12 full calendar months following the Date of D, B, D or I and shall not be charged a management or incentive allocation for such period. The Executive Managing Member shall direct such DKIL Shares to be compulsorily redeemed at the quarter-end falling on or immediately following the end of such 12-month period.

(iii)    During an LLP Partner's Retirement Term, upon such LLP Partner's death, Bankruptcy, Disability or adjudication of incompetency:

(a)        such LLP Partner shall have the right to redeem all or part of such LLP Partner's DKIL Shares and withdraw from the Partnership as of the end of the month during which such death, Bankruptcy, Disability or adjudication of incompetency occurred; <u>provided</u>, <u>however</u>, that an LLP Partner may only redeem less than all of his or her DKIL Shares in a year in which Schedule A becomes effective with the consent of the Management Committee; and <u>provided, further</u>, that, if applicable, such LLP Partner shall retain a limited interest in the Partnership as a Schedule C Person.   Redemptions pursuant to this Section 10.A(iii)(a) shall not be subject to the 2.5% Proviso.  In the event that an LLP Partner requests a complete redemption of his or her DKIL Shares and an interest of the Partnership pursuant to this Section 10.A(iii)(a), DKIL may, in its discretion and at the direction of the Management Committee, hold back a portion of such redemption proceeds based on a formula as determined by the Management Committee.  If, for any reason, the LLP Partner advises the Management Committee that he is unable to leave such holdback in DKIL, then the holdback shall not be made and the LLP Partner shall cease to receive Retirement Benefits pursuant to Article 8 and such LLP Partner and any related Schedule B Persons will be compulsorily redeemed from DKIL and compulsorily withdrawn from the Partnership.

(b)        Subject to sub-section (a) above, such LLP Partner shall continue to receive his or her Retirement Benefits pursuant to Section 11 until the end of such LLP Partner's Retirement Term, upon which such LLP Partner's

DKIL Shares, to the extent not redeemed, shall be subject to the provisions of Section 11.M; provided, however, that in the event that such LLP Partner and/or his or her related Schedule B Persons elect to redeem more than 50% of his or her Retirement Capital, at any time during such LLP Partner's Retirement Term, such LLP Partner shall be deemed to have provided a notice of Early Termination under Section 11.K and such LLP Partner and his or her related Schedule B Persons shall thereafter be subject to the terms of Section 11.L, as applicable.

B.    Distribution of Withdrawal Proceeds Under 10.A.

(i)    The redemption proceeds with respect to DKIL Shares redeemed pursuant to the terms of Sections 10.A(ii)(b) and 10.A(iii)(a) shall be distributed in accordance with the terms of the governing documents of DKIL to the extent fiscally practicable for DKIL, as determined in the discretion of the Management Committee, but at least 90% shall be distributed no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period) distributed as soon as practicable after the annual audit for such year.

(ii)    In the sole discretion of DKIL, DKIL may fulfill the redemption request in cash or in kind, or in a combination thereof.

(iii)    All distributions pursuant to this Section 10.B shall remain subject to any gate, suspension and, except as otherwise provided herein, other provisions of DKIL relating to redemptions.

(iv)    Subject to Section 12.8 of the Partnership Agreement, with respect to an interest of the Partnership withdrawn pursuant to the terms of Sections 10.A(ii)(a) and 10.A(iii)(a), the Partnership shall distribute 90% of the withdrawal proceeds (computed on the basis of unaudited data as of the end of the fiscal year and including interest at the Federal Funds Rate on the amount distributed for the period from the end of the fiscal year through the date of distribution) no later than 30 days after the end of the fiscal year, with the balance (including interest on the balance at the Federal Funds Rate for the period from the end of the fiscal year through the date of distribution) distributed as soon as practicable after the annual audit for such fiscal year. Notwithstanding the foregoing, the Management Committee may in its discretion hold back, postpone or suspend the payment of withdrawal amounts if, among other reasons, (i) the Partnership is unable to make a timely payment due to liquidity or other considerations (including the imposition of a gate at a DK Entity) or (ii) as of the effective date of the withdrawal, the Partnership has pending multiple requests for withdrawals. Upon any such postponement or suspension, the Managing Member shall use reasonable efforts to make any payment of the withdrawal amount (together with interest, payable simultaneously with the distribution, at the Federal Funds Rate, compounded quarterly) as soon as practicable.

31

(v)     The Partnership shall distribute the mandatory withdrawal proceeds in cash, unless the Management Committee determines, based on the liquidity needs of the Partnership, that all or a portion of the withdrawal proceeds shall be paid in kind. Distributions that are made in kind shall represent a pro rata portion of each asset held by the Partnership unless the Management Committee determines a pro rata distribution is not practicable.

(vi)     Distributions of any withdrawal proceeds by the Partnership pursuant to this Section 10.B are subject to the provision by the Partnership for reserves for liabilities for any Clawback Obligation in the Managing Member's discretion.  In addition, in the sole discretion of the Managing Member, any redemption proceeds with respect to DKIL Shares pursuant to this Section 10.B may be required to be contributed to the Partnership on behalf of such LLP Partner for reserves for liabilities for any Clawback Obligation.

C.     Upon the death, Bankruptcy, Disability, or adjudication of incompetency of its related LLP Partner, a related Schedule B Person may: (i) elect to redeem all, but not less than all, of its DKIL Shares pursuant to the terms of Section 8.A(vi), by providing notice to the Executive Managing Member; provided, however, that the effective date of withdrawal under Section 8.A(vi) shall be the end of the month during which the Date of D, B, D or I occurred, or (ii) if the related LLP Partner had been eligible to become a Retired Partner, elect to remain invested until the earlier of (a) the end of the Retirement Term or (b) the date of an Early Termination, at which time such Schedule B Person shall thereafter be subject to the terms of Section 11.L, as applicable.

