# Exhibit 6
# (Dkt. No. 5-3)

Employment Tribunal

# Claim form

| Official Use Only | | | |
|---|---|---|---|
| Tribunal office | London Central | | |
| Case number | 6011625/2026 | Date received | 02-04-2026 |

**You must complete all questions marked with an '*'**

## 1  Your details

| 1.1 | Title | ☐ Mr   ☐ Mrs   ☐ Miss   ☐ Ms   ☐ Other _____ |
|---|---|---|

**1.2\*** First name (or names)

Michael

**1.3\*** Surname or family name

Herzog

**1.4** Date of birth

☐☐ / ☐☐ / ☐☐☐☐

**1.5** Sex

☑ Male   ☐ Female   ☐ Prefer not to say

**1.6\*** Address

2 Og, Weidstrasse 9b,
Zug,
Switzerland

Postcode  Zug6300

**1.7** Phone number
Where we can contact you during the day

**1.8** Mobile number (if different)

**1.9** How would you prefer us to contact you?
(Please tick only one box)

☐ Email   ☐ Post

**1.10** Email address

**1.11** Would you be able to take part in hearings by video and phone?

☑ Yes, I can take part in video hearings
☑ Yes, I can take part in phone hearings
☐ No, I cannot take part in either video or phone hearings.

Explain why you are unable to take part in video or phone hearings

© Crown copyright 2024

**2** **Respondent's details** (that is the employer, person or organisation against whom you are making a claim)

2.1* Give the name of your employer or the person or organisation you are claiming against (If you need to you can add more respondents at 2.5)

> Davidson Kempner European Partners, LLP

2.2* Address

> 1 New Burlington Place, 3rd Floor,
> London,
> United Kingdom

Postcode | W1S 2HR

2.3* Do you have an Acas early conciliation certificate number?

☑ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

> R116383/26/35

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

2.4 If you worked at a different address from the one you have given at 2.2 please give the full address

Address

Postcode

2.5 If there are other respondents please tick this box and put their names and addresses here. ☑

(If there is not enough room here for the names of all the additional respondents then you can add any others at Section 13.)

**Respondent 2**

Name

Davidson Kempner Solutions Cayman LP

Address

9 West 57th Street, 29th Floor,
New York,
United States

Postcode    NY10019

2.6 Do you have an Acas early conciliation certificate number?

☑ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

R116384/26/26

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**Respondent 3**

2.7 Name

Anthony Yoseloff

Address

9 West 57th Street, 29th Floor,
New York,
United States

Postcode    NY10019

2.8 Do you have an Acas early conciliation certificate number?

☑ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.Acas.org.uk*

If Yes, please give the Acas early conciliation certificate number

R116386/26/08

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

## 3 Multiple cases

3.1 Are you aware that your claim is one of a number of claims against the same employer arising from the same, or similar, circumstances?

☐ Yes    ☐ No

If Yes, and you know the names of any other claimants, add them here. This will allow us to link your claim to other related claims.

## 4 Cases where the respondent was not your employer

4.1 Did you work for the respondent you're making your claim against?

☐ Yes. Go to section 5    ☐ No. Go to section 8

## 5 Employment details

If you are or were employed please give the following information, if possible.

5.1 When did your employment start?

Is your employment continuing?

☐ Yes    ☐ No

If your employment has ended, when did it end?

If your employment has not ended, are you in a period of notice and, if so, when will that end?

5.2 Please say what job you do or did.

## 6 Earnings and benefits

**6.1** How many hours on average do, or did you work each week in the job this claim is about?

[                    ] hours each week

**6.2** How much are, or were you paid?

Pay before tax £ [                    ]    ☐ Weekly    ☐ Monthly    ☐ Annually

Normal take-home pay
(Incl. overtime, commission, bonuses etc.) £ [                    ]    ☐ Weekly    ☐ Monthly    ☐ Annually

**6.3** If your employment has ended, did you work (or were you paid for) a period of notice?    ☐ Yes    ☐ No

If Yes, how many weeks, or months' notice did you work, or were you paid for?    [        ] weeks    [        ] months

**6.4** Were you in your employer's pension scheme?    ☐ Yes    ☐ No

If Yes, give your employers weekly contributions    £ [                    ]

**6.5** If you received any other benefits, e.g. company car, medical insurance, etc, from your employer, please give details.

[                                                            ]

## 7 If your employment with the respondent has ended, what has happened since?

**7.1** Have you got another job?    ☐ Yes    ☐ No

If No, please **go to section 8**

**7.2** Please say when you started (or will start) work.    [                    ]

**7.3** Please say how much you are now earning (or will earn).    £ [                    ]    ☐ Weekly    ☐ Monthly    ☐ Annually

## 8  Type and details of claim

8.1*  Please indicate the type of claim you are making by ticking one or more of the boxes below.

- ☐ I was unfairly dismissed (including constructive dismissal)
- ☐ I was discriminated against on the grounds of:

  - ☐ age
  - ☐ gender reassignment
  - ☐ pregnancy or maternity
  - ☐ sexual orientation
  - ☐ religion or belief

  - ☐ race (including colour, nationality, and ethnic or national origins)
  - ☐ disability
  - ☐ marriage or civil partnership
  - ☐ sex (including equal pay)

- ☑ I am making a whistleblowing claim including dismissal or any other unfair treatment after whistleblowing

- ☐ I am claiming a redundancy payment
- ☑ I am owed
  - ☐ notice pay
  - ☐ holiday pay
  - ☐ arrears of pay
  - ☑ other payments

- ☐ I am making another type of claim which the Employment Tribunal can deal with.
  (Please state the nature of the claim. Examples are provided in the Guidance.)

8.2* Please set out the background and details of your claim in the space below.

The details of your claim should include **the date(s) when the event(s) you are complaining about happened.** Please use the blank sheet at the end of the form if needed.

**Please see attached Grounds of Complaint.**

## 9   What do you want if your claim is successful?

9.1    Please tick the relevant box(es) to say what you
want if your claim is successful:

☐    If claiming unfair dismissal, to get your old job back and compensation (reinstatement)

☐    If claiming unfair dismissal, to get another job with the same employer or associated employer and compensation (re-engagement)

☐    Compensation only

☐    If claiming discrimination, a recommendation (see Guidance).

9.2    What compensation or remedy are you seeking?

If you are claiming financial compensation please give as much detail as you can about how much you are claiming and how you have calculated this sum. (Please note any figure stated below will be viewed as helpful information but it will not restrict what you can claim and you will be permitted to revise the sum claimed later. See the Guidance for further information about how you can calculate compensation). If you are seeking any other remedy from the Tribunal which you have not already identified please also state this below.

Page 8

**10** **Information to regulators in protected disclosure cases**

10.1  If your claim consists of, or includes, a claim that you are making a protected disclosure under the Employment Rights Act 1996 (otherwise known as a 'whistleblowing' claim), please tick the box if you want a copy of this form, or information from it, to be forwarded on your behalf to a relevant regulator (known as a 'prescribed person' under the relevant legislation) by tribunal staff. (See Guidance).

☐

**Name of relevant regulator**

[                                                                                      ]

**11** **Your representative**

If someone has agreed to represent you, please fill in the following. We will in future only contact your representative and not you.

11.1  Name of representative

**Employment Portal**

11.2  Name of organisation

**Mishcon de Reya LLP**

11.3  Address

Africa House,
70 Kingsway,
London

Postcode: W C 2 B 6 A H

11.4  DX number (If known)

11.5  Phone number

11.6  Mobile number (If different)

11.7  Their reference for correspondence

11.8  Email address

employment.portal@mishcon.com

11.9  How would you prefer us to communicate with them? (Please tick only one box)    ☑ Email    ☐ Post

## 12  Disability

12.1  Do you have a physical, mental or learning disability or health condition that means you need support during your case?

☐ Yes    ☐ No

If Yes, it would help us if you could say what this disability is and tell us what assistance, if any, you will need as your claim progresses through the system, including for any hearings that maybe held at tribunal premises.

We call these reasonable adjustments. Reasonable adjustments can include:
- documents in alternative formats, colours and fonts
- help with communicating, sight, hearing, speaking and interpretation
- access and mobility support if a hearing takes place in person

## 13  Details of additional respondents

Section 2 allows you to list up to three respondents. If there are any more respondents please provide their details here

**Respondent 4**

Name

Address

Postcode

Do you have an Acas early conciliation certificate number?

