**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

In Re Application Of

MICHAEL HERZOG

Case No. 1:26-mc-00159

Petitioner, For An Order Pursuant To 28 U.S.C. § 1782 To Obtain Discovery For Use In A Foreign Proceeding

**DECLARATION OF MICHAEL HERZOG**
**IN SUPPORT OF THE APPLICATION FOR AN ORDER TO**
**OBTAIN DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, MICHAEL HERZOG, declare as follows:

1.     I submit this Declaration in further support of the Application of Michael Herzog for an Order Pursuant to 28 U.S.C. § 1782 To Obtain Discovery For Use In A Foreign Proceeding (the "Application") and in response to Davidson Kempner Capital Management LP's ("DKCM") Memorandum of Law in Opposition to my Application (the "Opposition").

2.     In its Opposition, DKCM contends that I filed the Application and commenced the underlying proceeding in the London Central Employment Tribunal of England and Wales (the "English Proceeding") in "bad faith" against DKCM or the Davidson Kempner firm (the "Firm" or "Davidson Kempner") as a whole.

3.     That is not true. I did not – and I still do not – want to be in litigation with Davidson Kempner, and I certainly did not file this Application in bad faith. I have not commented to the media regarding this matter, nor has anyone commented to the media on my behalf. By contrast, as I explain below, the Firm has made false and disparaging statements about me to the media that were attributed to the Firm and published by the media.

4.      I never wanted to leave Davidson Kempner, and certainly never intended to leave under these circumstances.  I devoted over 24 years of my life to the Firm, and I am immensely proud of my time there.  At the time of my departure, my career was thriving and I was as dedicated as ever to the Firm and the success of its funds.  As I stated in my complaint in the English Proceeding (the "Complaint") and this Application, I felt compelled to speak up about what I viewed to be serious misconduct by the Firm's current Executive Managing Member, Mr. Anthony Yoseloff.  Mr. Yoseloff did then and has continued to retaliate against me to this day.

5.      I set out below why I left the Firm (and the events thereafter) to give the Court the factual background regarding the legal proceeding I brought in England and the evidentiary support that I seek through this Application, as opposed to the unfounded accusations of bad faith lodged at me by DKCM's lawyers.  This information is drawn from my personal knowledge to the best of my recollection and does not divulge communications with my lawyers, which I understand are protected by privilege.

**My Career at Davidson Kempner**

6.      I joined Davidson Kempner in 2001 and ultimately left in January 2025.  I was responsible for incorporating and building out Davidson Kempner's European office, Davidson Kempner European Partners ("DKEP") in 2004, and I became a partner of DKEP that same year. I became a general partner in 2008.  I also became a partner of Davidson Kempner Solutions Cayman LP ("DK Solutions") at the time that fund was incorporated in 2022.

7.      For several decades, I helped build the Firm's global equity franchise and grow the Firm into a large multi-strategy hedge fund.  I was primarily responsible for building and globalizing the Firm's merger arbitrage business and its long/short equity business.  I held the positions of Global Head of Merger Arbitrage and Global Head of Long/Short Equity for nearly

2

ten years.  I was also one of the largest capital holders in the partnership.

8. During my 24 years at the Firm, most of them as a partner, I was passionate about and dedicated to the Firm's success.  I was all in with my time and energy, and as one of the largest owners of the Firm, the vast majority of my personal net worth was invested in DKCM.  That remained true right up to the last minute of my last day at Davidson Kempner, much to the amusement of my colleagues, as I was late for my own going-away party.

9. I served on many Firm committees, including the Firm's Management Committee and Investment Committee.  I was also appointed to the Code Committee of the UK Panel on Takeovers and Mergers in 2016, and I served for the maximum three terms, until 2024.

10. I left the businesses I ran in very good shape.  I held some of the most profitable positions in the main fund, and I single-handedly (without any of the Firm's marketing resources) raised $500 million which enabled the subsequent full launch of a multi-billion-dollar co-mingled fund for the UK long short equity business in 2026.