11.     Retirement Term.

A.     So long as an LLP Partner is a partner in the Partnership or upon (i) his or her removal without Cause or (ii) his or her death, Bankruptcy, Disability or adjudication of incompetency, such LLP Partner (which for these purposes shall include his or her estate or legal representatives) may elect to become a retired partner (upon such election, a "Retired Partner" and, collectively with all retired LLP Partners, "Retired Partners"); provided, that such LLP Partner has or had (in the case of death, Bankruptcy, Disability or adjudication of incompetency) been a party to this Agreement or any prior version of this Agreement for five or more years.  A Retired Partner shall be entitled to the Retirement Benefits for the Retirement Term upon the terms set forth herein.  An LLP Partner shall not be entitled to the Retirement Benefits if he does not elect to become a Retired Partner.

B.     An LLP Partner must provide to the Executive Managing Member written notice of such LLP Partner's intent to retire and to elect to receive Retirement Benefits (a "Notice of Intent to Retire").  Such Notice of Intent to Retire may be given at any time by an LLP Partner and within 30 days following the effective date of his or her removal without Cause or his or her death, Bankruptcy, Disability or adjudication of incompetency; provided, however, that such Notice of Intent to Retire must be received no later than the first business day in January of a year in which a new Schedule A is to be determined in order for the then-effective Schedule A to apply with respect to the Retired Partner.  A Notice of Intent to Retire that is received after the first business day of a year in which a new

32

*Highly Confidential*

Schedule A is to be determined shall subject the Retired Partner to the terms of such new Schedule A from and after the date that it becomes effective. Any LLP Partner providing a Notice of Intent to Retire shall be deemed to have given a Notice of Intent to Retire from all DK Group entities in which such LLP Partner holds an interest.

C.      Upon receipt of a Notice of Intent to Retire (other than in the case of an LLP Partner's death, Bankruptcy, Disability or adjudication of incompetency), the Management Committee may elect to require that the Retired Partner remain as an active member of the Partnership for a period of up to one year from the retirement date set forth in the Notice of Intent to Retire (the "Gate"). The Management Committee shall advise the Retired Partner of its determination to impose the Gate within 30 days of receipt by it of the Retired Partner's Notice of Intent to Retire. During this period of up to 30 days, the Retired Partner will continue to perform his or her duties on behalf of the Partnership on a full-time basis. The Gate will not be imposed when an LLP Partner is retiring as a result of a severe personal hardship (*e.g.*, significant health problems) involving an LLP Partner or a member of his or her immediate family. Upon the expiration of the Gate, the Retirement Term shall commence.

D.      If, pursuant to Section 11.C, the Management Committee elects to impose a Gate, the Retired Partner shall continue to receive his or her full compensation, including his or her draw and Profit Distribution, and benefits at current rates and shall continue to perform his or her current duties on behalf of the Partnership on a full time basis during the period of the Gate. The Schedule A Percentage that shall apply with respect to the Retired Partner when he is subject to a Gate shall be the Schedule A Percentage that would apply under Section 11.B hereof based upon the date that the Retired Partner provided his or her Notice of Intent to Retire. If the Management Committee determines not to impose the Gate, then, until the end of the second full month (the "Two-Month Period") following the date that the Retired Partner is advised by the Management Committee of such determination, the Retired Partner will continue to perform his or her current duties on a full-time basis. Such Two-Month Period will be considered part of the Retirement Term, and compensation to the Retired Partner shall be pursuant to Sections 11.F and 11.G hereof. The Two-Month Period may be waived by the Management Committee in cases of severe personal hardship.

E.      Effective as of the beginning of the Retirement Term, and continuing throughout such Retirement Term, the Retired Partner (except in the case of death, Bankruptcy, Disability or adjudication of incompetency) agrees to be available for consulting services on reasonable terms and conditions in areas relating to the services that had been performed by the Retired Partner prior to retirement. As a consultant, the Retired Partner shall not be required to provide ongoing, regular services to the Partnership on a day-to-day basis unless the Retired Partner is specifically engaged for more ongoing, regular services on terms and conditions memorialized by a separate consulting agreement executed by the Retired Partner and the Partnership. The Partnership anticipates that its need for the Retired Partner's time will diminish over the Retirement Term.

33

*Highly Confidential*

F.      Retirement Benefits

(i)      The Retirement Term shall continue for four years from the effective date of the LLP Partner's retirement (the "Retirement Term").  During this period, the Retired Partner shall continue to receive his or her Capital Earnings which are attributable to his or her Capital Rate in effect for the relevant periods.  The Retired Partner's Performance Rate, however, shall decline over the Retirement Term in accordance with the following schedule:

| Year | Percentage of 100% of the Performance Rate at the time of Retirement |
|:---:|:---:|
| 1 | 75% |
| 2 | 50% |
| 3 | 25% |
| 4 | 12.50% |

provided that, for the avoidance of doubt, the Retired Partner's Profit Distribution for each fiscal year during the Retirement Term shall continue to be calculated in the manner set out in the definition of "Profit Distribution," so that the amount (Amount D) calculated by reference to the Schedule A Percentage in force for the relevant fiscal year and the Weighted Average Schedule A Percentage in force for any Weighted Average Funds shall be determined for fiscal years during the Retirement Term in accordance with the foregoing provisions of this Section 11.F. For the avoidance of doubt, a Retired Partner shall be entitled to a Weighted Average Schedule A Percentage for any Weighted Average Fund added to Schedule D hereto that has an initial closing during such Retired Partner's Retirement Term, unless the Management Committee determines in good faith that fairness considerations dictate otherwise (for example, among others, where the initial closing of the Weighted Average Fund occurs within a few days of the end of such Retired Partner's Retirement Term).

(ii)      Notwithstanding the foregoing, during a Retired Partner's Retirement Term, the Capital Rate and Performance Rate (including for purposes of calculating his or her Weighted Average Schedule A Percentage applicable to a particular Weighted Average Fund) of each Retired Partner may be diluted in the discretion of the Executive Managing Member, provided that Capital Rates and Performance Rates of all of the other LLP Partners and Retired Partners are being simultaneously diluted on a pro rata basis.

G.      During the Retirement Term, the Retired Partner shall continue to receive his or her draw (which draw shall be subject to the same increase or decrease as the draw of the active LLP Partners), provided, however, that such draw shall be subject to the same sunset provisions as the Performance Rate set forth above.  In addition, the Retired Partner shall

34

*Highly Confidential*

be entitled to receive distributions at the same declared rate as would have been distributed to him had he been an active member of the Partnership.