☐ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**Respondent 5**

Name

Address

Postcode

Do you have an Acas early conciliation certificate number?

☐ Yes    ☐ No

*Nearly everyone should have this number before they fill in a claim form. You can find it on your Acas certificate. For help and advice, call Acas on 0300 123 1100 or visit www.acas.org.uk*

If Yes, please give the Acas early conciliation certificate number.

If No, why don't you have this number?

☐ Another person I'm making the claim with has an Acas early conciliation certificate number

☐ Acas doesn't have the power to conciliate on some or all of my claim

☐ My employer has already been in touch with Acas

☐ My claim consists only of a complaint of unfair dismissal which contains an application for interim relief. (See guidance)

**14** **Additional information**

You can provide additional information about your claim in this section.

If you're part of a group claim, give the Acas early conciliation certificate numbers for other people in your group. If they don't have numbers, tell us why.

**General Data Protection Regulations**

The Ministry of Justice and HM Courts and Tribunals Service processes personal information about you in the context of tribunal proceedings.

For details of the standards we follow when processing your data, please visit the following address https://www.gov.uk/government/organisations/hm-courts-and-tribunals-service/about/personal-information-charter.

To receive a paper copy of this privacy notice, please call our Customer Contact Centre:

England and Wales: 0300 323 0196

Welsh speakers: 0300 303 5176

Scotland: 0300 790 6234

**Please note:** a copy of the claim form or response and other tribunal related correspondence may be copied to the other party and Acas for the purpose of tribunal proceedings or to reach settlement of the claim.

**Employment Tribunals check list**

Please check the following:

1. Read the form to make sure the information given is correct and truthful, and that you have not left out any information which you feel may be relevant to you or your client.
2. Do not attach a covering letter to your form. If you have any further relevant information please enter it in the 'Additional Information' space provided in the form.
3. Send the completed form to the relevant office address.
4. Keep a copy of your form posted to us.

If your claim has been submitted on-line or posted you should receive confirmation of receipt from the office dealing with your claim within five working days. If you have not heard from them within five days, please contact that office directly. If the deadline for submitting the claim is closer than five days you should check that it has been received before the time limit expires.

You have opted to print and post your form. We would like to remind you that forms submitted online are processed much faster than ones posted to us. If you want to submit your claim online please go to www.gov.uk/employment-tribunals/make-a-claim

A list of our office's contact details can be found at the hearing centre page of our website at – www.gov.uk/guidance/employment-tribunal-offices-and-venues; if you are still unsure about which office to contact please call our Employment Tribunal Customer Contact Centre (Mon – Fri, 9am – 5pm) they can also provide general procedural information about the Employment Tribunals.

**Customer Contact Centre:**

England and Wales: 0300 323 0196

Welsh speakers: 0300 303 5176

Scotland: 0300 790 6234

<u>IN THE EMPLOYMENT TRIBUNAL</u>

BETWEEN:

**MICHAEL HERZOG**

<u>Claimant</u>

- and -

**(1) DAVIDSON KEMPNER EUROPEAN PARTNERS, LLP**

**(Incorporated as a limited liability partnership in England & Wales)**

**(2) DAVIDSON KEMPNER SOLUTIONS CAYMAN LP**

**(Incorporated as an exempted liability partnership in Cayman Islands)**

**(3) MR ANTHONY YOSELOFF**

<u>Respondents</u>

---

**GROUNDS OF COMPLAINT**

---

**INTRODUCTION**

1. The Claimant made a series of repeated protected disclosures between 2020 and 2024, the consistent theme of which was the inadequate corporate governance of the global investment management firm, Davidson Kempner (the "**Firm**"), headed by the Third Respondent, Mr Yoseloff. Over the course of several years, Mr Yoseloff was able to parlay his minority interest in the Firm to take effective control of it, ensuring that it operated like his personal fiefdom. The result of Mr Yoseloff's virtually uncontrolled power over the Firm was that it operated with a lack of transparency, an inadequate risk management strategy, and as though the Firm was an adjunct of Mr Yoseloff's family office rather than one of the largest hedge funds in the world, managing investments including those of pension funds, university endowments, and insurance companies. Many of these protected disclosures not only raised potential breaches of fiduciary duties by the Respondents, and various other partners, but also potential breaches of regulatory duties in the UK and USA.

1

2.  The Claimant was subjected to unlawful detriments contrary to s. 47B(1) ERA 1996 on the ground that he made the protected disclosures. He also claims (and in the alternative) for unlawful deduction from wages by the First and Second Respondents contrary to s. 13 ERA 1996.

**THE PARTIES**

3.  The Claimant joined the Firm in 2001. The Firm comprises several entities including the First and Second Respondents. The Firm is headquartered in New York City, with additional offices in London, Hong Kong, Dublin, Philadelphia, Shenzhen and Mumbai. As of January 2026, the Firm has more than USD 37 billion in assets under management, over 500 employees across seven offices, and over 1600 investors globally.

4.  The Firm's investors include the partners in the various limited liability partnerships that comprise the Firm themselves as well as large institutional investors such as pension funds, university endowments, insurance companies, and sovereign wealth funds. The Firm manages both evergreen and closed-end drawdown fund structures to accommodate different investor requirements and liquidity needs. The Firm employs a multi-strategy approach, investing globally across a variety of credit and equity strategies as well as real assets.

5.  In the 24 years that he was at the Firm, the Claimant played a key role in building the Firm's global Merger Arbitrage business. He was also instrumental in building the Firm's London office and establishing the Firm in European markets.

6.  Recognised as a leading market participant in the European M&A market, the Claimant was appointed to the Code Committee of the UK Panel on Takeovers and Mergers in 2016, and served for the maximum three terms until 2024.

7.  Within the Firm, the Claimant was:

    7.1. A limited partner of the First Respondent ("**DKEP**") from its incorporation, for which the Claimant was responsible, in 2004;

2

7.2. A limited partner of the Second Respondent ("**DK Solutions**") since its incorporation in 2022;

7.3. The Firm's Global Head of Merger Arbitrage and Global Head of Long/Short Equity, positions which he had held for almost ten years;

7.4. One of the largest capital holders in the partnership; and

7.5. A 'managing member partner' of the Firm, being a partner who had a net share in the general profit of the Firm.

8. As a partner of DKEP and DK Solutions, the Claimant was a worker for each of those entities.

9. The Claimant ceased being a partner and holding the above roles on 31 January 2025 (see further below at paragraph 104).

10. The First Respondent, DKEP, is a London-based limited liability partnership, and part of the global investment management Firm. DKEP is an FCA-regulated entity (no. 401821). DKEP is governed by a partnership agreement, effective 1 July 2023 (see paragraphs 21-22 below).

11. The Second Respondent, DK Solutions, is a Cayman-based exempted limited partnership that participates and invests in the insurance business.

12. The Firm operates through multiple fund entities and operating companies globally. The Firm's main operating entity is Davidson Kempner Capital Management LP ("**DKCM**"). DKCM is a Registered Investment Advisor ("**RIA**") with the U.S. Securities and Exchange Commission and all Firm affiliates based in the USA operate on the basis of being registered. DKCM was the ultimate controlling party of DKEP.

13. In addition to DKEP and DK Solutions, the principal fund entities include Davidson Kempner Partners ("**DKP**"), a New York limited partnership; Davidson Kempner Institutional Partners, L.P. ("**DKIP**"), a Delaware limited partnership; and Davidson Kempner International, Ltd. ("**DKIL**"), a British Virgin Islands business company.

3

DKCM acts as investment manager to these entities, as well as DKEP and DK Solutions, and is responsible for the voting and investment decisions.

14. The Third Respondent, Mr Yoseloff, is a managing member partner, the Managing Partner and Chief Investment Officer of the Firm. Mr Yoseloff was appointed in 2020 when the former Managing Partner and Chief Investment Officer of the Firm, Mr Tom Kempner, retired. Mr Yoseloff is referred to in partnership agreements as the "**Executive Managing Member**". As Executive Managing Member, Mr Yoseloff ultimately controls both DKEP and DK Solutions.

15. Mr Yoseloff is also identified on Companies House as a person with significant control over DKEP because he has the right to appoint or remove members, owns 75% or more of the voting rights, and has a 75% or more right to surplus assets.