11. Joining Davidson Kempner was by far the best professional decision I ever made.  I was fortunate to be given a shot by the Firm's founders, and my mentors, Marvin Davidson and Tom Kempner.  Under their leadership, the Firm was run with transparency and as a true meritocracy and partnership, with a strong culture of accountability.  Interests were aligned between general and limited partners because the Firm's general partners – including myself – were all heavily invested in the Firm's funds.  I genuinely treasured my time there, and it remains a source of great pride to me.

**Mr. Yoseloff's Rise to Power and His Mismanagement of the Firm**

12. After co-founding partner Tom Kempner retired, Mr. Yoseloff became the sole Executive Managing Member of the Firm.  With Mr. Yoseloff's rise to power, I witnessed the

culture of meritocracy and accountability built by Mr. Davidson and Mr. Kempner begin to erode.

13.     Mr. Yoseloff turned a genuine partnership and an institutional firm with a strong culture that had developed over many years, characterized by integrity and accountability which was well-loved (evidenced by low staff turnover), into a firm more akin to a medieval court, where the promotion of tenure and loyalty was valued over merit and independent thinking.

14.     For example, as I stated in the Complaint, after ascending to Executive Managing Member, I observed Mr. Yoseloff treating the Firm like a personal family office.  What I mean is that he was using his position to operate the Firm without its traditional transparency or adequate risk management strategies, he misused Firm resources, and he ██████████████████ ████████████, all the while taking steps to consolidate power and silence opposition.  This was completely counter to the culture that had been fostered by Mr. Davidson and Mr. Kempner, who operated as first among equals.

15.     I do not intend to repeat the full substance of the Complaint in this declaration, but in order to address the false allegations made in DKCM's Opposition about my motives in bringing the English Proceeding and this Application, I feel it is important to provide context, which I do with the summary and examples below.

**(i) Consolidation of Power**

16.     In 2020 and 2023, Mr. Yoseloff proposed amendments to the partnership governance documents that had the impact of further consolidating power in Mr. Yoseloff's hands. For example, in 2020, the amendments extended the non-compete terms and increased the length of time that shareholders were restricted from selling their shares after giving notice of their intention to withdraw from the Firm.  This was Mr. Yoseloff's first major act as Executive Managing Member.

4

17.    In 2023, the amendments made it more difficult to remove managing members, including Mr. Yoseloff (as Executive Managing Member) from the partnership by requiring the consent of 75% of all Schedule A interests and the consent of the Management Committee, among other things.  Mr. Yoseloff's 2023 amendments also changed the voting structure from one-partner-one-vote to a percentage-interest-based structure.  While he called this a "general housekeeping matter," it heavily favored Mr. Yoseloff, who I understand owned a significant percentage of Schedule A interests.  As a result, it was easier for Mr. Yoseloff to get rid of partners who challenged his authority or who he otherwise did not agree with and, in turn, increase his control over the Firm.

18.    Mr. Yoseloff introduced these changes shortly before the partner compensation decisions, which in my view was designed to force the partners to accept the changes.  His objective was clear in my view: to change the power balance between himself and the general partners in his favor.  When I objected to the changes in 2020, I was told by the Firm's General Counsel Shuly Leviant that I could review the changes with my lawyers but that "Tony won't change anything."  In 2023, I was told that Mr. Yoseloff told the Firm's General Counsel to remove from the agenda of the Partners meeting that he was proposing new partnership amendments again.

19.    When I objected both to the substantive provisions and to the way Mr. Yoseloff stymied discussion among the partnership, on multiple occasions Mr. Yoseloff threatened to expel me from the partnership if I did not "approve" the amendments.  I could only force Mr. Yoseloff to drop the most draconian changes by not providing my signature until a time when Mr. Yoseloff would otherwise not be able to appoint the new partners for the cycle that we had voted on.

**(ii) Mismanagement of Investor Funds and Resources**

20.    In 2022, Mr. Yoseloff made the Firm start an insurance business – now called DK

Solutions – notwithstanding the serious concerns I raised, and others voiced as well, that this would require diversion of critical Firm resources into areas where the Firm lacked the history, reputation, client relationships, and scale to compete with major industry players.  Despite these concerns and the fact that it would require a large investment of our capital, Mr. Yoseloff proceeded with setting up DK Solutions *without* seeking support or *bona fide* consent from the Firm partners.  Significant hedge fund resources were diverted from more successful products to running DK Solutions.  For example, by my estimation, approximately 20% of the structured products team's time and resources was diverted to DK Solutions, but the Firm refused to allocate the associated costs and expenses to DK Solutions, apparently to artificially inflate the profitability of DK Solutions.