H.      During the Retirement Term, the Retired Partner shall remain a partner in the Partnership; provided, that his or her interest shall convert to a non-managing member or equivalent interest and shall carry with it no management responsibilities that he may have had in his or her capacity as an active member of the Partnership.  Such interest shall be non-voting except as set forth in Section 14.B hereof with respect to amendments.  References herein to an LLP Partner during his or her Retirement Term are solely for purposes of referring to the appropriate UK Partner with respect to the covenants under Section 2 hereof and the withdrawal and removal provisions under Sections 8, 9 and 10 hereof and are not intended to indicate that such Retired Partner has any management responsibilities with respect to the Partnership.

I.      If the aggregate capital of the Retired Partners invested in the DK Entities exceeds 5% of total investor capital (including capital invested by the general partners of the relevant DK Entities) invested in the DK Entities, the Management Committee, in its discretion, may require the Retired Partners to redeem a portion of their interests in such DK Entities, as the Management Committee determines, provided, however, that such mandatory redemption shall not cause the aggregate capital of the Retired Partners to be less than 5% of total capital of the DK Entities.  Mandatory redemptions of the interests of Retired Partners shall be made pro rata in accordance with their respective interests.

J.      During the Retirement Term, the Partnership will provide the Retired Partner, at no expense to him, office space, and secretarial, health and other ancillary benefits.  Office space shall be on premises leased by the Partnership.  Subsequent to the Retirement Term, and for so long as the Retired Partner continues to comply with Section 2.E hereof, such benefits shall continue to be provided, except that the Partnership, in the discretion of the Management Committee, may charge reasonable amounts to the Retired Partner for health benefits.

K.      A Retired Partner may choose to terminate the Retirement Term prior to the conclusion thereof pursuant to Section 11.F as of the last day of any month upon not less than 30 days' prior written notice to the Executive Managing Member (an "Early Termination").  The Retired Partner, upon exercising an Early Termination, shall be treated as if the Retirement Term for such Retired Partner had concluded as of the effective date of the Early Termination, and such Retired Partner shall be bound in all respects by the terms and conditions applicable to Retired Partners subsequent to their Retirement Term as set forth in Section 11.  In addition, at the end of the Retired Partner's Retirement Term (including upon Early Termination), such Retired Partner shall be removed as a partner in the Partnership, provided that, if applicable, he or she will retain a limited interest in the Partnership as a Schedule C Person in order to receive Closed End Fund GP Profits as provided hereunder.

L.      Upon the termination of a Retired Partner's Retirement Term (including upon Early Termination), such Retired Partner, as a Schedule C Person will retain a limited interest in the Partnership and will be entitled to receive his or her share of Closed End Fund GP

Profits for the remaining term of any Closed End Fund listed on <u>Schedule D</u>. In the event the Retirement Term terminates during the Investment Period of a Weighted Average Fund, for purposes of determining such Retired Partner's Weighted Average Schedule A Percentage related to such Weighted Average Fund, such Retired Partner's Schedule A Percentage shall be 0% as of the date of termination.

M.     Subsequent to the Retirement Term, any amounts that are invested by the Retired Partner or a foundation, trust or similar entity established for the benefit of the Retired Partner (including a related Schedule B Person) (a "<u>Family Investor</u>" and, together with the Retired Partner, a "<u>Post-Retirement Member</u>") in DKIL shall be subject to management fees of 0.75% per annum and incentive compensation of 15% per annum. Management fees and incentive compensation in respect of any other funds managed by the DK Group in which the Post-Retirement Member is an investor will be the highest fees paid by (and incentive allocations made with respect to) any investor therein. Withdrawals from such funds shall be made in accordance with the notice provisions of such funds and otherwise shall be subject to the same terms in respect of withdrawals (including compulsory withdrawals and gates) as are set forth in the applicable fund documents with respect to full fee paying investors.

12.     <u>Management Committee</u>. A management committee (the "<u>Management Committee</u>") has been established for the DK Group. The Management Committee is comprised of up to six, but no less than four, members selected by, and including, the Executive Managing Member and Deputy Executive Managing Member(s), and all such members serve in a similar capacity with respect to the DK Group (and not only the Partnership). A determination by the Management Committee shall be made by a majority vote (on a *per capita* basis); <u>provided</u>, <u>however</u>, that such majority must include the Executive Managing Member. A member of the Management Committee shall not vote on any determination relating exclusively or primarily to such member (and not generally to all members). The vote of the Executive Managing Member shall be the "tie breaker" in any vote where the members of the Management Committee are evenly divided. If the vote relates to the Executive Managing Member, then the majority must include the Deputy Executive Managing Member(s) and the vote of the Deputy Executive Managing Member(s) shall be the "tie breaker" in any such vote where the members of the Management Committee are evenly divided.

13.     <u>Books of Account</u>.

A.     <u>Books of Account</u>. At all times during the continuance of the Partnership, the Managing Member shall keep or cause to be kept true and complete books of account, including true and complete entries with respect to each position of the Partnership, on the basis of the Partnership's fiscal year. The accounts of the Partnership shall be kept in accordance with accounting principles and practices applicable to the Partnership's business.

B.     <u>Availability of Books of Account</u>. All of the books of account referred to in Section 13.A shall at all times be maintained at the principal office of the Partnership and, upon reasonable notice to the Managing Member, shall be open to the inspection and examination of each of the LLP Partners, the Retired Partners or their respective representatives during reasonable business hours. In addition, all of the financial statements of each of the DK Group entities shall,

*Highly Confidential*

upon reasonable notice by an LLP Partner or a Retired Partner to the general partner or managing member, as applicable, of the relevant DK Group entity, be available to such LLP Partner, Retired Partner or their respective representatives upon request. Notwithstanding any provision to the contrary herein, the inspection right set forth in this Section 13.B shall not apply to any privileged advice of counsel given to the Partnership, the Funds, the Managing Member, the Executive Managing Member, a Deputy Executive Managing Member or the Management Committee, to the extent disclosure pursuant to such inspection rights is likely to result in the loss or forfeiture of privilege (such likelihood to be determined, in good faith, by external counsel). Except as otherwise expressly provided in this Agreement, no Schedule B Person shall have any right or claim that it has any right to obtain any information contained in the books and records of the Partnership (whether kept by the Managing Member or any other Person) or in the financial statements of any DK Group entity (whether kept by the general partner or managing member as applicable, of the relevant DK Group entity, or any other Person), including any information relating to any other UK Partner.