16. Mr Yoseloff is also a partner of DK Solutions.

17. All of the managing member partners in DKCM, including Mr Yoseloff, at all material times owed and continue to owe fiduciary duties to DKCM and to the other general and limited partners under Delaware law, namely:

    17.1. A duty of loyalty, namely a duty to act in good faith and with a reasonable belief that what is done is in DKCM's best interests and while refraining from self-dealing.

    17.2. A duty of care, namely a duty that he act in good faith with the care that a reasonable person in a similar position and circumstances would exercise and in the best interests of DKCM and its stakeholders.

18. All of the managing member partners in DK Solutions, including Mr Yoseloff, at all material times owed and continue to owe the same duties to DK Solutions and to the other general and limited partners in DK Solutions under Delaware law.

19. In addition, each of the limited partners, of which Mr Yoseloff was one, agreed to devote all of his or her business time and attention and his or her best efforts exclusively to the business and interests of the Firm (including DKCM), under Clause 4.2 of the Eleventh

4

Amended and Restated Limited Partnership Agreement of DKCM, dated 1 July 2023, (the "**Eleventh DKCM Partnership Agreement**") and, pending disclosure, it is assumed in the earlier version(s) of the agreement in force since 2020. Similar provisions were contained in the following provisions (and, pending disclosure, it is assumed in earlier versions of the provisions in force since 2020):

19.1. Clause 4.1 of the Fifth Amended and Restated Limited Liability Company Operating Agreement of Davidson Kempner Long-Term Distressed Opportunities GP LLC, of which Mr Yoseloff was a limited partner;

19.2. Clause 4.1 of the Second Amended and Restated Limited Liability Company Agreement of Davidson Kempner Holdings LLC, of which Mr Yoseloff was a managing partner;

19.3. Clause 4.2 of the Third Amended and Restated Limited Partnership Agreement of M.H. Davidson & Co. 520 LP, of which Mr Yoseloff was a limited partner;

19.4. Clause 4.2 of the Second Amended and Restated Exempted Limited Partnership Agreement of DK Solutions (the "**DK Solutions Partnership Agreement**"), of which Mr Yoseloff was a limited partner; and

19.5. Clause 4.1 of the Second Amended and Restated Limited Liability Company Operating Agreement of Davidson Kempner Drawdown GP Topco LLC, of which Mr Yoseloff was a managing partner.

20. Furthermore, as Executive Managing Member, Mr Yoseloff was on the management committee (the "**Management Committee**") of the Firm, together with the Claimant at all material times. As a result, Mr Yoseloff – together with the other members of the Management Committee – was responsible for acting for or on behalf of other DK entities that comprised the Firm in circumstances which gave rise to a relationship of trust and confidence and/or in circumstances which involved the assumption of responsibility by Mr Yoseloff in respect of the conduct and/or the affairs of DKEP. As a result, Mr Yoseloff at all material times owed and continues to owe fiduciary duties under English law to DKEP:

5

20.1.  A duty to act in good faith in the best interests of DKEP;

20.2.  A duty to exercise reasonable care, skill and diligence;

20.3.  A duty to avoid a conflict with DKEP and not to compete with DKEP.

## THE PARTNERSHIP AGREEMENTS

21.  DKEP was governed by a 'partnership agreement' which was amended and restated on a number of occasions while the Claimant was an LLP partner. The most recent version is the Tenth Amended and Restated Limited Liability Partnership Agreement dated 22 February 2023 (the "**Tenth DKEP Partnership Agreement**"), which is supplemented by the Tenth Amended and Restated Agreement Supplementing the Tenth Amended and Restated Limited Liability Partnership Agreement of Davidson Kempner European Partners, LLP (the "**Tenth DKEP Supplemental Partnership Agreement**") effective as of 1 July 2023. The LLP Partners are listed in Schedule A of that agreement as the Claimant, Mr Jogeesvaran Krishanthan and Mr Zachary Gozali.

22.  The terms of the Tenth DKEP Supplemental Partnership Agreement provide, in material part, as follows:

22.1.  For so long as an LLP partner is a partner in DKEP, the LLP Partner shall be entitled to a profit distribution (the calculation of which is set out in the agreement) (Clause 4A). The LLP partner shall be required to contribute (i) all or a portion of his or her profit distribution and (ii) all or a portion of his or her allocable share of the profits of DK Solutions, as determined by DKCM, through its Executive Managing Member (i.e. Mr Yoseloff), to Davidson Kempner International (BVI), Ltd ("**DKIL**").

22.2.  An LLP partner may elect to become a retired partner, provided the partner has been a party to the Tenth DKEP Partnership Agreement or any prior version for five years or more (a "**Retired Partner**"), by providing a written notice of the partner's intent to retire and to elect to receive certain benefits, referred to as "**Retirement Benefits**" (a "**Notice of Intent to Retire**") (Clause 8A(ii)).

6

22.3.  The retirement term shall continue for four years from the effective date of the LLP partner's retirement (the "**Retirement Term**"). During that period the Retired Partner shall continue to receive a profit distribution calculated in accordance with Clause 11F(i).

22.4.  During the Retirement Term, the Retired Partner will be provided, at no expense to him, with office space, and secretarial, health and other ancillary benefits (Clause 11J).

22.5.  During his Retirement Term, an LLP partner shall have the right to redeem: an amount of the aggregate of the partner's (i) DKIL shares, (ii) capital account in DKEP, and (iii) capital account in DK Solutions, as well as the DKIL shares of any related person to whom the partner has transferred a portion of his or her DKIL shares ("**Aggregate DK Interests**") that, when aggregated with any other amount of the Aggregate DK Interest redeemed by such LLP partner does not exceed 50% of such partner's aggregate net asset value of the Aggregate DK Interests determined as of the close of business of the day prior to the effective date of the Retirement Term ("**DKEP Partner's Retirement Capital**") (Clause 8A(v)).

22.6.  In the event that a partner elects to redeem (i) an amount of Aggregate DK Interests, or (ii) DKIL Shares, that exceeds 50% of the DKEP Partner's Retirement Capital at any time during the Retirement Term, the partner shall be deemed to have provided a notice of Early Termination (Clause 8A(v) and (vii)). The partner will retain a limited interest in the DKEP and will be entitled to receive his or her share of the net profits for the remaining term of any Close End Fund listed in Schedule D (Clause 11.L).

22.7.  The Tenth DKEP Supplemental Partnership Agreement is governed and construed in accordance with New York law, without regard to its conflict of law rules (Clause 21.C).

23.  The terms of the DK Solutions Partnership Agreement dated 28 June 2023, and effective as of 1 July 2023, provide, in material part, as follows:

7

23.1.   During his Retirement Term, a partner shall have the right to withdraw an amount that when aggregated with any other amounts withdrawn does not exceed 50% of the aggregate amount of capital attributable to the partner's Capital Account, determined as of the close of business on the day prior to the effective date of the Retirement Term (the "**DK Solutions Partner's Retirement Capital**"). In the event the partner elects to withdraw an amount that when aggregated with other amounts withdrawn exceeds 50% of the DK Solutions Partner's Retirement Capital, such partner shall be deemed to have provided a notice of early termination (Clause 11.1(iv)).

23.2.   A partner may elect to become a Retired Partner, provided that such partner has been a partner of the Firm for five or more years (Clause 12.1), by providing a written notice of the partner's intent to retire and to elect to receive Retirement Benefits (Clause 12.2). The DK Solutions Retirement Benefits set out in Clauses 12.6 and 12.12 are materially identical to the Retirement Benefits offered by DKEP: i.e. a profit distribution and office space, and secretarial, health and other ancillary benefits at no expense to the Retired Partner.

23.3.   The DK Solutions Partnership Agreement is governed and construed in accordance with Cayman Islands law (Clause 15.11).

**THE CLAIMANT'S DISCLOSURES**

24.   Between 2020 and 2024, as particularised below, the Claimant made a number of protected disclosures to:

24.1.   Partners in DKEP and DK Solutions (with whom he had a worker relationship);

24.2.   Mr Yoseloff; and

24.3.   Partners in DKCM which as stated at paragraph 10 above was the ultimate controlling entity and/or related or affiliated entity of DKEP or DK Solutions.