21.     This was a marked change from the way that Mr. Davidson and Mr. Kempner ran the Firm and, in my view, was becoming seriously detrimental.

22.     Also, under Mr. Yoseloff, the Firm failed to adequately supervise our Distressed Opportunities Fund (which had been valued at approximately $4-5 billion), leading to poor performance of the fund.  I raised the need for executive oversight with Mr. Yoseloff on several occasions, but it fell on deaf ears.  Mr. Yoseloff refused to give anyone a mandate to captain the Distressed Opportunities Fund and, ultimately, ████████████████████████████████ ████████████████████

23.     Mr. Yoseloff also failed to hold partners accountable for poor investment decisions. For example, a partner once lost over $500 million and did not face any accountability.  This greatly concerned me, and others, who felt that the fund was no longer being run as a meritocracy.

**(iii) Abuse of Power and Corporate Governance Failures**

24.     Mr. Yoseloff's desire to run the Firm with absolute control and no accountability became increasingly clear and concerning to me over time.  ██████████████████████████

25. ████████████████████████████████████████████████████

26.     Under Mr. Yoseloff's management, the Firm also lacked proper internal processes for correctly allocating expenses across funds, which made it difficult to identify profits and losses with respect to various funds and Firm businesses.  As I mentioned above, for example, the Firm under-allocated expenses to DK Solutions to obscure the fact that it was highly unprofitable, despite that it was taking significant Firm resources that should have been devoted to other, more successful enterprises.

27.     I repeatedly raised my concerns regarding the Firm's risk management under Mr. Yoseloff, which lacked a holistic strategy to track risks across the Firm.  This included the need to stop constructing hedges on the credit books, which correlated too much with the high yield indices, among other issues.

28.     ████████████████████████████████████████████████████

███████████████████████████████████████████████████ As for their replacement, Mr. Yoseloff was more concerned about appointing a COO who would be loyal to him than he was about appointing someone with the appropriate skills and experience. ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████, even though this person lacked experience for the role.

### (iv) Conflicts of Interest

29.    As I mentioned above, I and most other Davidson Kempner partners kept the vast majority of our capital invested in the Firm's funds.  This helped ensure that we were focused on the Firm's success and that our incentives were totally aligned with the Firm's investors.  But not Mr. Yoseloff.  Unlike most other partners, Mr. Yoseloff maintained his own family office, to which he devoted significant time and resources.

30.    Over time, I became increasingly concerned that the risk of overlap between Davidson Kempner and Mr. Yoseloff's family office would inevitably lead to questions and concerns about conflicts of interest, which were reinforced when I learned ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ This is another example of Mr. Yoseloff overriding the checks and balances that existed in the Firm in order to do as he pleased.  Because I cared strongly about the success and future of the Firm, I was highly disturbed by Mr. Yoseloff's conduct.

31.    I also became concerned that the Firm was losing direction and was not managing

8

investments in the best interests of its investors.  And I became concerned that my own capital that was invested in the Firm and its funds was at risk.

**My Departure From Davidson Kempner**

32.     As I stated in my Complaint, I repeatedly shared my concerns with other Firm partners, including partners of DKCM who reside in New York.  But no changes were made.  After witnessing Mr. Yoseloff's mismanagement of the Firm go unchecked for about four years, I felt I could no longer remain at the Firm.

33.     In 2024, I engaged the law firm Herbert Smith Freehills LLP ("Herbert Smith") to provide strategic advice to me personally regarding how best to work with Mr. Yoseloff to negotiate a departure from the Firm.

34.     On May 27, 2024, I emailed my attorney at Herbert Smith and reattached a note of advice prepared by Herbert Smith that contained legal advice regarding my contractual rights and obligations relating to my potential departure from the Firm.  My standard practice is to copy my personal Gmail account on my outgoing emails so that I can keep better track of them.  But when I sent the May 27 email, I inadvertently copied my Davidson Kempner email address instead of my Gmail address.  I understand the document attached to the May 27 email to be the "strategy memo" referenced in (but not provided with) DKCM's Opposition.