14.    Amendments and Waivers.

A.    Amendments to this Agreement dealing with Schedule A and the right of an LLP Partner to withdraw capital from the Partnership or to redeem shares from DKIL may be made by the Executive Managing Member (or the Deputy Executive Managing Member on his or her behalf) without any UK Partner's consent (subject only to the provisions of the following sentence), provided that the Executive Managing Member (or the Deputy Executive Managing Member on his or her behalf) shall give written notice to the UK Partners of the proposed amendments at least 90 days before the effective date thereof in a form approved by the Management Committee prior to its distribution (the "Schedule A Notice"). Such proposed amendments shall be deemed accepted by each of the UK Partners unless any such UK Partner shall, in effect, reject the proposed amendment by giving notice in writing not less than 45 days prior to the effective date of such amendment to the Executive Managing Member (or the Deputy Executive Managing Member on his or her behalf) of such UK Partners' election to withdraw from the Partnership and redeem their DKIL Shares, effective as of the last day before the effective date of such amendment. Notwithstanding anything to the contrary in this Section 14.A:

(i)    with respect to any amendment made pursuant to this Section 14.A for the purpose of adopting a new Performance Rate, Capital Rate and Schedule A Percentage, the relevant Schedule A Notice shall be deemed sufficient notice of such amendment provided that it sets forth: (A) the final Performance Rate, (B) the estimated Capital Rate and estimated Schedule A Percentage (which in each case shall be calculated using the most recent unaudited net asset value of the UK Partners' DKIL Shares and interest in the Partnership) and (C) the methodology to be used for calculating the final Capital Rate and the final Schedule A Percentage; and

(ii)    the Executive Managing Member (or the Deputy Executive Managing Member on his or her behalf) may only amend this Agreement as set forth in the first sentence of this Section 14.A effective as of the first day of every other year, beginning January 1, 2018 (each such two-year period, a "Biennial Period");

37

provided, however, that the Executive Managing Member (or the Deputy Executive Managing Member on his or her behalf) may make such an amendment at any time, without providing the UK Partners 90 days' prior written notice or allowing the UK Partners to reject such amendment, (A) to reflect an assignment by a UK Partner made in accordance with, and subject to the consents required by, Section 6, (B) to the extent such amendment increases the Performance Rate or the Schedule A Percentage of one or more UK Partners and consent has been obtained from any UK Partner whose Performance Rate or Schedule A Percentage would be decreased by such amendment, (C) to update Schedules A, B or C to reflect the conversion of LLP Partners and Schedule B Persons into Schedule C Persons; or (D) to update the Weighted Average Schedule A Percentages of the LLP Partners set forth in Schedule D due to changes in Schedules A, B or C; or (E) to update Appendix I and, if applicable, Schedule D, to reflect the formation, dissolution or change of name of any Fund.

B.      Notwithstanding Section 14.A, the provisions of this Agreement relating to the LLP Partner's retirement terms, including, without limitation, Section 11, may be amended only by a written agreement executed by 80%, in interest and in number, of the DK Members and retired DK Members.  Each such DK Member's interest shall be based upon the aggregate Company Percentage or Partnership Percentage of such DK Member and his or her related members in each of the DK Group entities (as such term is defined in the operating agreement of each DK Group entity) then in effect.  Except as set forth in the DK Solutions Agreement, the LLP Partners shall have no vote in respect of any matter relating to the DK Group, or a member or partner thereof, other than a matter relating to the Partnership.

C.      Except as provided in this Section 14, this Agreement may not be amended, supplemented or discharged, and no provision hereof may be modified or waived, except expressly by the parties hereto as well as an instrument in writing signed by all of the DK Members, or, in the case of an amendment that does not adversely affect the DK Members, by an instrument in writing signed by at least 75% of all DK Members in interest (which, for this purpose, must include the Executive Managing Member). Each such DK Member's interest shall be based upon the aggregate Company Percentage or Partnership Percentage of such DK Member and his or her related members in each of the DK Group entities (as such term is defined in the operating agreement of each DK Group entity) then in effect. Except as set forth in the DK Solutions Agreement, the LLP Partners shall have no vote in respect of any matter relating to the DK Group, or a member or partner thereof, other than a matter relating to the Partnership.

15.    Taxation.

A.      If the U.S. Internal Revenue Service or any other U.S. (including state and local) taxing authority determines that withholding should apply in respect to any payments to a UK Partner either retrospectively or prospectively and if such UK Partner can claim any form of credit(s) with respect to such withholding (or taxes imposed pursuant to Section 15.B) on such UK Partner's United Kingdom income taxes, such UK Partner shall be obligated to claim any such credit(s) and to the extent such UK Partner is granted such

38

*Highly Confidential*

credit(s), such UK Partner shall promptly reimburse the relevant DK Entity in respect of such withholding (or taxes imposed pursuant to Section 15.B). The Partnership will reimburse such UK Partner for legal and other professional costs associated with claiming such credit(s).

B.      The Partnership will reimburse a UK Partner for any taxes (and associated interest, penalties and interest on penalties) imposed on such UK Partner (in connection with a withholding obligation described in Section 15.A or in a direct assessment on such UK Partner) by the U.S. Internal Revenue Service or any other U.S. (including state and local) taxing authority (and any U.K. taxes imposed on the amounts payable under this Section 15.B). Such payment shall be made at such time as such taxes are due. In addition, associated legal and other professional costs shall be reimbursed as incurred.

16.     <u>Holiday Leave</u>.