25.   As detailed below, those disclosures related to how the Firm and/or entities within the Firm, including DKEP and DKCM, were being run. The disclosures ought to have been

8

handled in accordance with SYSC 18. Insofar as it is established at the hearing of this claim that the Firm, including DKEP, have failed to comply with SYSC 18 and/or that the disclosures herein were not handled in accordance with SYSC 18, the Claimant is entitled to and will invite the Tribunal to draw an adverse inference about the reason for the detriments to which he was subjected (set forth below).

PD1: 2020 Amendments to Partnership Governance Documents

26. In 2020 Mr Yoseloff proposed changes to the partnership governance documents. The proposed changes concerned the checks and balances that already existed to offset the Executive Managing Member's (i.e. Mr Yoseloff's) power to determine on a biannual basis each managing member partner's percentage share in the Firm's profit by reference to the Executive Managing Member's assessment of each partner's contribution to the Firm (known as a "**Schedule A Decision**"). The changes included extending the non-compete terms and increasing the length of time that shareholders were restricted from selling their shares after they gave notice to withdraw from the partnership. Previously, the ability of a partner to leave without being significantly restricted from being employed shortly afterwards served as a counter-balance to the power of the Executive Managing Member to make Schedule A Decisions, in the event that a Schedule A Decision seemed unfair to them.

27. The Claimant disclosed information by raising his concerns about these changes with Mr Yoseloff orally and in writing by an email on 23 August 2023 marked "High" importance (the "**23 August 2023 Email**"), specifically that these changes represented a substantial shift in the checks and balances that were put in place to offset the Executive Managing Member's power in respect of Schedule A Decisions.

28. These statements were a protected disclosure ("**PD1**").

29. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

29.1.  Mr Yoseloff's duties of loyalty and care under Delaware law;

9

29.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

30. In other words, the changes to the checks and balances on the Executive Managing Member's power could not be considered, in good faith, to be in the best interests of any of the entities that made up the Firm and/or were in Mr Yoseloff's own self-interest as the Executive Managing Member. Furthermore, a reasonable person in a similar position and circumstances would exercise greater care when amending partnership governance documents.

31. The Claimant reasonably believed that PD1 was made in the public interest because:

31.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

31.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondents to be operating in a way where there are appropriate controls and governance in relation to the management of very substantial investor funds.

32. The Claimant's belief was reasonable in all the circumstances.

PD2: 2023 Amendments to Partnership Governance Documents

33. In 2023, Mr Yoseloff proposed further changes to the partnership governance documents. The proposed changes included (but were not limited to) the following:

33.1. For a managing member (including the Executive Managing Member), who has been a managing member for over 5 years, to be removed, the consent of 75% of the Schedule A percentage interest of all managing members and the consent of the Management Committee (on which the Executive Managing Member sat) would be required. The current position in 2023 was that only the consent of 75% (per capita) of all managing members was required.

10

33.2. The Executive Managing Member would be able to make changes that are not adverse to the managing members with the consent of 75% in Schedule A interest of all managing members, instead of the consent of 100% of the managing members.

33.3. The General Partner entity, through whom the Executive Managing Member conducted his duties in respect of DKCM and DK Solutions, would only be able to be appointed with a 75% Schedule A interest voting threshold rather than a 75% per capita voting threshold.

33.4. The Executive Managing Member would be given express rights to (i) enter into an agreement for a negotiated separation with a partner (with the approval of the Management Committee), (ii) prosecute/ settle claims against the Firm (with the approval of the Management Committee), (iii) reorganise/ restructure the entity in a way that does not materially adversely affect the partners (with the approval of the Management Committee), (iv) purchase insurance for the Firm, (v) establish and maintain reserves or escrow accounts as the Executive Managing Member considers appropriate), and (vi) establish Firm committees.

34. As stated above, Mr Yoseloff as the Executive Managing Member controlled the Schedule A interests held by the managing member partners. It would therefore have been possible for Mr Yoseloff to reward loyalty and penalise those who challenged him.

35. The Claimant disclosed information by raising his concerns with:

35.1. Mr Yoseloff, in writing, in the 23 August 2023 Email. That email set out the Claimant's *"key concerns as a UK partner and a set [of] proposals to address them"*. The Claimant stated that:

35.1.1. The overall corporate governance of the firm – how major decisions impacting the general partnership were taken in practice and what the checks and balances were – directly impacted the assessment of the risks under the partnership agreements;

11

35.1.2. The changes to the voting bases from a per capita voting threshold to an ownership percentage threshold, combined with the fact the managing partners were accruing the capital of the largest capital owners as they retired, meant that the informal control that already existed in the Firm was soon to become formalised;

35.1.3. The fact that the partners were having to agree to another set of revised terms after the 2020 revisions and the manner in which the revisions were presented to the partners made clear how the partnership now worked;

35.1.4. The partnership governance documents generally included many provisions which were broadly defined, lacked clarity or specificity, and so were left open to the interpretation of the Executive Managing Member or Management Committee, and therefore granted powers that were open to abuse, particularly where there was no requirement for transparency to establish and disclose the facts to support the invocation of any condition and without any requirement for the remedies to be reasonable and proportionate; and

35.1.5. The updated partnership governance documents would not provide adequate safeguards to departing partners *"due to a combination of the degree of management discretion, the absence of any clear standards to be met before the exercise of that discretion can be justified, a lack of required transparency and disclosure and the risk that information can be deemed sensitive and so restricted from the partner. Without tightening up these conditions this creates too much room for discretion and interpretation."*

35.2. Mr Yoseloff, by telephone, in 2023. The Claimant raised his concerns that the changes suggested that Mr Yoseloff's intention was to turn the Firm from an institution into his own family office, and to insulate and protect his personal position and control about the changes, and said that if Mr Yoseloff made those changes, he ought to account for himself to the partners rather than remove the topic from the partners' agenda as he had done.

12

35.3. Numerous partners in one-on-one meetings. In those meetings the Claimant said that this was a complete change in terms of how the partnership had worked previously, as now the partners were not involved or properly informed about business decisions.

36. These statements were a protected disclosure or disclosures ("**PD2**").

37. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

37.1. Mr Yoseloff's duties of loyalty and care under Delaware law;

37.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

38. In other words, the proposed changes to the partnership governance documents could not be considered, in good faith, to be in the best interests of any of the entities in the Firm including DKCM and DKEP and/or a reasonable person in a similar position and circumstances would exercise greater care and/or the changes were in Mr Yoseloff's own self-interest as the Executive Managing Member. In particular:

38.1. The proposed change at paragraph 33.1 above, when combined with Mr Yoseloff's power to make Schedule A Decisions and therefore determine which partners, taken in combination, held 75% of the Firm, would have had the potential of enabling Mr Yoseloff to decrease the likelihood that he would be removed;

38.2. The proposed change at paragraph 33.2 above would – for the same reason – enable Mr Yoseloff to increase the likelihood that he would be able to make changes that he wanted provided they were not adverse to the managing members; and

38.3. The proposed change at paragraph 33.3 above would enable Mr Yoseloff to control the likelihood that he, via the General Partner entity (i.e. the entity through which the Executive Managing Member conducted his duties in respect of the limited partnerships), would be able to be removed from DKCM or DK Solutions; and

13

38.4. The amendments increased Mr Yoseloff's power, without proper supervision or scrutiny.

39. The Claimant reasonably believed that PD2 was made in the public interest because:

39.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

39.2. it is in the public interests of the people whose funds are being managed by the Firm for the Respondents to be operating in a way where there are appropriate controls and governance in relation to the management of very substantial investor funds; and

39.3. it is in the public interest for partners to be able to hold accountable senior management of a firm, especially one in which members of the public are investing, and therefore scrutinise and debate proposed changes to governance documents that would have the effect of limiting accountability in future.

40. The Claimant's belief was reasonable in all the circumstances.

PD3 and PD4: The Firm's Strategy

41. In 2022 Mr Yoseloff decided to start an insurance business, following a proposal by Mr Gabriel Schwartz, the Co-Deputy Managing Partner of DKCM and subsequently a partner in DK Solutions after it was established to run the insurance business. As Co-Deputy Managing Partner, Mr Schwartz owed the same fiduciary duties to DKCM as a matter of Delaware law as Mr Yoseloff as set out at paragraph 17 above. Mr Schwartz was also a member of the Management Committee and therefore owed the same fiduciary duties to DKEP as a matter of English law as Mr Yoseloff set out at paragraph 20 above.