35.     It was not my intention to waive privilege under these circumstances—namely by inadvertently copying my Davidson Kempner email address on a consultation with personal lawyers—nor was it my intention that DKCM's counsel would attempt to use that email.

36.     But, in any event, in a footnote to the Opposition, DKCM completely mischaracterizes the May 27 email and attachment.  As I stated above, DKCM's claim that I "used DK's own email servers to communicate with counsel" is false; I sent that email from my personal

Gmail account and copied my Davidson Kempner address by accident.  Likewise, DKCM's statement that I "mapped out how to maximize leverage in connection with my departure and compensation demand" is similarly false and misleading.  In reality, the email laid out many of the same concerns with Mr. Yoseloff's mismanagement that are reflected in my Complaint and explained to counsel my goals respecting my future departure from the Firm.

37.    Several months later, on October 30, 2024, I sent Mr. Yoseloff an email explaining the reasons for my departure and attaching a "Notice of Intent to Retire."  That email stated:

> Whilst I still immensely enjoy the work at DK and care greatly about the firm, I have reached the clear conclusion that under the current circumstances I have no choice but to depart. *Despite repeated attempts to express to you the concerns I have regarding the management and operation of the firm over the past five years, they have largely fallen on deaf ears or have been rejected out of hand and remain unresolved.  Unfortunately, this neglect has already resulted in a series of events that have hurt the partnership and the firm's prospects. Finally, I see little evidence that there is any real desire to make the tough decisions to change the situation.*

This email and attachment are attached hereto as **Exhibit A** (emphasis added).

38.    Because of the 24 years I had dedicated to the Firm, I hoped that my departure would be amicable.  After sending the Notice of Intent to Retire, I engaged in discussions with the Firm regarding the terms of my separation.  What I initially wanted from those negotiations was to depart with "Retired Partner" status, or to otherwise resign with my capital returned.

39.    After weeks of discussions with Mr. Yoseloff, I thought that we had reached an agreement in principle on the key financial terms of my departure in January 2025.  But I now see that Mr. Yoseloff had no intention of reaching an amicable separation agreement with me.  Instead, it is clear to me that Mr. Yoseloff was, and remains, intent on punishing me for what he perceived as insubordination relating to my attempts to protect the Firm over the last few years.

40.    Following my departure, at the direction of Mr. Yoseloff, the Firm took increasingly punitive steps with respect to my capital that remained with the Firm and my other contractual

rights.  As of December 31, 2024, Mr. Yoseloff caused the Firm to allocate $4.5 million of my capital to DK Solutions, apparently in an effort to gain leverage over me by holding my capital hostage.  In addition, as I stated in my Complaint, the Firm disputed my right to "Retired Partner" status under the DKEP Partnership Agreement.  It also began charging me large fees on my capital that remained in the Firm.

41.    To avoid these punitive fees and because I did not trust Mr. Yoseloff to act honestly with respect to my capital, I was forced into a position in which I felt compelled to redeem my shares in April 2025 and exit the Firm's retirement program and ceased my pursuit of Retirement Benefits.  As a result, I lost access to a retirement earnout amount of approximately $170 million.

42.    I nonetheless continued to try and work with the Firm to resolve this matter out of court.  █████████████████████████████████████████████████

█████████████████████████████████

43.    On December 12, 2025, my counsel at Mishcon de Reya LLP ("Mishcon") submitted a Data Subject Access Request ("DSAR") to DKEP seeking production of my personal data held by DKEP, including relating to "[c]oncerns relating to Tony Yoseloff" and "[c]ommunications relating to the management and operation of the Firm," among other items. The December 12, 2025 DSAR is attached hereto as **Exhibit B.**

44.    On December 17, 2025, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") responded on behalf of DKEP to the DSAR and stated that the requests relating to "concerns relating to Tony Yoseloff" and "communications relating to the management and operation of the Firm" were "manifestly unfounded and excessive."  The December 17, 2025 letter is attached hereto as **Exhibit C.**

45.    After a few more rounds of letters between counsel, on April 7, 2026, DKEP made

11

its production in response to the DSAR.  In its corresponding cover letter, DKEP stated that it used only the following search terms to identify the documents it produced:

- Michael Herzog
- M Herzog
- Global Head of Merger Arbitrage
- Global Head of Long/Short Equity; and
- My "personal identifiers," such as my "employee ID, payroll number, email addresses, postal address, work phone numbers, and national insurance number."