Notwithstanding anything to the contrary in the Partnership Agreement, the holiday entitlement of a UK Partner in any calendar year shall be at the discretion of the Executive Managing Member.

17.     <u>Mediation and Arbitration of Disputes</u>.

A.      <u>Mediation</u>.

(i)      The parties agree that any and all Controversies shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to Section 17.B below.

(ii)     Prior to pursuing any arbitration, the parties agree that they shall attempt in good faith to resolve any Controversies promptly by mediation. Either party may commence mediation by providing to JAMS and the other party a written request for mediation, setting forth the subject of the dispute and the relief requested. Within 15 days after delivery of such notice, the receiving party shall submit to the other party(s) a written response. The notice and response shall include, among other things, (a) a statement of such party's position, (b) a summary of arguments supporting that position, and (c) all material documents relevant to the dispute (which, in the case of a dispute regarding the economic or financial rights of a UK Partner in DKIL or the Partnership, may include financial statements, management accounts, and/or correspondence regarding the preparation thereof).

*Highly Confidential*

(iii)    The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals and in scheduling the mediation proceedings. If the parties are not able to agree on a mediator within 10 days after delivery of the written request for mediation, the mediator shall be selected by JAMS as promptly as practicable, with the proviso that the chosen mediator is able to hold a first meeting with the parties (the "First Meeting") within 30 days after being appointed.  The parties agree that they will participate in the mediation in good faith with the objective of reaching a fair and equitable resolution of any Controversies.  The parties agree that they will share equally in the joint costs of the mediation (it being understood and agreed that each party will be responsible for its individual fees and expenses incurred in connection with such mediation).

(iv)    All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

(v)    Either party may initiate arbitration in accordance with Section 17.B below with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the First Meeting or at any time following 60 days from the date of filing the written request for mediation, whichever occurs first ("Earliest Initiation Date"). The mediation may continue after the First Meeting and during the pendency of arbitration if the parties so desire.

(vi)    At no time prior to the Earliest Initiation Date shall either side initiate an arbitration or litigation related to this Agreement except to pursue a provisional remedy that is authorized by law or by JAMS Rules or by agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of clause (iii) above.

(vii)    All applicable statutes of limitation and defenses based upon the passage of time shall be tolled until 15 days after the Earliest Initiation Date. The parties will take such action, if any, required to effectuate such tolling.

B.    Arbitration.

(i)    The parties agree to submit to arbitration, which arbitration may be initiated no sooner than the Earliest Initiation Date, all disputes, claims and controversies arising out of or relating to the Partnership or its businesses or concerning any transaction, dispute or the construction, performance, enforcement, termination or breach of this, or any other agreement, including, without limitation, the scope or applicability of this agreement to arbitrate, whether entered into prior, on or subsequent, to the date set forth above ("Controversies") in accordance with the provisions set forth below and acknowledge that: (a) arbitration is final and binding

40

*Highly Confidential*

on the parties; (b) the parties are waiving their rights to seek remedies in court, including the right to jury trial; and (c) discovery in arbitration generally is more limited than and different from court proceedings.

(ii)    Controversies shall be determined by arbitration in New York, New York administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (the "Arbitration Rules"), and the parties agree that the Emergency Relief Procedures set forth in the Arbitration Rules shall be available.

(iii)    Arbitrations conducted pursuant to this Section 17.B will be before a panel of three arbitrators.  Within 14 days after the commencement of arbitration, each side of the dispute shall select one arbitrator, and the two arbitrators so selected shall select the third arbitrator within 28 days of the commencement of the arbitration.  If the parties (or the initial two arbitrators, as the case may be) fail to select all arbitrators within the applicable time periods, JAMS shall appoint the arbitrator(s) in accordance with Rule 15 of the Arbitration Rules.

(iv)    The arbitrators' award may include factual findings or legal reasoning. Every aspect of the arbitration, including the award, shall be treated as confidential information. None of the parties shall disclose any information about the fact of the arbitration, claims asserted in the arbitration, the evidence adduced in the arbitration, documents produced in connection with the proceeding, or the decision of the arbitrator except to the extent (a) necessary to enforce an arbitral award, (b) ordered (x) in the course of a judicial or regulatory proceeding, or (y) by other governmental authority, or (c) to comply with legal or regulatory obligations. Before making any disclosure permitted by the foregoing, the disclosing party shall, to the extent practicable, give the other party reasonable notice of the intended disclosure.

(v)    Judgment on any award of any such arbitration may be entered in the Supreme Court of the State of New York or in any other court having jurisdiction thereof.  Each party agrees that the determination of the arbitrators shall be binding and conclusive upon them.

(vi)    Each party shall bear its own cost and fees incurred in connection with the arbitration.  The arbitrators shall determine the fees and expenses of the arbitration and each party shall bear such party's share of such arbitration fees and expenses, including its share of the arbitrators' compensation and expenses (including travel, copying, telephone and other out-of-pocket expenses), administrative fees, arbitration and court costs, and costs of the stenographic record.  Each party shall bear its own witness fees, third-party professional fees (including expenses of consultants, attorneys, accountants and other experts retained by it) and other costs and expenses.

(vii)    Notwithstanding anything to the foregoing, the following claims, disputes and actions shall be excluded from arbitration pursuant to this Section 17.B: (a) claims by a party for benefits under a DK Group plan or program that provides

*Highly Confidential*

its own process for dispute resolutions and (b) claims that cannot be subject to mandatory arbitration as a matter of law.

(viii)   For the purposes of this Section 17.B, "parties" shall include each UK Partner, Schedule C Person, the Partnership, the Managing Member, the DK Members, the DK Group and any of their respective partners, members, managers, officers, directors, shareholders, agents, or legal representatives.

(ix)   The forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated in this Agreement.

(x)   The UK Partners acknowledge and agree that any breach of this Section 17.B will be deemed to have a material adverse effect on the business or reputation of the DK Group.