42. The Claimant disclosed information by raising his concerns that this was the wrong strategy and that Mr Yoseloff was diverting resources into areas where the Firm lacked the history, reputation, client relationships, and scale to compete with the big players on many occasions with:

14

42.1. Mr Yoseloff, including at lunch in 2023 at Cecconis, London; and

42.2. The managing member partners in meetings at partner offsites, including in January 2024 in Miami.

43. These statements were protected disclosures ("**PD3**").

44. In addition, the Claimant disclosed information by raising his concerns that the insurance business proposal made no sense for the business, specifically because:

44.1. It involved running a 'stack them high, sell them low' business using an extremely expensive hedge fund platform;

44.2. Hedge fund resources were being used for a low margin product. For example, the structured products team were required to select the investments when they could have been spending time working on hedge funds;

44.3. The Firm were clearly avoiding allocating costs to the insurance business to distort the fact that it was deeply unprofitable; and

44.4. The Firm risked unsettling the investors who paid fees that should have been allocated to the management of the funds that they invested in, but which were effectively diverted to the insurance business.

45. These statements were also protected disclosures ("**PD4**").

46. These concerns were raised with the managing member partners at the 2022, 2023 and 2024 offsites, as well as Mr Yoseloff and Mr Schwartz separately.

47. The Claimant reasonably believed that the information disclosed in PD3 and PD4 tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

47.1. Mr Yoseloff's and Mr Schwartz' duties of loyalty and care under Delaware law;

15

47.2. Mr Yoseloff's duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

47.3. The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business.

48. In other words, it could not be considered, in good faith, to be in the best interests of any of the Firm's entities including DKEP and DKCM for resources to be diverted to establish an insurance business, particularly when that risked unsettling or even losing investors and provided very little benefit to the Firm or any of its entities. A reasonable person in a similar position and circumstances would exercise greater care.

49. The Claimant reasonably believed that PD3 and PD4 were made in the public interest because:

49.1. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondent to be operating in a way which is *prima facie* likely to lead to the greatest returns for investors rather than divert hedge fund resources to low margin products, in respect of which the Firm has no real experience, client relationships or capability to succeed, when they could be put to better use; and

49.2. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties.

50. The Claimant's belief was reasonable in all the circumstances.

PD5: Risk Management

51. The hedge fund's existing risk management strategy was prejudiced and jeopardised because there was no holistic strategy to risk across the Firm. The Claimant persistently raised his concerns as to the need to improve risk management of the hedge fund,

16

specifically to stop constructing hedges on the credit books which correlated too much with the high yield indices at investment committee meetings which took place every fortnight. To the best of the Claimant's recollection, pending disclosure, the people in attendance at those meetings included:

51.1.   Mr Yoseloff;

51.2.   Mr Conor Bastable, the Deputy Chief Investment Officer of the Firm who also oversaw the risk management team and who was also a partner in DK Solutions; and

51.3.   Mr Jeff Hurwitz, the Chief Risk Officer.

52.   As managing member partners, Mr Bastable and Mr Hurwitz owed the same fiduciary duties under Delaware law as Mr Yoseloff, set out at paragraph 17 above.

53.   The Claimant also disclosed information by raising his concerns with partners at off-site meetings.

54.   These statements were protected disclosures ("PD5").

55.   The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

55.1.   Mr Yoseloff's, Mr Bastable's and Mr Hurwitz's duties of loyalty and care under Delaware law;

55.2.   The duties of the management committee members, including Mr Yoseloff, owed to DKEP under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

55.3.   The regulatory duties of the hedge funds, by failing to have adequate risk management systems, including the duty of DKEP as an FCA-regulated entity to comply with Principles 2 and 3 of the FCA's Principles for Business, and the duty of DKCM under the Investment Advisors Act for Regulated Investment Advisers

17

to implement record keeping functions and maintain adequate management by designated persons.

56. In other words, prejudicing and jeopardising the hedge fund's existing risk management strategy could not be considered, in good faith, to be in the best interests of DKCM or DKEP, and a reasonable person in a similar position and circumstances would exercise greater care.

57. The Claimant reasonably believed that PD5 was made in the public interest because:

57.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties; and

57.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) to have an effective risk management policy, to reduce the likelihood of losses.

58. The Claimant's belief was reasonable in all the circumstances.

PD6: Distressed Opportunities Fund

59. The Firm managed approximately USD 4-5bn in the distressed opportunities fund ("**DOF**"). While Mr Bastable and Mr Morgan Blackwell were nominally responsible for DOF, in reality no one properly constructed the DOF portfolio nor was anyone accountable for its performance. Instead an 'odds and ends' approach was adopted whereby all the credit portfolio managers decided what to add to the portfolio. Normally credit portfolio managers chose to add the balance of positions which they had taken in their own funds but which were limited, for example, by how big that position could be or because of liquidity issues. As a result, what was added to the DOF was what the credit portfolio managers thought was best for their own funds, rather than for the DOF.

60. The Claimant disclosed information by raising his concerns about this approach, and the lack of appropriate investment oversight and management, at the 2024 partner off-site.

18

61. This statement was a protected disclosure ("**PD6**").

62. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

    62.1.  Mr Yoseloff's duty of care under Delaware law;

    62.2.  The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

    62.3.  The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in investors' best interests.

63. In other words, how the DOF was managed could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKCM and DKEP and a reasonable person in a similar position and circumstances would exercise greater care. Nor was the credit portfolio managers' use of the DOF in the best interests of the investors.

64. The Claimant reasonably believed that PD6 was made in the public interest because:

    64.1.  it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

    64.2.  it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Respondents to be operated with reasonable care and skill rather than for a fund to be used as a bin for leftovers to be thrown into, which will likely lead to the fund performing poorly and the Firm having to decide whether to leave itself or the investors being left with illiquid positions, as in fact happened.

65. The Claimant's belief was reasonable in all the circumstances.

PD7: Misallocation of Costs

19

66. A further issue with how the Firm operated was that there were no proper internal management accounts for allocating costs to the relevant fund. The Claimant disclosed information by raising this concern on numerous occasions on the basis that it is impossible to run a business properly if one cannot clearly establish profitability and returns on capital of various businesses, and that consequently it was also impossible to make accurate Schedule A Decisions, including at:

66.1.    Annual compensation meetings;

66.2.    Annual partner offsites, including the January 2024 offsite in Miami; and

66.3.    Monthly partner meetings.

67. This statement was a protected disclosure ("**PD7**").

68. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

68.1.    Mr Yoseloff's duty of care under Delaware law;

68.2.    The duties of the management committee members, including Mr Yoseloff, owed to DKEP under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

68.3.    The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business, and the regulatory duty on DKCM as an RIA to maintain records necessary to form the basis for or demonstrate the calculation of performance for managed accounts.

69. In other words, the failure to keep proper internal management accounts for allocating costs could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and a reasonable person in a similar position and circumstances would exercise greater care in respect of the management of the Firm.

20

70. The Claimant reasonably believed that PD7 was made in the public interest because:

70.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

70.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for the Firm to allocate the right costs to the investments and to keep accurate accounting records so that the Firm can assess which businesses are profitable, what the return on capital is, and which businesses incur the most costs, and use that information to make decisions about where to divert resources in a way that creates the greatest returns for investors.

71. The Claimant's belief was reasonable in all the circumstances.

PD8: Compliance

72. Furthermore, there were issues with how the compliance team of the Firm worked and its lack of separation from the legal team.

73. The Claimant disclosed information by raising the following concerns, to the best of his recollection (pending disclosure herein), with (i) general counsel in 2023 and 2024, (ii) the head of compliance, Mr James Ganges, (iii) Mr Yoseloff, (iv) Mr Chris Krishanthan, a partner in DK Solutions, and (v) the investment committee:

73.1. That the compliance team effectively left compliance issues to line managers to resolve between themselves.

73.2. That decisions in respect of managing conflicts were being made not in accordance with Firm policy or in the Firm's best interests; and

73.3. That the reason internal conflicts processes were not effective was that it was clear to portfolio managers that Mr Yoseloff did not care about those processes.

74. These statements were protected disclosures ("**PD8**").

21

75. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

75.1. Mr Yoseloff's duty of care as an officer under Delaware law;

75.2. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence;

75.3. The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in their investors' best interests:

75.4. The regulatory duties of the hedge funds, by failing to have robust conflicts procedures, including the duty of DKEP as an FCA-regulated entity to comply with Principles 2 and 8 of the FCA's Principles for Business, and the duties of DKCM as an RIA (and all other U.S. affiliates) to adopt and implement compliance procedures and policies under the Compliance Rule (Rule 206(4)-(7)).