46.     The April 7, 2026 letter from Paul Weiss is attached hereto as **Exhibit D.**

47.     Of the 6,902 documents produced by DKEP in response to the DSAR, only 67 were produced without redactions.  Ex. D.

48.     Meanwhile, throughout 2025 and into 2026, the Firm continued to make unexplained deductions from and reallocations of my carry distributions and it also failed to make timely payment of those sums.  The Firm did not pay out my carry distributions for Q2 or Q3 2025 until November 15, 2025, and inexplicably (and in my view inconceivably) claimed that the delay was the result of a wire transfer issue.

49.     The issues continued into 2026, when the Firm continued to make unexplained deductions from, and late payments of, my quarterly carry distributions.  On January 30, 2026, the Firm issued a "withdrawal statement" concerning my interests in the Firm.  The statement was completely unclear, and no information to support the statement or reconcile the figures that were provided, despite the fact that my 2025 profits in DKEP had supposedly been wiped out due to unparticularized "amounts already paid" and a deficit created on my account.  On March 24, 2026, I received a "Capital Account Summary" document for the period ending January 31, 2026. Among other things, this showed that my interest in DK Solutions had been transferred as a "distribution in kind" to a new entity, DKS Intermediate LP.  Again, no explanation or information was provided, and I have little knowledge of what DKS Intermediate LP is, or the basis on which

12

my interests were transferred to that entity.

50.     Most recently, on June 30, 2026, Paul Weiss sent a letter to Mishcon stating that DKEP had purportedly removed me for "Cause" effective June 30, 2026.  The corresponding Notice of Removal from DKEP, which is also dated June 30, 2026, did not provide any explanation or basis for the so-called "Cause," but it purported to crystalize a negative balance of around $1.3 million on my DKEP capital account and DKEP stated that my right to receive profits in respect of certain closed-end funds would cease as of June 30, 2026.  Due to the nature of the investments typically held in these closed-end funds, the value of a position is marked below its actual and potential value, and the big uplift does not occur until the investments are monetized towards the end of the funds' terms (at which point the investments can be marked up by multiples).  By purporting to terminate prematurely my right to share in these future profits, the Firm and Mr. Yoseloff are taking from me (improperly) the known value (at the time of transfer) of my DKEP capital account plus the upside potential of the investments in the funds when they are monetized. This is another example of Mr. Yoseloff retaliating against me, and of him transferring current and future value from me, in this case to him and the Firm's other partners, on a wholly flawed basis and with very little transparency or accountability.

51.     The June 30, 2026 letter to Mishcon and June 30, 2026 Notice of Removal are attached hereto as **Exhibit E** and **Exhibit F** respectively.

52.     On July 14, 2026, Mishcon responded to Paul Weiss and requested "a full explanation" of the basis for DKEP's removal of me for "Cause."  This email chain is attached hereto as **Exhibit G**.

53.     To date, DKCM has refused to provide any explanation for its determination of supposed "Cause," but I can surmise that Mr. Yoseloff's purported basis is further retaliation for

filing the English Proceeding and bringing this Application to seek further evidence for that case. *See* Ex. G.

54.     In addition to its declaration of "Cause" and deductions and late payment of funds to which I am owed as discussed above, the Firm has taken other, non-monetary steps to retaliate against me for blowing the whistle on Mr. Yoseloff's misconduct.  For example, in January 2026, the Firm stated that it would no longer continue to act on my behalf in connection with an ongoing tax investigation by HMRC into the Firm's tax structure for the 2015-2016 tax year.

**The English Proceeding And Supporting Evidence In New York**

55.     Because Mr. Yoseloff and the Firm continued to take retaliatory actions against me for having repeatedly raised my concerns about Mr. Yoseloff's misconduct and mismanagement, I initiated the English Proceeding to uphold my rights under English law.  I then initiated this Application to obtain further evidence in support of the English Proceeding.