18.   Historical Performance Information.  Without limiting the generality of Sections 2 and 19, each UK Partner acknowledges and agrees that investment performance information and the investment track record of each Fund, each investment by a Fund and each Fund strategy is the property of the DK Group.  Without the written consent of the Managing Member, no LLP Partner may, on such LLP Partner's own behalf or on behalf of another Person, directly or indirectly, use, promote, market or claim as such LLP Partner's own, the investment performance record of any Fund, or retain or disclose to any third Person any books, records, documents or other written materials.  Notwithstanding the foregoing, this Section 18 shall not prohibit any LLP Partner from accurately describing his or her employment history, position, responsibilities and experience to third Persons.

19.   Intellectual Property.  Each LLP Partner acknowledges and agrees that all Inventions are and will be the sole and exclusive property of the DK Group and its assigns, and such LLP Partner hereby assigns and transfers to the DK Group all right, title and interest in and to such Inventions, including, without limitation, the right to use the same in any and all versions and in any other works, in any media now known or hereafter developed, and the right to recover for past or future infringements thereof.  The DK Group and its assigns will have the right to use the Inventions and/or apply for patents, copyrights or other statutory or common law protections for the Inventions in any and all countries.  In addition, each LLP Partner acknowledges and agrees that (i) he/she will execute all documents reasonably requested by the DK Group to enable the DK Group to apply for and obtain any patents, copyrights and other statutory or common law protections and enforce the same, including, without limitation, any confirmatory assignments, (ii) the DK Group may make any changes or additions to the Inventions, and may engage others to do any or all of the foregoing, all with or without attribution to such LLP Partner, and (iii)  he/she waives any so-called moral rights in the Inventions and to the extent that such rights or similar rights may not be waived in other jurisdictions, agrees not to assert such rights against the DK Group or its assigns to the extent permitted by law.

20.   Return of Property. Each LLP Partner covenants and agrees that upon termination of such LLP Partner's services to or association with the Firm (which, in the case of a Retired Partner, shall be the end of his or her Retirement Term), unless otherwise agreed by the Executive

*Highly Confidential*

Managing Member, such LLP Partner (or, as applicable, his or her related Schedule B Persons) will return to the Partnership and will not retain any files, letters of intent, investor and prospective investor lists, management reports, drawings, memoranda, forms, financial data or reports, or any other documents or electronic communications obtained or created by such LLP Partner and belonging to the Partnership or any of its Affiliates, whether in electronic or paper form, and including any such materials found on laptop computers and/or mobile devices (including all copies of the foregoing, and including all Confidential Information). Unless otherwise agreed by the Executive Managing Member, each LLP Partner will also return any computers, phones or other mobile devices that were issued to such LLP Partner.

21.    <u>Miscellaneous</u>.

A.    This Agreement, including the Appendix and Schedules hereto, constitutes the entire agreement among the parties and contains all of the agreements among such parties with respect to the subject matter hereof.  This Agreement supersedes any and all other term sheets, memoranda and agreements, either oral or written, among such parties with respect to the subject matter hereof.  Except as specifically provided herein, this Agreement shall not otherwise affect any of the terms of the Partnership Agreement.  The terms of this Agreement (including, for the avoidance of doubt, the agreement to mediate and arbitrate in Section 17 above) shall control in the event any conflict exists between this Agreement and the Partnership Agreement.

B.    This Agreement shall be binding upon and shall inure to the benefit of the parties, and their respective permitted successors and assigns.

C.    This Agreement shall be governed and construed in accordance with the law of the State of New York, without regard to its conflict of law rules.

D.    In the event that any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable.  Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.  The parties acknowledge that the restrictive covenants contained in Section 2 of this Agreement are reasonable and valid in geographical and temporal scope and in all other respects.

E.    A waiver or consent, express or implied, to or of any breach or default by any party in the performance by that party of his or her obligations is not a consent or waiver to or of any other breach or default in the performance by that party of the same or any other obligations of that party.  Except as expressly set forth herein, failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long that failure continues, does not constitute a waiver by that party of its rights with respect to that default until the applicable statute-of-limitations period has run.

*Highly Confidential*

F.      In connection with this Agreement, each party shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

G.      All notices under this Agreement shall be in writing and are permitted to be (a) personally delivered (with receipt thereof acknowledged in writing), (b) sent by facsimile with receipt of the transmission confirmed (and, unless waived by the recipient upon such receipt, confirmed by delivery in another manner permitted hereunder), (c) e-mailed, (d) mailed by pre-paid certified mail, return receipt requested or (e) sent by reputable overnight courier (receipt confirmed), in each case to the Managing Member of the Partnership, with a copy to the office of the DK Group in New York City, Attention: Anthony A. Yoseloff.  Notices given in accordance with this Section 21.G shall be deemed given (i) on the business day of receipt, if delivered personally, or e-mailed, (ii) on the first business day after being sent by a reputable overnight courier service and (iii) on the third business day after being mailed.  Any notice period specified herein shall end on the close of business on the day that is the prescribed number of days following the first day of the relevant period, unless that day is not a business day, in which case such notice period shall end as of the close of business on the next succeeding business day.

H.      This Agreement may be executed in several counterparts, each of which shall be considered an original Agreement and all of which together shall constitute one and the same Agreement.  For the avoidance of doubt, any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpg or similar attachment to electronic mail, shall be treated in all manner and respects as an original executed counterpart, and a person's execution and delivery of this agreement by electronic signature and electronic transmission, including via DocuSign or other similar method, shall constitute the execution and delivery of a counterpart of this agreement by or on behalf of such person and shall bind such person to the terms of this agreement.

I.      <u>Legal Counsel</u>.

(i)      Each UK Partner hereby acknowledges and agrees that each of (A) the DK Group's legal department and its members and (B) the law firm retained by the Managing Member in connection with the organization, management and operation of the Partnership or any dispute that may arise between any UK Partner, on the one hand, and the Managing Member or the Partnership, on the other hand (any such matter, a "<u>Partnership Legal Matter</u>"), (x) does not and shall not represent the UK Partners in connection with any Partnership Legal Matter and (y) does not owe any duty to such UK Partner or to the UK Partners as a group.