76. In other words, how the compliance team functioned and the lack of robust conflicts procedures could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to compliance and conflicts issues in the Firm. Furthermore, the hedge fund managers' approach to making decisions about conflicts could not be considered in good faith to be in the best interest of investors, and/or a reasonable person in their position would exercise greater care when making such decisions.

77. The Claimant reasonably believed that PD8 was made in the public interest because:

77.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

22

77.2.   it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for a hedge fund to have effective and robust conflicts and compliance procedures.

78. The Claimant's belief was reasonable in all the circumstances.

PD9: Not Managing Business in Best Interests of Investors

79. As a result of these issues with the Firm, the Claimant became concerned that the Firm was losing direction and therefore potentially not managing investments in the best interests of its investors. On a personal level, the Claimant had concerns about his capital being at risk. The Claimant disclosed information by raising these concerns with Mr Yoseloff over lunch in 2023 at Cecconis in London, and more specifically that:

79.1.   The Firm was not focusing on the performance of the hedge funds even though the fees from those funds supported the entire Firm;

79.2.   The Firm was one major redemption away from not being able to continue to operate, at least without significant cost-cutting;

79.3.   The US credit team had no one taking responsibility or in charge;

79.4.   A managing member partner at DKCM, Ms Suzanne Gibbons, had lost over USD 500m and there was no accountability for this from the partners in charge, including Mr Schwartz, and yet Mr Schwartz was nevertheless rewarded by Mr Yoseloff by being promoted; and

79.5.   The firm was not acting like a meritocracy.

80. These statements were protected disclosures ("**PD9**").

81. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

81.1.   Mr Yoseloff's duty of care under Delaware law;

23

81.2. The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence;

81.3. The fiduciary duties of hedge fund managers to act with loyalty and care, specifically to act in their investors' best interests: and

81.4. The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business, and the duty on DKCM as an RIA under the Investment Advisers Act for Registered Investment Advisers to maintain adequate management by designated persons.

82. In other words, how the Firm was being managed (as set out at paragraph 79) could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the Firm.

83. The Claimant reasonably believed that PD9 was made in the public interest because:

83.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

83.2. it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for a hedge fund to be operated in a way that maximised returns for investors and that ensured the hedge fund's long-term stability.

84. The Claimant's belief was reasonable in all the circumstances.

PD10: The Firm as an Autocracy

24

85. The Claimant disclosed information by voicing his broader concern that Mr Yoseloff wanted to have an autocracy where he controlled everything without any accountability, and only a 'democracy' in the sense of shared risk and liability and shared costs (but without the participants having any vote) on various occasions, including:

   85.1. To Mr Yoseloff in the 23 August 2023 Email. Among other things, the Claimant stated that: "*the MC* [Management Committee] *operates largely to support and executive the decisions of the managing partner*" and that few decisions even required a vote of the managing member partners: that there was a "*concentration of control with the managing partner*"; that "*[t]he partnership no longer operates as a true partnership and certainly not how it used to operate*";

   85.2. At a meeting with an external consultant, the managing member partners, and Mr Yoseloff;

   85.3. With Mr Patrick Dennis, a Co-Deputy Managing Partner and a partner in DK Solutions, over drinks at Oswald's in London in 2024 before the London office drinks party.

86. These statements were protected disclosures ("**PD10**").

87. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

   87.1. Mr Yoseloff's duties of loyalty and care under Delaware law; and

   87.2. The duties of the management committee members, including Mr Yoseloff and Mr Dennis, under English law to act in good faith in the best interests of DKEP and DKCM and to exercise reasonable care, skill and diligence.

88. In other words, Mr Yoseloff's attempt to make the Firm into an autocracy could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the Firm.

25

89. The Claimant reasonably believed that PD10 was made in the public interest because:

    89.1.   it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

    89.2.   it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents) for those in charge of hedge funds to be held accountable by the partners and for decisions affecting hedge funds (and therefore the investors' investments) to be made by a group rather than one individual.

90. The Claimant's belief was reasonable in all the circumstances.

    PD11: Mr Yoseloff Devoting Resource to his Family Office and Creating a Conflicts Risk

91. An example of Mr Yoseloff running the firm however he liked was that he devoted one day per week to his family office, instead of the Firm's funds. The Claimant disclosed information by voicing his concern that Mr Yoseloff should not have done so given the size of the Firm's funds and the value of his time spent on that, as well as the conflicts risk, and his view that Mr Yoseloff did not want to take full responsibility for the Firm, many times since 2020 to many partners, including Mr Tom Kempner, Mr Chris Krishanthan several times in the Claimant's office, and Mr Dennis over drinks at Oswald's in London in 2024 before the London office drinks party.

92. The Claimant reasonably believed that the information disclosed tended to show that a Mr Yoseloff was not devoting sufficient time and attention to the management of the Firm and the funds, and that a breach of the following obligations had occurred, was occurring, or was likely to occur:

    92.1.   Mr Yoseloff's duties of loyalty and care under Delaware law;

    92.2.   Mr Yoseloff's obligations set out in the clauses listed at paragraph 19 above to devote all of his business time and attention and his best efforts exclusively to the business and interests of the Firm; and

26

92.3.   The duties of the management committee members, including Mr Yoseloff, under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence.

93.   In other words, Mr Yoseloff spending a day a week working in his family office could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the management of the Firm.

94.   These statements were protected disclosures ("**PD11**").

95.   The Claimant reasonably believed that PD11 was made in the public interest because:

95.1.   it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

95.2.   it is in the public interest of the people whose funds are being managed by the Firm (and therefore the Respondents) for those in charge of hedge funds to be held accountable by the partners and for decisions affecting hedge funds (and therefore the investors' investments) to be made by a group rather than one individual.

96.   The Claimant's belief was reasonable in all the circumstances.

PD12: Hiring of a COO

97.   After the COO of the Firm left in mid-2024, there was a search for a new COO. That search was led by Mr Schwartz.

98.   The Claimant had concerns about the process of recruiting a new COO and raised those concerns. In particular, the Claimant disclosed information in 2024 by:

98.1.   Writing to the entire partnership in an email dated 27 September 2024, addressed to Mr Schwartz, saying that as this was *"a very important and consequential decision for the partners and the firm"* there should be a partners meeting to discuss

27

and review the decision and a vote on the proposed COO in line with the approach taken to discussing internal candidates for the same role;

98.2. Expressing the view many times to the managing member partners and to Mr Yoseloff that Mr Schwartz should not have been appointed the acting COO in the period until a new COO was appointed, as Mr Schwartz had no COO experience and only dedicated a third of his time to the role;

98.3. Having many discussions with Mr Yoseloff about how Mr Schwartz should not be leading the search as he lacked relevant experience and by leading the search, an inadequate COO could be appointed; and

98.4. Discussing with Mr Yoseloff how the new COO once appointed should report to Mr Yoseloff not Mr Schwartz, as was consistent with how other hedge funds operated, especially in circumstances where Mr Schwartz had no experience of COO functions.

99. The Claimant reasonably believed that the information disclosed tended to show that a breach of the following obligations had occurred, was occurring or was likely to occur:

99.1. Mr Yoseloff's and Mr Schwartz' duties of care under Delaware law;

99.2. Mr Yoseloff's and Mr Schwartz' duties under English law to act in good faith in the best interests of DKEP and to exercise reasonable care, skill and diligence; and

99.3. The regulatory duties of the hedge funds, by not conducting business with integrity or with due skill, care and diligence, including the duty of DKEP as an FCA-regulated entity to comply with Principles 1 and 2 of the FCA's Principles for Business.

100. In other words, the approach to finding a new COO and appointing a COO in the interim could not be considered, in good faith, to be in the best interests of any of the entities within the Firm including DKEP and DKCM, and/or a reasonable person in a similar position and circumstances would exercise greater care in relation to the management of the Firm.

28

101. These statements were protected disclosures ("**PD12**").

102. The Claimant reasonably believed that PD12 was made in the public interest because:

102.1. it is in the public interest generally for officers of a corporate entity and for those on management committees of a group of corporate entities to comply with their fiduciary duties;

102.2. it is in the public interests of the people whose funds are being managed by the Firm (and therefore the Respondents), including the partners, that an adequately qualified chief operating officer be appointed to manage the Firm's operations and ensure efficiency and growth of the Firm.