56.     Specifically, on April 2, 2026, my counsel filed the Complaint in the English Proceeding.  The Complaint summarizes the many instances in which I aimed to bring attention to Mr. Yoseloff's misconduct and the retaliation I suffered at the hands of Mr. Yoseloff, DKEP, and DK Solutions as a result.

57.     Many of the Davidson Kempner partners who I informed of my concerns about Mr. Yoseloff's conduct work in New York and are employees of DKCM, and much of the conduct I witnessed occurred in New York.  I therefore believe that significant evidence about the matters in the Complaint is in New York and otherwise in the possession of DKCM, including emails and other documents and the knowledge of my former colleagues.  For example, the Complaint alleges that the following individuals, who I understand are current or former employees of DKCM and work in New York, witnessed either Mr. Yoseloff's misconduct or my concerns about the same:

14

- Gabriel Schwartz, Co-Deputy Managing Partner (Compl. ¶¶ 46, 79.4, 98-99);
- Conor Bastable, Deputy Chief Investment Officer (Compl. ¶¶ 51.2, 59);
- Jake Hurwitz, Chief Risk Officer (Compl. ¶ 51.3);
- James Gange, former Managing Director and Chief Compliance Officer (Compl. ¶ 73);
- Suzanne Gibbons, Managing Member Partner (Compl. ¶ 79.4);
- Patrick Dennis, Co-Deputy Managing Partner (Compl. ¶¶ 85.3, 91);
- Anthony Gonzalez, Managing Director and Chief Financial Officer (Compl. ¶¶ 114-15, 117);
- Eric Sacks, former Chief Financial Officer and Co-Chief Operating Officer; and
- Numerous other partners, including at offsites in the United States (Compl. ¶¶ 46, 66.2, 112.3).

58.     My counsel filed this Application on April 20, 2026, requesting this Court's assistance to obtain such evidence.  The Application was heavily redacted so that DKCM could have the opportunity to apply to this Court and request that those redactions remain permanent, if it wanted to.  I took no position with the Court on that subject.

59.



60.

61.     I understand that, as of July 22, 2026, the Court denied DKCM's sealing request such that my Application and all supporting papers are now on the Court's public docket.

**DKCM's False And Disparaging Statements About Me**

62.     I am aware that Bloomberg has previously reported on me, including on my departure from the Firm.

63.     Specifically, on January 16, 2025, Bloomberg published an article by Eyk Henning,

Swetha Gopinath, and Nishant Kumar stating that I "will leave Davidson Kempner at the end of the month, according to an investor letter seen by Bloomberg." Notably, the article did not describe my departure as "retirement." I did not provide any comment to Bloomberg about my departure from the Firm, and I am not aware of how Bloomberg came to see the investor letter. The January 16, 2025 Bloomberg article is attached hereto as **Exhibit H**.

64.     On January 26, 2026, Bloomberg published another article about me authored by Aaron Kirchfeld, this time focusing on my investment strategy relating to the German defense company Rheinmetall AG. The article also mentioned that I was "the global co-head of merger arbitrage and global head of long/short equity at Davidson Kempner until [I] left in January 2025." The January 26, 2026 Bloomberg article is attached hereto as **Exhibit I**.

65.     I understand that on April 20, 2026, the Application was reported on by a publication called OffshoreAlert several hours after it was filed. I was not contacted by OffshoreAlert, nor had I heard of OffshoreAlert, and I was unaware of the article until well after it was published. But, unlike me, Davidson Kempner provided an immediate statement in the article published the day of the Application:

> The claims are without merit. Davidson Kempner has acted entirely properly at all times, and will robustly defend its position. Tony Yoseloff is an individual of the highest integrity and has acted to the highest standards.

The April 20, 2026 OffshoreAlert article is attached hereto as **Exhibit J**.