(ii)      Each UK Partner further acknowledges and agrees that neither this Agreement nor the transactions contemplated hereby relating to the management and operation of the Partnership are intended to create an attorney/client or any other relationship between the DK Group's legal department or its members, or the law firm retained by the Managing Member for itself and/or the Partnership, on the one hand, and such UK Partner, on the other hand, pursuant to which such UK

*Highly Confidential*

Partner (acting other than in the name of the Partnership) would have a right to object to the DK Group's legal department's (or its members') or such law firm's representation of any Person under any circumstances.

J.        No Right to Partition.  The UK Partners, on behalf of themselves and their partners, members, managers, trustees, officers, directors, shareholders, agents and employees, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

K.        Survival of Certain Provisions.  In addition to the sections of this Agreement that survive pursuant to their terms, each of the UK Partners agrees that the covenants and agreements set forth in Section 5, Section 11.J, Section 17, Section 18, Section 19, Section 21.C, this Section 21.K and Section 21.L shall survive (a) any transfer from the Partnership, (b) any withdrawal from the Partnership and/or termination of a Partner's status as a Partner and (c) the termination of the Partnership.

L.        Specific Performance.  The Partnership has the right to seek damages or specific performance, or any other applicable remedy (including injunctive relief) in the event that any other party fails to perform such party's obligations under Section 6, Section 8, Section 9, Section 10 and Section 11 exclusively through use of the Emergency Relief Procedures set forth in the JAMS Comprehensive Arbitration Rules & Procedures, without the need to post any bond or other security. Any UK Partner against whom such an action is brought hereby waives any claim or defense that the plaintiff party has an adequate remedy at law.

M.        Interpretation.  As used herein, "including" (and with any correlative meaning "include") means including without limiting the generality of any description preceding such term. As used in this Agreement, the phrases "any provision of this Agreement," "the provisions of this Agreement" and derivative or similar phrases, and the terms "hereof," "herein," "hereby," and derivative or similar words mean or refer only to any express provision actually written in this Agreement and not to any provision of the Act that may have application to the Partnership.

N.        Rule of Construction.  The general rule of construction for interpreting a contract, which provides that the provisions of a contract should be construed against the party preparing the contract, is waived by the parties to this Agreement.  Each party acknowledges that such party had the opportunity to retain counsel to participate in the preparation of this Agreement and will not allege otherwise.

[*The rest of this page is intentionally left blank*]

IN WITNESS WHEREOF, the undersigned has executed this Agreement this [6th] day of November, 2023.

**MICHAEL HERZOG**

Signed as a deed by Michael Herzog
in the presence of:

Witness: _____

Name: _fleur leech_

Address: _50 caledonian wharf_

_london, SE16 7TN, UK_

**JOGEESVARAN KRISHANTHAN**

Signed as a deed by Jogeesvaran Krishanthan
in the presence of:

Witness: _____

Name: _____

Address: _____

_____

**ZACHARY GOZALI**

Signed as a deed by Zachary Gozali
in the presence of:

Witness: _____

Name: _____

Address: _____

_____

Tenth A&R Supplemental Agreement to the
Tenth A&R Limited Liability Partnership Agreement of
Davidson Kempner European Partners, LLP

Doc#: US1:16655045v4

IN WITNESS WHEREOF, the undersigned has executed this Agreement this 1st day of July 2023.

**MICHAEL HERZOG**

_____

Signed as a deed by Michael Herzog
in the presence of:

Witness:_____

Name:_____

Address: _____

_____


**JOGEESVARAN KRISHANTHAN**

_____

Signed as a deed by Jogeesvaran Krishanthan
in the presence of:

Witness:_____

Name: LAURA HICKEY

Address: 16 NEW BURLINGTON

PLACE, LONDON

**ZACHARY GOZALI**

_____

Signed as a deed by Zachary Gozali
in the presence of:

Witness:_____

Name:_____

Address: _____

_____

Tenth A&R Supplemental Agreement to the
Tenth A&R Limited Liability Partnership Agreement of
Davidson Kempner European Partners, LLP

Doc#: US1:16655045v4

IN WITNESS WHEREOF, the undersigned has executed this Agreement this 1st day of July 2023.

**MICHAEL HERZOG**

_____

Signed as a deed by Michael Herzog
in the presence of:

Witness:_____

Name:_____

Address: _____

_____

**JOGEESVARAN KRISHANTHAN**

_____

Signed as a deed by Jogeesvaran Krishanthan
in the presence of:

Witness:_____

Name:_____

Address: _____

_____

**ZACHARY GOZALI**

_____

Signed as a deed by Zachary Gozali
in the presence of:

Witness: _Melanie Posner_

Name: _Melanie Posner_

Address: _520 Madison Ave, 30th Floor_
_New York, NY 10022 USA_

Tenth A&R Supplemental Agreement to the
Tenth A&R Limited Liability Partnership Agreement of
Davidson Kempner European Partners, LLP

*Highly Confidential*

**DAVIDSON KEMPNER EUROPEAN PARTNERS, LLP**

By:  DK European Ltd.
     its Managing Member

Anthony A. Yoseloff
Director


**DK EUROPEAN LTD.**

Anthony A. Yoseloff
Director

Tenth A&R Supplemental Agreement to the
Tenth A&R Limited Liability Partnership Agreement of
Davidson Kempner European Partners, LLP

*Highly Confidential*

**APPENDIX I**

## <u>Companies Comprising the DK Group</u>

Ashland Place Finance Ireland DAC

Ashland Place Finance LLC

Davidson Kempner Advisers LLC

Davidson Kempner Asia Limited

Davidson Kempner Capital Management LP

Davidson Kempner Co-Invest GP LLC

Davidson Kempner Credit Investments GP LLC

Davidson Kempner Crow Co-Invest GP LLC

Davidson Kempner Distressed Opportunities GP LLC

Davidson Kempner Drawdown GP Topco LLC

Davidson Kempner European Partners, LLP

Davidson Kempner Hawthorne Partners LLC

Davidson Kempner Hawthorne Partners Ltd.