103. The Claimant's belief was reasonable in all the circumstances.

**NOTICE OF RETIREMENT**

104. On 30 October 2024, the Claimant sent a notice to Mr Yoseloff stating that he was exercising his right under Clause 8A(ii) of the Tenth DKEP Supplemental Partnership Agreement to become a 'Retired Partner'. The Notice of Intent to Retire stated the following:

104.1. The Claimant would retire on 31 January 2025.

104.2. Consistent with the overarching theme of his repeated protected disclosures set out above, the reason for the Claimant's retirement was the fact that despite repeated attempts to express to Mr Yoseloff the concerns he had regarding the management and operation of the firm over the past five years, they had largely fallen on deaf ears or had been rejected out of hand and remained unresolved; that "*this neglect has already resulted in a series of events that have hurt the partnership and the firm's prospects*"; and that he saw "*little evidence that there is any real desire to make the tough decisions to change the situation*".

**DETRIMENTS**

29

105. The Claimant has suffered the following detriments as a result of his protected disclosures above.

106. To the extent there is any issue as to whether these acts are out of time, the Claimant will assert that they are part of a series of similar acts or failures within the meaning of s. 48(3)-(4) ERA 1996.

### 1. Failure to treat the Claimant as a Retired Partner

107. As set out at paragraphs 22 and 23 above, under the Tenth DKEP Supplemental Partnership Agreement and the DK Solutions Partnership Agreement, as a Retired Partner, the Claimant would be entitled to (i) Retirement Benefits, and (ii) an office, and secretarial, health other ancillary benefits, at no expense to him. However, the Claimant was never provided with these.

108. In addition, the Firm began charging the Claimant significant fees on his DKIL shares in 2025. There was no basis under the Tenth DKEP Supplemental Partnership Agreement for the Firm to charge such fees in respect of a Retired Partner's DKIL shares.

109. Prior to the Claimant's disclosures, there was no indication that if and when the Claimant issued a Notice of Intent to Retire, he would not be treated as a Retired Partner, including (i) receiving Retirement Benefits in accordance with Clause 11.F; (ii) receiving an office, secretarial and other ancillary benefits at no cost to him in accordance with Clause 11.J; and (iii) not being charged fees on his capital.

110. Faced with the prospect of paying significant management fees, on 29 April 2025 the Claimant was forced to submit a notice to redeem all of his shares, in consequence of which the Claimant had to give up any claim to be entitled to participate in the Firm's retirement programme. In addition, DKEP and/or the Firm retained 10% (approximately USD 80m) of the Claimant's redemption proceeds, pending completion of the audit.

111. As set out at paragraph 22.6, a Retired Partner who redeems all of his shares is treated as having given a notice of Early Termination and therefore exiting the retirement program.

30

112. Pending disclosure herein, it is reasonably to be inferred that the decisions of the Firm to force the Claimant to redeem his shares were ultimately made by Mr Yoseloff as Mr Yoseloff felt threatened by the Claimant's challenges to his decision-making and position in the Firm. That inference is based on Mr Yoseloff's strategy to seek and consolidate ever greater unilateral control over the Firm's business and affairs and from the following threats made by Mr Yoseloff to the Claimant:

112.1.  In October 2023 over lunch, when Mr Yoseloff threatened to remove the Claimant from the Firm or force the Claimant to withdraw;

112.2.  In December 2023, when Mr Yoseloff said that he could have removed the Claimant from the Firm; and

112.3.  In January 2024, when Mr Yoseloff and the Claimant met the day before the 2024 partners offsite meeting and Mr Yoseloff said that he had considered over Christmas whether to tell the Claimant that he had to leave the Firm, and that Mr Yoseloff had decided not to do so, but that the Claimant would have to step into line going forwards.

113. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the act of the Respondents, was done on the ground of the Claimant's protected disclosures set out above. The Claimant has, as a result, suffered the following detriments:

113.1.  First, he was not treated as a Retired Partner by the Firm despite giving a Notice of Intent to Retire;

113.2.  Second, the Claimant has been forced to redeem his capital earlier than he otherwise would have;

113.3.  Third, DKEP and/or the Firm retained 10% of the redemption proceeds and thereby deprived the Claimant of the ability to reinvest that 10%, which they would not have done had the Claimant not redeemed in full and instead redeemed less than 90% of the net asset value of his shares; and

31

113.4. Fourth, by redeeming his capital, the Claimant has given up any claim he had to Retirement Benefits. These would have included an earnout of approximately USD 170m.

## 2. Wrongful deductions from carry distributions

114. Furthermore, on 3 April 2025, Mr Anthony Gonzalez, a managing director at DKCM, provided by email a summary of the carry distribution for Q1, with a deduction for "compensation points" of USD 14,805.

115. In that same email, Mr Gonzalez also stated in respect of the Claimant's 2024 profit allocation that:

> "*Additionally in 2024, given the investment in the DK Solutions platform, there are additional capital needs here relating to:*
>
> *i. 2024 capital calls upfront paid by the Firm on behalf of your proportionate ownership ($2.9m), and*
>
> *ii. your proportionate reallocation of the retiring Partners' investment in DK Solutions ($3.2m)*
>
> *Given there has been no formal withdrawal of your interest in DK Solutions, the above reallocation is reflected*
>
> *As the total amounts due (aggregate of the above = $6.1m) are greater than your 2024 residual profit allocation ($5.8m), there remains a ~$300k amount due, to be netted against future earnings cash flow*"

116. In other words, two further wrongful deductions were made, despite the Claimant no longer being a limited partner of DKEP nor having agreed that his profits should be reinvested rather than returned to him. In particular:

116.1. A deduction for an additional subscription to Davidson Kempner Solutions Co-Invest Fund K LP which Mr Yoseloff rounded up to USD 2.9m (which was in fact USD 2,890,619); and

116.2. A deduction for an additional subscription in relation to redemptions by two other retired partners, Mr Tom Kempner (the former Managing Member who retired in 2020, as set out at paragraph 14 above) and Mr Avi Friedman, which Mr Yoseloff rounded up to $3.2m (which was in fact USD 3,249,989).

32

117. Mr Gonzalez added that the total carry distribution for Q1 would be credited against the residual $300k amount remaining due.

118. The Q2 carry distribution summary that the Firm considered was due to the Claimant was provided on 19 July 2025 by Mr Gonzalez by email, being the sum of £477,670. There is no reason why payment should not have been made on the same date – i.e. 19 July 2025.

119. That summary included various deductions, in particular:

   119.1. As in the Q1 summary, a deduction for an additional subscription to DK Solutions totalling USD 2,890,619;

   119.2. As in the Q1 summary, a deduction for an additional subscription in relation to redemptions by Mr Kempner and Mr Friedman, totalling USD 3,249,989;

   119.3. A deduction of USD 438,698 from the residual 2024 profit allocation set out in the schedule dated 29 January 2025 which was sent to the Claimant by email on 7 February and 3 April 2025; and

   119.4. A deduction for "compensation points", which reduced the distribution by USD 703,965 in the Q2 carry distribution sheet. The deduction seems to amount to 45% of the distribution from a fund known as LDO GP IV significantly higher than the standard 15% awarded as employee compensation and contrary to the compensation policy.

120. The Claimant queried these deductions with Mr Gonzalez by email dated 20 July 2025. Mr Gonzalez, in response in an email dated 30 July 2025:

   120.1. Purported to explain the deduction of USD 438,698 in respect of the Claimant's residual 2024 profit allocation as due in large part to expenses related to the internally developed IT software and applications; and

   120.2. Confirmed that compensation points deductions "*will have occurred in any periods in which there has been realized carry in any of the closed-end funds (LDO II –*

33

*DKOF – VI, and DKIF 1) and will continue into the future, as more realized carry is received*".

121. No clear or coherent explanation was provided, however, as to why the deduction for compensation points were significantly greater than normally. Nor has any supporting documentation been provided to support the calculations.

122. The Claimant raised further queries as to the deductions in emails dated 3 August 2025 and 13 November 2025. Among other things, the Claimant flagged that an additional large expense for internal IT software costs after the end of the financial year is "*highly unusual and hard to reconcile, given how the budgeting process works*". To date, no detailed clarification has been received as to how this was possible and what the circumstances were. That is despite regulation 6 of the Limited Liability Partnerships (Accounts and Audits) (Application of Companies Act 2006) Regulations 2008 which grants the Claimant the right to inspect DKEP's accounting records.