66.     The day after the Application was filed, I received a request for comment from Bloomberg reporter Donal Griffin. I understand that my lawyer, Daniel Naftalin from Mishcon, received a similar request for comment from Bloomberg reporter Jonathan Browning. Neither I nor my counsel responded to these requests, and Bloomberg ran a story authored by Donal Griffin on April 21, 2026, without any comment from me or my lawyers. The April 21 Bloomberg article contained the same statement from Davidson Kempner that it had previously provided to

16

OffshoreAlert.  This April 21, 2026 Bloomberg article is attached hereto as **Exhibit K**.

67.     On April 22, 2026, Hedgeweek published an article about my Application and the English Proceeding.  Hedgeweek did not reach out to me for comment, and I did not provide any. But Davidson Kempner again provided a statement, which this time contained false and disparaging statements about me:

> Davidson Kempner and Tony Yoseloff, its Managing Partner, unequivocally deny the recent allegations made by Michael Herzog, who left Davidson Kempner of his own volition more than a year ago. This is a classic case of sour grapes in a contractual dispute with a disgruntled former colleague, reflecting his dissatisfaction with historic management decisions. Davidson Kempner and Mr. Yoseloff intend to vigorously defend against these contrived grievances, which appear to be Mr. Herzog's latest attempt in his long-running campaign to inflate the amounts otherwise payable to him on his departure from the firm.

68.     The statement is false and disparaging because my Complaint and Application are far from "a classic case of sour grapes" or the complaints of a "disgruntled former colleague."  As discussed above, when I resigned from the Firm, I recounted that my "repeated attempts" to express my concerns "regarding the management and operation of the firm over the past five years" had "largely fallen on deaf ears" or been "rejected out of hand."  And, as the Firm knows, although I felt I had no choice but to leave given the direction Mr. Yoseloff was taking the Firm, separating amicably was my desire.  If this had been about money, I would have made it about the approximately $170 million otherwise owed to me in Retirement Benefits.  But, in the face of increasing retaliation from Mr. Yoseloff for expressing my serious concerns about him, and in an attempt to avoid further retaliation, I redeemed my shares in April 2025 and exited the Firm's retirement program.  I also continue to have around $80 million in my own personal funds invested in the Firm and have suffered ongoing retaliation at the hands of Davidson Kempner.  Neither the Application nor my Complaint are the "sour grapes" of a "disgruntled" former partner.

69.     The April 22, 2026 Hedgeweek article is attached hereto as **Exhibit L**.

70.     On May 7, 2026, DKCM filed its application to seal certain aspects of the

17

Application and, in doing so, I understand also filed on the public docket versions of the Application papers with *fewer* redactions than I had submitted initially.

71.     About a week later, on May 12, 2026, Mr. Griffin from Bloomberg contacted me by email informing me of Bloomberg's intention to run a follow-up story based on the less-redacted version of the Application filed by DKCM, and he provided a short summary of its content.  I again did not comment.

72.     The next day, on May 13, 2026, Bloomberg ran its follow-up story authored by Donal Griffin and Jonathan Browning.  Davidson Kempner provided the same false and disparaging statement for publication in the May 13 article that had previously been published by Hedgeweek and, it appears, also suggested that Bloomberg characterize my former position with Davidson Kempner as a "trader."  I believe this because the summary Bloomberg provided to me when asking for comment (which I did not give) had characterized me as "one of the largest capital holders in the partnership."  The May 13, 2026 Bloomberg article is attached hereto as **Exhibit M**.

73.     After this Court unsealed my Application (including the Complaint), I and my lawyers received a request for comment from Bloomberg on July 23, 2026 to publish in its reporting.  We did not provide comment to Bloomberg for its article.  Davidson Kempner, however, did comment by repeating its false and disparaging "sour grapes" narrative.

74.     The July 23, 2026 Bloomberg article is attached hereto as **Exhibit N**.

75.     Hedgeweek ran a similar article on July 24, 2026, attached hereto as **Exhibit O**, which I also did not provide comment for, unlike DKCM.

76.     On July 24, 2026, Bloomberg ran an additional article specifically focused on the allegations in my Complaint relating to the HMRC investigation, which is attached hereto as **Exhibit P**.  I did not give a comment to Bloomberg for that article either, but DKCM did.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct.

Executed on July 29, 2026
Saint-Tropez, France

/s/
Michael Herzog

19