Davidson Kempner Holdings LLC

Davidson Kempner Income GP II LLC

Davidson Kempner Income GP LLC

Davidson Kempner Investment Advisors India Private Limited

Davidson Kempner Investment Consulting (Shenzhen) Limited

Davidson Kempner Ireland Designated Activity Company

Davidson Kempner Liquid GP Topco LLC

Davidson Kempner Long-Term Distressed Opportunities GP II LLC

Davidson Kempner Long-Term Distressed Opportunities GP III LLC

Davidson Kempner Long-Term Distressed Opportunities GP IV LLC

*Highly Confidential*

Davidson Kempner Long-Term Distressed Opportunities GP LLC

Davidson Kempner Long-Term Distressed Opportunities GP V LLC

Davidson Kempner Multi-Strategy GP II LLC

Davidson Kempner Multi-Strategy GP LLC

Davidson Kempner Opportunistic Credit GP LLC

Davidson Kempner Opportunities GP VI LLC

Davidson Kempner Solutions Cayman GP LLC

Davidson Kempner Solutions Cayman LP

Davidson Kempner Special Opportunities GP II LLC

Davidson Kempner Special Opportunities GP III LLC

Davidson Kempner Special Opportunities GP IV LLC

DK Employee Fund International Management LLC

DK Employee Fund Management LLC

DK European Ltd.

DK Group LLC

DK India Holdings LLC

DKCM GP LLC

DKDOI GP LLC

DKEL LLC

DKIL GP LLC

M.H. Davidson & Co.

M.H. Davidson & Co. 520 GP LLC

M.H. Davidson & Co. 520 LP

M.H. Davidson & Co. GP, L.L.C.

MHD Management Co. LLC

*Highly Confidential*

## SCHEDULE A

## LLP PARTNERS

| Name | Schedule A Percentage |
|---|---|
| Michael Herzog | |
| Jogeesvaran Krishanthan | |
| Zachary Gozali | |

Doc#: US1:16655045v4

*Highly Confidential*

## SCHEDULE B

## SCHEDULE B PERSONS

| Name | Schedule A Percentage |
|------|----------------------|
|      |                      |

*Highly Confidential*

## SCHEDULE C

## SCHEDULE C PERSONS

| Name | Schedule A Percentage |
|------|------------------------|
|      |                        |

*Highly Confidential*

SCHEDULE D

| Weighted Average Fund Name | Weighted Average Fund GP Name | Investment Period | Name of LLP | 2023 Weighted Average Schedule A Percentage |
|---|---|---|---|---|
| Davidson Kempner Long-Term Distressed Opportunities Fund II LP and Davidson Kempner Long-Term Distressed Opportunities International Master Fund II LP | Davidson Kempner Long-Term Distressed Opportunities GP II LLC | February 1, 2013 – December 31, 2015 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Special Opportunities Master Fund II LP | Davidson Kempner Special Opportunities GP II LLC | July 1, 2014 – December 31, 2015 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Long-Term Distressed Opportunities Fund III LP, Davidson Kempner Long-Term Distressed Opportunities International Master Fund III LP, DK LDOI III Aggregate Holdco LP and DK LDOI III Aggregate Holdco II LP | Davidson Kempner Long-Term Distressed Opportunities GP III LLC | January 1, 2015 – December 31, 2017 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Special Opportunities Fund III LP, Davidson Kempner Special Opportunities Master Fund III LP, DK SOI III Aggregate Holdco LP and DK SOI III Aggregate Holdco II LP | Davidson Kempner Special Opportunities GP III LLC | January 1, 2016 – June 30, 2017 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Special Opportunities Fund IV LP, Davidson Kempner Special Opportunities Master Fund IV LP and Davidson Kempner Special Opportunities Master Fund IV (DI) LP | Davidson Kempner Special Opportunities GP IV LLC | July 1, 2017 - December 31, 2019 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Long-Term Distressed Opportunities Fund IV LP, Davidson Kempner Long-Term Distressed Opportunities International Master Fund IV LP and DK LDOI IV Aggregate Holdco LP | Davidson Kempner Long-Term Distressed Opportunities GP IV LLC | January 1, 2018 - December 31, 2020 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |
| Davidson Kempner Long-Term Distressed Opportunities Fund V LP, Davidson Kempner Long-Term Distressed Opportunities International Master Fund V LP and DK LDOI V Aggregate Holdco LP | Davidson Kempner Long-Term Distressed Opportunities GP V LLC | April 1, 2020 – March 31, 2023 | Michael Herzog Jogeesvaran Krishanthan | [_]% [_]% |

Schedule D – Page 1

*Highly Confidential*

| Weighted Average Fund Name | Weighted Average Fund GP Name | Investment Period | Name of LLP | 2023 Weighted Average Schedule A Percentage |
|---|---|---|---|---|
| Davidson Kempner Income Fund LP, Davidson Kempner Income International Master Fund LP, Davidson Kempner Income International Master Fund (DI) LP | Davidson Kempner Income GP LLC | July 1, 2021 – June 30, 2024 | Michael Herzog<br>Jogeesvaran Krishanthan<br>Zachary Gozali | [_]%<br>[_]%<br><br>[_]% |
| Davidson Kempner Opportunities Fund VI LP, Davidson Kempner Opportunities International Master Fund VI LP and DKOI VI Aggregate Holdco LP | Davidson Kempner Opportunities GP VI LLC | January 3, 2022 – December [●], 2025 | Michael Herzog<br>Jogeesvaran Krishanthan<br>Zachary Gozali | [_]%<br>[_]%<br><br>[_]% |

| Fixed Schedule A Percentage Fund Name | Fixed Schedule A Percentage Fund GP Name | Initial Closing Date | Name of LLP | Fixed Schedule A Percentage |
|---|---|---|---|---|
| Davidson Kempner Merchant Co-Invest Fund LP | Davidson Kempner Co-Invest GP LLC | March 18, 2021 | Michael Herzog<br>Jogeesvaran Krishanthan | [_]%<br>[_]% |
| Davidson Kempner Crow Co-Invest Fund LP | Davidson Kempner Crow Co-Invest GP LLC | December 1, 2022 | Michael Herzog<br>Jogeesvaran Krishanthan<br>Zachary Gozali | [_]%<br>[_]%<br><br>[_]% |

Schedule D – Page 1