123. In addition, DKEP withheld the distribution, without explanation. It was only after the Claimant made enquiries, that the wire transfer was made on 15 November 2025, almost four months after it ought to have been and without any explanation for the delay.

124. DKEP then failed to inform the Claimant of his carry distribution for Q3 or make payment of the same which was due in October 2025, until he made enquiries.

125. On 25 November 2025, payment was eventually made. Given that deductions were made for other carry distributions, the Respondents are put to proof as to the basis for any deductions made to the Q3 distribution. Despite repeated requests, no explanation was provided by DKEP as to why the carry distribution was held back until the Claimant chased for an update.

126. On 9 January 2026, payment of the Q4 distribution was received by the Claimant. The summary of the carry distribution, sent by email by the Firm's legal representatives on 7 January 2026, stated that it included a deduction for "compensation points", totalling USD 4,921. However, no explanation was provided as to what the compensation point percentage was or how it had been determined.

34

127. Prior to the Claimant's disclosures, there was no indication that:

    127.1.  The Claimant would not be paid his Q2 and Q3 carry distribution on time;

    127.2.  The Claimant would not be provided with any notification or information regarding his Q3 carry payment until he made enquiries himself;

    127.3.  Any deductions would be made to the carry payments payable to the Claimant, including the deductions set out at paragraphs 114, 116, 119, 125 and 126 above;

    127.4.  The Firm would refuse to address adequately the Claimant's concerns and queries regarding the adjustments and deductions from his carry distributions in his email dated 3 August 2025 and/or provide the Claimant with sufficient information to enable him to reconcile what he was told he would receive with what he actually received in Q2; and

    127.5.  The Firm would refuse altogether to address (or even acknowledge) certain concerns and queries regarding the adjustments and deductions from his carry distributions in the Claimant's email of 13 November 2025.

128. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the relevant Respondents to act as pleaded above, given his position in the Firm and for the reasons set out at paragraph 112 above.

129. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the acts of the Respondents, were done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered detriments.

130. Further or alternatively, for the reasons set out at paragraphs 114-125 above, DKEP and/or DK Solutions have made an unlawful deduction from the Claimant's wages contrary to s. 13 ERA 1996, in that it has failed to pay the full carry distributions for Q1, Q2 and Q3 2025 to which the Claimant is entitled.

<u>3. Wrongful revocation by the Firm of the agency relationship with the Claimant</u>

35

131. DKCM set up DKEP on 20 May 2004. At the outset, DKCM insisted that all employees in DKEP would be partners – i.e. a disguised employment scheme – so that the Firm would not have to pay national insurance contributions ("**NIC**"). The original partners in DKEP had no choice but to accept the requirement. In addition, in 2010, the Firm introduced a further scheme whereby partners in DKEP were required to defer their profit allocations initially for 2 years and then for 3 years, so that the profits could be reinvested, net of corporation tax, as a capital contribution to DKEP with the benefit that profits were taxed at a significantly lower rate of 28% (the rate of UK corporation tax) instead of 51% (the top rate of personal tax at the time).

132. The DKEP partners had to rely entirely on the Firm when it came to dealing with tax matters and filing tax returns to HMRC.

133. HMRC ultimately disputed the schemes and continues to investigate the partners' tax income for the 2015/16 tax year (the "**HMRC Investigation**"). All DKEP partners were required to sign a release stating that the Firm would manage all communications and the resolution of the dispute. As a result, the Firm was designated to act as the Claimant's agent vis-à-vis HMRC. That meant that the Firm would settle the dispute for everyone affected. It was therefore agreed that the Claimant and the Firm would respond to HMRC together.

134. On 30 January 2026, the Firm revoked the agency relationship it had with the Claimant concerning the HMRC Investigation.

135. On 6 February 2026, the Firm passed on information that it had received from HMRC regarding the HMRC Investigation, including that the Claimant's residual tax liability is £9,152,866 (plus interest which continues to accrue). The Firm also informed the Claimant that it had informed HMRC that it is no longer acting for him in this matter. This petty act is simply intended to make life as difficult as possible for the Claimant.

136. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the relevant Respondents to act as pleaded above, given his position in the Firm and for the reasons set out at paragraph 112 above.

36

137. Mr Yoseloff's direction of the relevant Respondents in this way, alternatively the acts of the Respondents, was done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered a detriment as he will have to incur the costs of his own legal representatives in respect of the HMRC Investigation. The Claimant reserves the right to plead further detriment as the HMRC Investigation progresses.

4. Wrongful accusation that the Claimant has breached his confidentiality and non-solicitation obligations

138. On 30 January 2026, the Firm via their legal representatives made serious and unsubstantiated allegations against the Claimant of breach of Clause 2(A) (regarding confidentiality) and Clause 2(D) (regarding non-solicitation) of the Tenth Amended LPA.

139. The allegations were untrue. The Claimant provided a detailed denial via his legal representatives in a letter dated 6 February 2026. The Firm has not pursued these allegations further.

140. In the letter dated 30 January 2026, the Firm threatened to require the Claimant to forfeit certain financial entitlements without identifying what those entitlements would be, and in circumstances where there is no provision in the Tenth Amended LPA for any financial entitlement to be withheld from the Claimant.

141. Pending disclosure herein, it is reasonably to be inferred that Mr Yoseloff directed the Firm's legal representatives to act in this way, on behalf of the Firm including the relevant Respondents, given his position in the Firm and for the reasons set out at paragraph 112 above.

142. Mr Yoseloff's direction, alternatively the act of the Respondents, was done on the ground of the Claimant's protected disclosures as set out above. The Claimant has, as a result, suffered detriments.

143. The Claimant reserves the right to plead further detriment should these baseless allegations be pursued.

**REMEDY**

37

144. The Claimant claims against each of the Respondents:

144.1. A declaration that the Claimant has been subjected to unlawful protected disclosure detriment contrary to s. 47B(1) ERA 1996;

144.2. Compensation for losses consequent to the detriments suffered, in addition to compensation for injury to feelings;

144.3. Such amount as the Tribunal considers appropriate in all the circumstances to compensate the Claimant for the financial loss sustained by him as a result of the failure to pay the Claimant sums which he was owed, including (without limitation) interest to reflect his loss of investment returns as a result of the delay in the receipt of the sums owed to him;

144.4. Aggravated damages;

144.5. Costs.

145. The Claimant claims against each of the First and Second Respondents:

145.1. A declaration that the Claimant is and/or was entitled to office space and secretarial, health and other ancillary benefits at no expense to him during the Retirement Term; and

145.2. A declaration that the Claimant is entitled to office space and secretarial and other ancillary benefits at no expense, and health benefits for which he may be charged a reasonable amount, after the Retirement Term has expired; and

145.3. A penalty under section 12A of the Employment Tribunals Act 1996.

146. Further or alternatively, by reason for the First Respondent's and/or Second Respondent's unlawful deductions from his wages, the Claimant is entitled to and seeks:

146.1. A declaration that the First and Second Respondents have made an unlawful deduction from the Claimant's wages contrary to s. 13 ERA 1996;

146.2. A order for payment of the amount of the deduction, namely for a sum to be particularised in due course following relevant disclosure from the First and/or Second Respondent;

146.3. Such amount as the Tribunal considers appropriate in all the circumstances to compensate the Claimant for the financial loss sustained by him as a result of the unlawful deduction, including (without limitation) interest and/or a sum to reflect his loss of investment returns as a result of the First and Second Respondents' unlawful deductions and the delay in the receipt of the sums owed to him; and

146.4. Costs.

147. In relation to the public interest disclosure claim, the Claimant also seeks a referral by the Employment Tribunal of DKEP to the FCA pursuant to the guidance at SYSC 18.3.9 (*"the FCA would regard as a serious matter any evidence that a firm had acted to the detriment of a whistleblower. Such evidence could call into question the fitness and propriety of the firm or relevant members of its staff, and could therefore, if relevant, affect the firm's continuing satisfaction of threshold condition 5 (Suitability) or, for an approved person or a certification employee, their status as such"*).

CHARLES CIUMEI KC
KATHERINE RATCLIFFE
ESSEX COURT CHAMBERS
30 March 2026

39